# EXHIBIT A

**CASTANO QUIGLEY CHERAMI LLC**
Gregory J. Castano Jr. – Attorney ID No. 040701992
Schuyler Abbott – Attorney ID No. 433022023
7 Giralda Farms – Suite 170
Madison, N.J. 07940
(973) 808-1234
Attorneys for Plaintiff

| | |
|---|---|
| TOWN OF KEARNY,<br>*Plaintiff*,<br><br>v.<br><br>FLYNYON LLC, FLYNYON DIGITAL LLC, HELO HOLDINGS INC., NYONAIR and RTC PROPERTIES INC.,<br>*Defendants*. | SUPERIOR COURT OF NEW JERSEY<br><br>HUDSON COUNTY – CHANCERY DIVISION<br><br>DOCKET NO. HUD-C-<br><br>*Civil Action*<br><br>**VERIFIED COMPLAINT** |

Plaintiff, the Town of Kearny (the "Town"), a municipal corporation of the State of New Jersey with a principal office at 402 Kearny Avenue, Kearny, New Jersey, by way of complaint against the defendants, says:

## THE PARTIES

1. RTC Properties Inc. ("RTC") is a New York corporation authorized to do business in New Jersey. RTC owns property in the Town at 100 Central Avenue, also known as 165 Western Road, Block 288, Lot 10.01 (the "Property").

2. Helo Holdings Inc. ("HHI") is a foreign corporation authorized to do business in New Jersey. HHI is a tenant at the Property and operates the HHI Heliport there.

3. Jeff Hyman is HHI's CEO of operations.

4. FlyNYON LLC ("FlyNYON") is a foreign limited liability company that operates at the Property. FlyNYON maintains an office at 78 John Miller Way, Kearny, New Jersey 07032.

5. Upon information and belief, NYONAir and FlyNYON Digital LLC are subsidiaries of or otherwise related to FlyNYON. NYONair LLC's registered address is 78 John Miller Way, Suite 441, Kearny, about one mile from the Property, and its registered trade names include FlyNYON LLC.

6. FlyNYON, FlyNYON Digital LLC, and NYONAir are referred to collectively as the "FlyNYON Defendants."

## THE PROPERTY AND ZONING ORDINANCE

7. The Property lies in the SKI-S zone.

8. Section 38-4.3 of the Kearny Zoning Ordinance provides that any use not designated as a principal permitted, accessory, or conditional use "is specifically prohibited."

9. Heliports are not a permitted, accessory, or conditional use in the SKI-S zone. HHI may operate a heliport at the Property only under a use variance granted by the Town of Kearny Zoning Board of Adjustment (the "Board").

10. The Federal Aviation Administration ("FAA") identifies the HHI Heliport as "65NJ." FAA facility data records 65NJ as privately owned by HHI and designated for private use. Attached as Exhibit 13 is a true and accurate copy of a September 2026 expert report issued by the Aloft Group LLC.

11. Searches of FAA grant materials and USAspending.gov identified no federal award to HHI or to the facility. (Exhibit 13 at 12)

## THE LAND USE APPROVALS

### *The 2005 Approval*

12. In 2005, HHI filed Application No. 2515 with the Board seeking preliminary and final site plan approval, with variances and design waivers, to construct an office building, hangars, a

maintenance shop, a fueling area, and a landing pad "in conjunction with the operations of a helicopter fixed base of operations." Attached as Exhibit 1 is a true and accurate copy of the Board's June 2, 2005 resolution.

13. At the May 12, 2005 Board hearing, HHI's representative, James Foster, testified under oath that HHI needed a facility that would provide "a staging area for equipment and support." (Exhibit 1)

14. The Board approved Application No. 2515 and, on or about June 2, 2005, adopted a resolution memorializing the approval. (Exhibit 1)

*The 2008 Approval*

15. In 2008 RTC and HHI filed Application No. 2814 with the Board seeking to amend the 2005 approval to construct a new building for office use and a maintenance shop area with two 12,000 gallon above-ground fuel tanks and a new helicopter hangar. Attached as Exhibit 2 is a true and accurate copy of the Board's May 1, 2008 resolution.

16. At the May 1, 2008 hearing, the applicants' engineer testified that "[t]he site would not be used for people just looking for a helicopter ride." (Exhibit 2)

17. The Board approved Application No. 2814 and, on or about June 5, 2008, adopted a resolution memorializing the approval. (Exhibit 2)

*The 2009 Approval*

18. In 2009 RTC and HHI filed Application No. 2912 with the Board seeking to use a new warehouse building as a helicopter maintenance building, place three trailers, and install two above-ground fuel tanks. Attached as Exhibit 3 is a true and accurate copy of the Board's July 22, 2009 resolution.

19. The Board recorded the applicants' "unconditional and uncontroverted testimony" that facility operations and impacts "would be the same as in the operations approved by the use variance in 2005." (Exhibit 3)

20. The Board approved Application No. 2912 and, on or about August 4, 2009, adopted a resolution memorializing the approval. (Exhibit 3)

*The 2012 Approval*

21. In 2012 RTC and HHI filed Application No. 2012.19 with the Board seeking approval to construct an office building and a hangar with maintenance shop areas. Attached as Exhibit 4 is a true and accurate copy of the Board's September 4, 2012 resolution.

22. At the September 4, 2012 hearing, Mr. Hyman testified under oath and "reiterated the site does not permit passengers and is basically for storage, maintenance and fueling." (Exhibit 4)

23. The Board approved Application No. 2012.19 and, on or about October 2, 2012, adopted a resolution memorializing the approval. (Exhibit 4)

24. Each of those approvals was obtained on the representation that the Property would be an industrial support facility, not a passenger operation. (Exhibits 1-4)

*The 2014 Approval*

25. In 2014 RTC and HHI filed Application No. 2014.14 with the Board seeking to construct a 40,464 square foot helicopter maintenance facility with offices and a lounge. Attached as Exhibit 5 is a true and accurate copy of the Board's November 6, 2014 resolution.

26. The Town Engineer issued a review letter dated July 9, 2014, revised October 21, 2014, which the Board incorporated into the record. Attached as Exhibit 6 is a true and accurate copy of the Town Engineer's October 21, 2014 letter.

27. The Town Engineer's letter confirmed that the application sought to expand a non-conforming use and required a General Use Restriction Variance under Section 38-4.3. (Exhibit 6)

28. In Engineering and Planning Comment No. 3, marked "This comment still applies," the letter required the applicant to testify to its hours of operation, number of shifts, and employees per shift. (Exhibit 6)

29. The letter recorded that the applicant's submission contemplated "24 hour / 7 days a week operations with a total of 20 employees." (Exhibit 6)

30. At the November 6, 2014 hearing, Mr. Hyman testified under oath on behalf of the applicants. The Board's resolution records his testimony as follows:

> Jeff Hyman, 165 Western Road, Kearny, New Jersey was sworn-in and testified on behalf of the Applicant. Mr. Hyman is the CEO of operations. He described the current operations at the site. Specifically, he estimated that the hours of operation during the periods March/April to September/October would be 8 am to 7 pm and during the winter months 8 am to 5 pm. At any given time, Mr. Hyman stated there would be sixty (60) employees maximum. His facilities would offer no helicopter tours.

(Exhibit 5)

31. The applicants' engineer testified that there would be "only one or two customers" and that peak staffing of sixty employees would occur "during 8 am and 5 pm." (Exhibit 5)

32. The applicants' planner described the use as "a special unique one that is usually not permitted." (Exhibit 5)

33. The Board voted unanimously to approve Application No. 2014.14. On December 8, 2014, it adopted a resolution approving the application "subject to the following conditions," including that "Applicant's testimony was accepted as satisfying #1, #3, #4, #5, #6 and #7" of the Engineering and Planning Comments. (Exhibit 5)

34. Item #3 is the hours-of-operation comment. Mr. Hyman's testimony was the applicant's formal response to that outstanding condition of review. (Exhibit 6)

**THE FLYNYON DEFENDANTS' HELICOPTER TOUR OPERATIONS**

35. In recorded investigative interviews conducted by the National Transportation Safety Board ("NTSB") in investigation ERA18MA099, Patrick Day, Jr., the chief executive and founder of FlyNYON/NYONair LLC, told investigators that he started FlyNYON in November 2014 and that its first load of paying customers flew that month. (Exhibit 13 at 4)

36. Since at least 2018, FlyNYON has marketed its flights as tours departing from Kearny, by name and by the seat. A June 28, 2018 capture of FlyNYON's booking page lists four products, each "Departs from Kearny, NJ," priced from $99 to $499 per seat. (Exhibit 13 at 4)

37. FlyNYON holds itself out on Google as providing "New York City Helicopter Tours," with a hyperlink to its "NJ Doors-off Helicopter Tour" service, and its Google listing styles the business "FlyNYON Helicopter Tours." Upon information and belief, FlyNYON entered those items into Google, and they are not auto-generated. A true and accurate copy of a screenshot of a Google search for "FlyNYON" is attached as Exhibit 9; Exhibit 13 at 4.

38. FlyNYON's website advertises operating hours of 8:00 a.m. to 11:00 p.m., seven days a week, and claims more than 750,000 passengers. (Exhibit 13 at 4)

39. FlyNYON's website sells tickets for daily flights departing at 7:15 p.m. and 8:15 p.m. A true and accurate copy of a screenshot of FlyNYON's website at https://www.flynyon.com/checkout/6/ is attached as Exhibit 10.

40. HHI's website lists "hours of operation" of 7:00 a.m. through 9:00 p.m. A true and accurate copy of a printout of HHI's website at https://www.hhiheliport.com/facility-info is attached as Exhibit 11.

41. NYONAir holds itself out as providing a "flagship aerial experience" out of Kearny. A true and accurate copy of a screenshot of NYONAir's LinkedIn page is attached as Exhibit 12.

42. Another operator, New York Helicopter, marketed sightseeing tours "Departing from HHI Heliport" until the FAA grounded it after the fatal April 10, 2025 accident of N216MH. (Exhibit 13 at 4)

43. On March 11, 2018, a FlyNYON-branded, doors-off flight operated by Liberty Helicopters crashed in the East River. The FAA Office of the Chief Counsel concluded that the flight "would likely qualify as a commercial air tour, even though it was not conducted as such." The FAA's final determination, reported to the NTSB in April 2019, was that the flight operated as a commercial air tour. (Exhibit 13 at 5)

44. In NTSB Report AAR-19/04, the NTSB concluded that Liberty and NYONair "exploited the exception at 14 CFR 119.1(e)(4)(iii)," and found that customer-experience staff were trained to be alert to anyone using the word "tour." (Exhibit 13 at 5)

45. The FAA Chief Counsel memorandum of April 27, 2018 and the FAA's April 11, 2019 follow-up address only which federal operating rules governed the 2018 accident flight. Neither contains any reference to land use, zoning, local approvals, heliport siting, or municipal authority. (Exhibit 13 at 11)

## THE FLIGHT DATA

46. The Town retained Thomas M. Lintner, FRAeS, of The Aloft Group, LLC. Mr. Lintner is a 30-year FAA veteran who managed the FAA's Air Traffic Investigations Division. He holds an Airline Transport Pilot certificate and an FAA Air Traffic Control Specialist certificate for LaGuardia Tower and the New York TRACON. (Exhibit 13 at 1)

47. Mr. Lintner prepared a report dated September 13, 2026 with James K. Allerdice Jr. of Vianair, a retired FAA air traffic control professional of more than three decades. (Exhibit 13 at 1)

48. The experts analyzed JETNET flight data for 65NJ, derived from ADS-B surveillance, and independently recomputed the entire dataset from the raw records. (Exhibit 13 at 2)

49. Each data record is a single flight operation: one takeoff or one landing. The 59,495 operations consist of 29,438 takeoffs and 30,057 landings, so the number of individual sorties is approximately half the operations count. ADS-B data can undercount activity but cannot invent it. (Exhibit 13 at 3)

50. From October 1, 2024 through August 16, 2026, the experts verified 59,495 flight operations at 65NJ. FlyNYON conducted 39,007 of them, or 65.6%. New York Helicopters conducted 1,648 more, the last on April 10, 2025. (Exhibit 13 at 5)

51. FlyNYON flies Bell 206L-3 and 206L-4 helicopters (ICAO type "B06"). B06 aircraft flew 96.4% of FlyNYON's operations, and FlyNYON accounted for 93.2% of all B06 activity at the facility. (Exhibit 13 at 8)

52. A spot check of July 1–15, 2026 identified 479 closed-loop circuits that departed from and returned to 65NJ without an intermediate stop. B06 helicopters flew 372 of them, about 78%. (Exhibit 13 at 7)

53. The circuits followed two recurring routes, a "long route" and a "short route," running up the East River, west into Central Park, and back to Kearny. (Exhibit 13 at 6-7)

54. The experts explained: "A charter or corporate operation carries a passenger from an origin to a destination; it does not fly the same two circuits over the same landmarks day after day and land where it started. A scheduled tour product does exactly that." (Exhibit 13 at 8)

55. The 39,007 FlyNYON operations include some repositioning, maintenance, and training flights. (Exhibit 13 at 9)

56. Mr. Lintner concluded that commercial helicopter sightseeing tours "constitute the dominant activity at the facility, contrary to the sworn representation memorialized in ZBA Resolution 2014.14." (Exhibit 13 at 14)

57. The experts applied the seasonal windows from Mr. Hyman's testimony: 8:00 a.m. to 7:00 p.m. from March through October, and 8:00 a.m. to 5:00 p.m. from November through February. They converted every timestamp from UTC to Eastern Time across each daylight-saving transition, and treated an operation at exactly the cutoff as outside the represented hours. (Exhibit 13 at 5)

58. Of the 59,495 operations, 14,172, or 23.8%, occurred outside the represented hours. Outside-hours operations occurred in every one of the 23 reporting periods, ranging from 15.0% (October 2024) to 32.1% (February 2026). (Exhibit 13 at 5)

59. FlyNYON conducted 8,896 of the outside-hours operations (62.8%). 22.8% of FlyNYON's own operations occurred outside the represented hours. (Exhibit 13 at 5)

60. The experts' recomputation reproduced the underlying outside-hours determination with 100% record-level agreement. (Exhibit 13 at 10)

61. Mr. Lintner found that "the data conclusively establishes that the facility operates substantially and persistently outside the hours Mr. Hyman represented." (Exhibit 13 at 9)

62. The monthly figures are as follows (Exhibit 13 at 16):

| Period | Season | Total Ops | FlyNYON Ops | Outside Hours | % Outside |
|---|---|---|---|---|---|
| October 2024 | Summer | 4,162 | 3,053 | 625 | 15.0% |
| November 2024 | Winter | 3,268 | 2,359 | 860 | 26.3% |
| December 2024 | Winter | 3,090 | 2,232 | 725 | 23.5% |
| January 2025 | Winter | 1,996 | 1,281 | 504 | 25.3% |
| February 2025 | Winter | 1,721 | 1,074 | 534 | 31.0% |
| March 2025 | Summer | 1,987 | 1,386 | 357 | 18.0% |
| April 2025 | Summer | 2,296 | 1,708 | 529 | 23.0% |
| May 2025 | Summer | 2,228 | 1,555 | 535 | 24.0% |
| June 2025 | Summer | 2,363 | 1,569 | 704 | 29.8% |
| July 2025 | Summer | 2,930 | 1,829 | 799 | 27.3% |
| August 2025 | Summer | 3,557 | 2,403 | 847 | 23.8% |
| September 2025 | Summer | 3,124 | 2,050 | 596 | 19.1% |
| **Notice of Violation ZV-25-00064 issued September 17, 2025** | | | | | |
| October 2025 | Summer | 2,555 | 1,810 | 393 | 15.4% |
| November 2025 | Winter | 2,120 | 1,400 | 601 | 28.3% |
| December 2025 | Winter | 2,183 | 1,474 | 589 | 27.0% |
| January 2026 | Winter | 1,774 | 1,122 | 504 | 28.4% |
| February 2026 | Winter | 1,474 | 876 | 473 | 32.1% |
| March 2026 | Summer | 1,751 | 1,085 | 363 | 20.7% |
| April 2026 | Summer | 2,346 | 1,551 | 517 | 22.0% |
| May 2026 | Summer | 3,214 | 1,936 | 811 | 25.2% |
| June 2026 | Summer | 3,952 | 2,122 | 1,007 | 25.5% |
| July 2026 | Summer | 3,609 | 2,050 | 874 | 24.2% |
| August 1–16, 2026 | Summer | 1,795 | 1,082 | 425 | 23.7% |
| **TOTAL** | | **59,495** | **39,007** | **14,172** | **23.8%** |

## <u>NOTICE OF VIOLATION AND CONTINUED NONCOMPLIANCE</u>

63. The outside-hours rate for July 2025 was 27.3%. (Exhibit 13 at 16)

64. On September 17, 2025, the Town's Zoning Officer issued Zoning Violation ZV-25-00064 to HHI. The notice cited operations "outside the scope of the approved conditions in Zoning Board Resolution 2014.14," quoted both the hours and the no-tours representations, and set a compliance date of September 26, 2025. A true and accurate copy of that violation is attached as Exhibit 7.

65. An extended compliance deadline of October 31, 2025 also passed without compliance.

66. Because defendants failed to remedy the violations, the Town issued municipal court summonses to RTC and HHI on February 5, 2026 for "operating outside of the approved [zoning] conditions." That matter remains pending. A true and accurate copy of the summonses is attached as Exhibit 8.

67. Over the ten complete months after the notice, October 2025 through July 2026, 6,132 of 24,978 operations, or 24.5%, occurred outside the represented hours, compared with 23.8% for the full period. (Exhibit 13 at 5)

68. Through August 16, 2026, the post-notice outside-hours rate remains 24.5% (6,557 of 26,773 operations). February 2026, at 32.1%, is the highest month in the dataset, and every month of 2026 falls between 20.7% and 32.1%. (Exhibit 13 at 5)

69. Operations increased after the notice. May through July 2026 produced 10,775 operations, compared with 7,521 in the same months of 2025, a 43% increase. June 2026, with 3,952 operations, was the busiest month in the dataset. (Exhibit 13 at 5)

70. FlyNYON conducted 16,508 operations at 65NJ from October 1, 2025 through August 16, 2026. (Exhibit 13 at 16)

71. Outside-hours operations averaged roughly twenty per day from October 1, 2024 through August 16, 2026. (Exhibit 13 at 5, 16)

72. Defendants have not ceased operating outside the represented hours or conducting helicopter tours from the Property.

## THE ZONING ORDINANCES

75. Town of Kearny Municipal Code Section 36-9.9(d) provides:

> In the event of a failure to comply with any condition of site plan approval, the Construction Code Official, on his own initiative or upon recommendation from the Engineer, may revoke the building permit, certificate of occupancy or zoning permit, as the case may be, and seek to enjoin the violation or take such other steps as permitted by law.

73. N.J.S.A. 40:55D-18 provides that "[t]he governing body of a municipality shall enforce this act and any ordinance or regulation made and adopted hereunder." It further provides:

> [T]he proper local authorities of the municipality or an interested party, in addition to other remedies, may institute any appropriate action or proceedings to prevent such unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance or use, to restrain, correct or abate such violation, to prevent the occupancy of said building, structure or land, or to prevent any illegal act, conduct, business or use in or about such premises.

WHEREFORE, Plaintiff demands judgment:

A. Immediately enjoining and restraining the defendants from operating, or permitting operations at, the Property before 8:00 a.m. or after 7:00 p.m. from March through October, and before 8:00 a.m. or after 5:00 p.m. from November through February;

B. Immediately enjoining and restraining the defendants from operating, or permitting, helicopter tours at or from the Property;

C. Imposing fines pursuant to state statutes and Town ordinances; and

D. Granting such other relief as the Court may deem appropriate.

## DESIGNATION OF TRIAL COUNSEL

Schuyler Abbott is designated trial counsel.

**CERTIFICATION**

I certify that the matter in controversy is not the subject of any other action pending in any court and is not the subject of any pending arbitration proceeding, other than the municipal court matter referenced above. I further certify that I have no knowledge of any contemplated action or arbitration proceeding regarding the subject matter of this action, and I am not aware of any other parties who should be joined.

DATED: September 28, 2026

Schuyler Abbott
CASTANO QUIGLEY CHERAMI LLC

**VERIFICATION**

ANTHONY J. CHISARI, being of full age, certifies:

1. I am the Construction Official and Zoning Officer for the Town of Kearny, the plaintiff in this complaint, and am duly authorized and qualified to make this verification.

2. I have read the complaint and on my own personal knowledge, know that the facts set forth are true and they are incorporated in this certification by reference.

3. I certify that the above statements are true. I am aware that if any of them are willfully false, I am subject to punishment.

DATED: September 28, 2026

Anthony J. Chisari

CASTANO QUIGLEY CHERAMI LLC
Gregory J. Castano Jr. – Attorney ID No. 040701992
Schuyler Abbott – Attorney ID No. 433022023
7 Giralda Farms – Suite 170
Madison, N.J. 07940
(973) 808-1234
Attorneys for plaintiff

| | |
|---|---|
| TOWN OF KEARNY,<br>*Plaintiff*,<br><br>v.<br><br>FLYNYON LLC, FLYNYON DIGITAL LLC, HELO HOLDINGS INC., NYONAIR and RTC PROPERTIES INC.,<br>*Defendants*. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>HUDSON COUNTY<br><br>DOCKET NO. HUD-C-<br><br>Civil Action<br><br>**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS** |

THIS MATTER brought to the Court by the Town of Kearny, through its attorneys, Castano Quigley Cherami LLC, Gregory J. Castano Jr. and Schuyler Abbott, appearing, seeking temporary restraints pursuant to R. 4:52 to enjoin defendants from illegally operating or allowing operations beyond 8:00 a.m. to 7:00 p.m. and/or from operating or allowing helicopter tours at or from 100 Central Avenue (also known as 165 Western Road), Kearny, New Jersey, Block 288, Lot 10.01 (the "Property") based upon the facts and exhibits set forth in the verified complaint, and it appearing that immediate or irreparable harm will likely result before notice can be given and a hearing held, and for good cause shown, it is

On this ___ day of September, 2026,

ORDERED that defendants appear and show cause before this Court at 583 Newark Avenue, Jersey City, New Jersey on __________________________ at ___________ why an order should not be issued preliminarily enjoining and restraining them from:

A. Illegally operating or allowing operations at the Property beyond 8:00 a.m. to 7:00

p.m. pending further disposition in this matter;

B. Illegally operating or allowing helicopter tours at or from the Property pending further disposition; and

C. Granting such other relief as the Court deems equitable and just.

IT IS FURTHER ORDERD THAT pending the return date of this order to show cause, defendants are temporarily enjoined and restrained from:

A. Operating or allowing operations at the Property beyond 8:00 a.m. to 7:00 p.m.; and

B. Operating or allowing helicopter tours at or from the Property.

IT IS FURTHER ORDERED THAT:

1. Defendants may move to dissolve or modify the temporary restraints herein contained on two (2) days notice to the plaintiff's attorney.

2. A copy of this order to show cause, verified complaint and any and all other supporting documentation submitted in support of this application be personally served upon the defendants within ____ of the date hereof, in accordance with R. 4:4-3 and R. 4:4-4, this being original process.

3. The plaintiff must file with the court its proof of service of the pleadings on the defendants no later than three (3) days before the return date.

4. Defendants shall file and serve a written response to this order to show cause and the request for entry of injunctive relief and proof of service by ________________________________. The original documents must be filed with the Clerk of the Superior Court in the county listed above. You must send a copy of your opposition papers directly to Judge Costello whose address is Brennan Courthouse, 583 Newark Avenue, Jersey City, N.J. 07306. You must also send a copy of your opposition papers to the plaintiff's

attorneys whose names and addresses appear above. A telephone call will not protect your rights; you must file your opposition and pay the required fee of $135.00 and serve your opposition on your adversary, if you want the court to hear your opposition to the injunctive relief the plaintiff is seeking.

5. The plaintiff must file and serve any written reply to the defendants' opposition by

________________________________.

6. If defendants do not file and serve opposition to this order to show cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that the plaintiff files proof of service and a proposed form of order at least three days prior to the return date.

7. If the plaintiff has not already done so, a proposed form of order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the court no later than three (3) days before the return date.

8. Defendants take notice that the plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The verified complaint attached to this order to show cause states the basis of the lawsuit. If you dispute the verified complaint, you, or your attorney, must file a written answer to the complaint and proof of service within 35 days from the date of service of this order to show cause; not counting the day you received it.

These documents must be filed with the Clerk of the Superior Court in the county listed above. A list of these offices is provided. Include a $135.00 filing fee payable to the "Treasurer State of New Jersey." You must also send a copy of your Answer to the plaintiff's attorneys whose names and addresses appear above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by

default. **Please note: Opposition to this order to show cause is not an Answer and you must file both. Please note further: if you do not file and serve an Answer within 35 days of this Order, the Court may enter a default against you for the relief plaintiff demands**.

9. If you cannot afford an attorney, you may call the Legal Services officer in the country in which you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

10. The Court will entertain argument, but not testimony, on the return date of the order to show cause, unless the Court and parties are advised to the contrary no later than _____ days before the return date.

______________________________
Mary K. Costello, P.J.Ch.

CASTANO QUIGLEY CHERAMI LLC
Gregory J. Castano Jr. – Attorney ID No. 040701992
Schuyler Abbott – Attorney ID No. 433022023
7 Giralda Farms – Suite 170
Madison, N.J. 07940
(973) 808-1234
Attorneys for plaintiff

| | |
|---|---|
| TOWN OF KEARNY,<br>*Plaintiff*,<br><br>v.<br><br>FLYNYON LLC, FLYNYON DIGITAL LLC, HELO HOLDINGS INC., NYONAIR and RTC PROPERTIES INC.,<br>*Defendants*. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>HUDSON COUNTY<br><br>DOCKET NO. HUD-C-<br><br>Civil Action<br><br>**ORDER** |

THIS MATTER brought to the Court by the Town of Kearny, through its attorneys, Castano Quigley Cherami LLC, Gregory J. Castano Jr. and Schuyler Abbott, appearing, seeking preliminary restraints pursuant to R. 4:52 to enjoin defendants from illegally operating or allowing operations beyond 8:00 a.m. to 7:00 p.m. and/or from operating or allowing helicopter tours at or from 100 Central Avenue (also known as 165 Western Road), Kearny, New Jersey, Block 288, Lot 10.01 (the "Property") based upon the facts and exhibits set forth in the verified complaint, and the Court having considered the matter and for good cause appearing, it is

On this ___ day of _______________, 2026,

ORDERED that defendants are preliminarily enjoined and restrained from:

A. Operating or allowing operations at the Property beyond 8:00 a.m. to 7:00 p.m.; and

B. Operating or allowing helicopter tours at or from the Property.

______________________________
Mary K. Costello, P.J.Ch.

CASTANO QUIGLEY CHERAMI

SCHUYLER ABBOTT
7 Giralda Farms – Suite 170
Madison, NJ 07940
o. 973-808-1234
f. 973-808-8480
sabbott@cqclaw.com

September 28, 2026

Hon. Mary K. Costello, P.J.Ch.
Brennan Courthouse
583 Newark Avenue
Jersey City, N.J. 07306

*Re:* *Town of Kearny v. FlyNYON LLC, et al.*
Docket No. HUD-C-
*Letter Brief in Support of the Entry of an Order to Show Cause with Temporary Restraints*

Dear Judge Costello:

This firm represents plaintiff, the Town of Kearny (the "Town"), and this letter brief is submitted in support of its application for an order to show cause with temporary restraints pursuant to R. 4:52-1.

## PRELIMINARY STATEMENT

Helicopter facilities are prohibited in the Town's SKI-S zone. Helo Holdings Inc. ("HHI") operates a heliport only because the Kearny Zoning Board of Adjustment (the "Board") granted it a use variance in 2014. To obtain the Board's approval, Jeff Hyman, HHI's CEO, swore to two limits:

1. The facility would operate from 8:00 a.m. to 7:00 p.m. in the spring, summer, and fall, and from 8:00 a.m. to 5:00 p.m. in winter (the "Permitted Hours"); and

2. "His facilities would offer no helicopter tours."

Both promises were broken. Tours are now HHI's dominant business. Nearly one in four flights occur outside the Permitted Hours. The Town's enforcement efforts changed nothing.

Defendants will likely argue federal preemption bars the Town from holding them to their bargain. However, the Airline Deregulation Act "bars state-imposed regulation of air carriers, but allows room for court enforcement of contract terms set by the parties themselves." *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995). The Town imposes no standard of its own. It asks the Court only to hold defendants to the limits they proposed under oath.

## STATEMENT OF FACTS

*Parties and the Property*

RTC Properties Inc. ("RTC") owns 100 Central Avenue, also known as 165 Western Road, Block 288, Lot 10.01, Kearny (the "Property"). HHI, RTC's tenant, operates the HHI Heliport there under FAA identifier 65NJ. Defendants FlyNYON LLC, FlyNYON Digital LLC, and NYONAir (the "FlyNYON Defendants") market "New York City Helicopter Tours." (65NJ is a privately owned, private-use facility, and the expert's searches identified no federal funding. (verified complaint ¶¶ 1, 2, 10, 33 and Exhibits 9, 12)

*Helicopter Facilities Are a Prohibited Use in the SKI-S Zone*

Heliports are not a permitted use in the SKI-S zone. Section 38-4.3 of the Kearny Zoning Ordinance provides that any use not designated as a principal, accessory, or conditional use "is specifically prohibited." HHI's right to operate therefore rests entirely on the Board's discretionary variance. (verified complaint ¶¶ 7-8, 25-34 and Exhibits 5-6)

*Every Approval Rested on Representations That the Site Would Not Serve Passengers*

**2005.** HHI sought a use variance to build hangars, a maintenance shop, a fueling area, and a landing pad "in conjunction with the operations of a helicopter fixed base of operations."

HHI's representative, James Foster, testified under oath that HHI needed "a facility that would provide a staging area for equipment and support." The Board adopted its resolution of approval on June 2, 2005. (verified complaint ¶¶ 12-14 and Exhibit 1)

**2008.** RTC and HHI sought amended site plan approval under Application No. 2814. At the May 1, 2008 hearing, the applicants' engineer testified that "[t]he site would not be used for people just looking for a helicopter ride." The Board adopted its resolution on June 5, 2008. (verified complaint ¶¶ 15-17 and Exhibit 2)

**2009.** Under Application No. 2912, the applicants sought to use a new warehouse as a helicopter maintenance building and to add trailers and fuel tanks. The Board recorded the applicants' "unconditional and uncontroverted testimony" that facility operations and impacts "would be the same as in the operations approved by the use variance in 2005." The Board adopted its resolution on August 4, 2009. (verified complaint ¶¶ 18-20 and Exhibit 3)

**2012.** Under Application No. 2012.19, the applicants sought to build an office building and a second hangar. At the September 4, 2012 hearing, Mr. Hyman testified under oath and "reiterated the site does not permit passengers and is basically for storage, maintenance and fueling." The Board adopted its resolution on October 2, 2012. (verified complaint ¶¶ 21-24 and Exhibit 4)

Each approval was obtained on the representation that the Property would be an industrial support facility, not a passenger operation. (verified complaint ¶¶ 24 and Exhibits 1-4)

*The 2014 Approval: HHI Swore to Its Hours and to "No Helicopter Tours"*

In 2014, RTC and HHI filed Application No. 2014.14 to build a 40,464 square foot helicopter maintenance facility with offices and a lounge. The Town Engineer issued an eight-

page review letter dated July 9, 2014, revised October 21, 2014, which the Board incorporated into the record. The letter did three things. It confirmed that the application sought to expand a non-conforming use and required a General Use Restriction Variance under Section 38-4.3. It required, in Engineering and Planning Comment No. 3, still marked "This comment still applies," that the applicant testify to its hours of operation, number of shifts, and employees per shift. And it recorded that HHI's own submission contemplated "24 hour / 7 days a week operations with a total of 20 employees." (verified complaint ¶¶ 25-29 and Exhibits 5-6)

At the November 6, 2014 hearing, Mr. Hyman answered Comment No. 3:

> Jeff Hyman, 165 Western Road, Kearny, New Jersey was sworn-in and testified on behalf of the Applicant. Mr. Hyman is the CEO of operations. He described the current operations at the site. Specifically, he estimated that the hours of operation during the periods March/April to September/October would be 8 am to 7 pm and during the winter months 8 am to 5 pm. At any given time, Mr. Hyman stated there would be sixty (60) employees maximum. His facilities would offer no helicopter tours.

(verified complaint ¶ 30 and Exhibit 5)

The applicants' engineer added that there would be "only one or two customers" and that peak staffing of sixty employees would occur "during 8 am and 5 pm." The applicants' planner described the use as "a special unique one that is usually not permitted." (verified complaint ¶¶ 31-32 and Exhibit 5)

The Board voted unanimously to approve. On December 8, 2014, it adopted a resolution approving the application "subject to the following conditions," including that "Applicant's testimony was accepted as satisfying #1, #3, #4, #5, #6 and #7" of the Engineering and Planning Comments. Item #3 is the hours-of-operation comment. As the Town's expert observed after verifying each passage against the source documents, the testimony "was not volunteered in

passing; it was the applicant's formal response to an outstanding condition of review, and the Board accepted it as satisfying that condition." The testimony drew no distinction among categories, brands, or regulatory labels of helicopter tours. (verified complaint ¶¶ 33-34 and Exhibits 5-6)

*FlyNYON Conducts Unauthorized Helicopter Tours From HHI*

FlyNYON maintains an office at 78 John Miller Way, Kearny about one mile from HHI. Since at least 2018, FlyNYON has sold tours departing from Kearny at $99 to $499 per seat. Its Google listing reads "FlyNYON Helicopter Tours," and its website advertises hours of 8:00 a.m. to 11:00 p.m. and more than 750,000 passengers. HHI's own website advertises hours of 7:00 a.m. to 9:00 p.m. The verified flight data places FlyNYON's operations at HHI. (verified complaint ¶¶ 4, 36-41 and Exhibits 9-13)

After the fatal March 11, 2018 crash of a FlyNYON-branded flight, the FAA determined that the flight operated as a commercial air tour. The NTSB concluded the operators had "exploited the exception at 14 CFR 119.1(e)(4)(iii)."[1] (verified complaint ¶¶ 43-45 and Exhibit 13)

*The Expert Report – Data and Findings*

*i. Helicopter Tours*

The Town retained Thomas M. Lintner, FRAeS, of The Aloft Group, LLC a 30-year FAA veteran who managed the FAA's Air Traffic Investigations Division. Mr. Lintner prepared his report with James K. Allerdice Jr. of Vianair, a retired FAA air traffic control professional of

[1] 14 CFR 119.1(e)(4)(iii) provides an exception to the applicability of CFR 119,1, *et seq.* for "ariel photography."

more than three decades. A report detailing defendants' operations was issued on September 13, 2026. (verified complaint ¶¶ 46-47 and Exhibit 13)

The experts analyzed "JETNET" flight data for FAA identifier 65NJ (HHI), derived from "ADS-B" surveillance, and independently recomputed the entire dataset from the raw records. Each data record is a single flight operation: one takeoff or one landing. The count of individual sorties is therefore about half the operations count. While ADS-B data can undercount activity it cannot hallucinate it, a limitation that "can only understate activity." (verified complaint ¶¶ 48-49 and Exhibit 13)

From October 1, 2024 through August 16, 2026, the experts verified 59,495 flight operations at HHI. FlyNYON conducted 39,007 of them, or 65.6%. New York Helicopters conducted 1,648. (verified complaint ¶ 50 and Exhibit 13)

A separate "spot check" examined where the flights go. Over July 1–15, 2026, Vianair identified 479 closed-loop circuits that departed and returned to HHI without an intermediate stop. B06 helicopters, the type used by FlyNYON, flew 372 of them, about 78%. The circuits followed two recurring routes, a "long route" and a "short route," running up the East River, west into Central Park, and back to Kearny. As the experts explained: "A charter or corporate operation carries a passenger from an origin to a destination; it does not fly the same two circuits over the same landmarks day after day and land where it started. A scheduled tour product does exactly that." verified complaint ¶¶ 52-54 and Exhibit 13)

*ii. Operational Hours Data*

The experts applied the seasonal windows from Mr. Hyman's testimony, treating March through October as the "8:00 a.m. to 7:00 p.m." season and November through February as the

"8:00 a.m. to 5:00 p.m. season." They converted every UTC timestamp to Eastern Time across each daylight-saving transition. Their recomputation reproduced the underlying outside-hours flag with 100% record-level agreement. (verified complaint ¶ 57 and Exhibit 13)

The results are stark. Of 59,495 operations, 14,172, or 23.8%, fell outside the represented hours. Outside-hours operations occurred in every one of the 23 reporting periods, ranging from 15.0% (October 2024) to 32.1% (February 2026). FlyNYON accounted for 8,896 of the outside-hours operations (62.8%). Monthly figures follow:

| Period | Season | Total Ops | FlyNYON Ops | Outside Hours | % Outside |
|---|---|---|---|---|---|
| October 2024 | Summer | 4,162 | 3,053 | 625 | 15.0% |
| November 2024 | Winter | 3,268 | 2,359 | 860 | 26.3% |
| December 2024 | Winter | 3,090 | 2,232 | 725 | 23.5% |
| January 2025 | Winter | 1,996 | 1,281 | 504 | 25.3% |
| February 2025 | Winter | 1,721 | 1,074 | 534 | 31.0% |
| March 2025 | Summer | 1,987 | 1,386 | 357 | 18.0% |
| April 2025 | Summer | 2,296 | 1,708 | 529 | 23.0% |
| May 2025 | Summer | 2,228 | 1,555 | 535 | 24.0% |
| June 2025 | Summer | 2,363 | 1,569 | 704 | 29.8% |
| July 2025 | Summer | 2,930 | 1,829 | 799 | 27.3% |
| August 2025 | Summer | 3,557 | 2,403 | 847 | 23.8% |
| September 2025 | Summer | 3,124 | 2,050 | 596 | 19.1% |
| **Notice of Violation ZV-25-00064 issued September 17, 2025** | | | | | |
| October 2025 | Summer | 2,555 | 1,810 | 393 | 15.4% |
| November 2025 | Winter | 2,120 | 1,400 | 601 | 28.3% |
| December 2025 | Winter | 2,183 | 1,474 | 589 | 27.0% |
| January 2026 | Winter | 1,774 | 1,122 | 504 | 28.4% |
| February 2026 | Winter | 1,474 | 876 | 473 | 32.1% |
| March 2026 | Summer | 1,751 | 1,085 | 363 | 20.7% |
| April 2026 | Summer | 2,346 | 1,551 | 517 | 22.0% |
| May 2026 | Summer | 3,214 | 1,936 | 811 | 25.2% |
| June 2026 | Summer | 3,952 | 2,122 | 1,007 | 25.5% |
| July 2026 | Summer | 3,609 | 2,050 | 874 | 24.2% |
| August 1–16, 2026 | Summer | 1,795 | 1,082 | 425 | 23.7% |
| **TOTAL** | | **59,495** | **39,007** | **14,172** | **23.8%** |

(verified complaint ¶¶ 58-62 and Exhibit 13)

*iii. Findings*

After reviewing the data, Mr. Lintner concluded:

> the record strongly supports the allegation that commercial **helicopter sightseeing tours have been operated from HHI Heliport continuously since November 2014 and constitute the dominant activity at the facility, contrary to the sworn representation memorialized in ZBA Resolution 2014.14 that the facilities would offer no helicopter tours.** The record likewise establishes as a matter of fact that **the facility has operated substantially and persistently outside the hours represented in that same testimony** — 23.8% of all verified flight operations across the 22-month plus window ending August 16, 2026, in every month without exception, without improvement after formal notice of violation and at materially higher volumes in the summer of 2026 than in the summer of 2025. (emphasis added)

(Exhibit 13)

*The Town Gave Notice. Defendants Did Not Change Their Operations.*

On September 17, 2025 the Town issued Zoning Violation ZV-25-00064 for operations at the Property "outside the scope of the approved conditions in Zoning Board Resolution 2014.14," and set a compliance date of September 26, 2025. Thereafter, an extended compliance deadline of October 31, 2025 also passed without change. (verified complaint ¶¶ 64-65 and Exhibit 7)

On February 5, 2026, the Town issued municipal court summonses to RTC and HHI for "operating outside of the approved [zoning] conditions." That matter remains pending. (verified complaint ¶ 66 and Exhibit 8)

Defendants ignored the Town. Over the ten complete months after the notice, 6,132 of 24,978 flights, or 24.5%, fell outside the Permitted Hours. Traffic also grew. May through July

2026 produced 10,775 operations, against 7,521 in the same months of 2025, a 43% increase. FlyNYON alone conducted 16,508 flights from October 1, 2025 through August 16, 2026. (verified complaint ¶¶ 67-71 and Exhibit 13)

As of this writing, unauthorized flights continue. (verified complaint ¶ 72)

**LEGAL ARGUMENT**

**POINT I**

**DEFENDANTS' UNLAWFUL OPERATIONS MUST BE RESTRAINED.**

Defendants are using the Property in violation of the 2014 approval. The Municipal Land Use Law ("MLUL") requires the Town to enforce that approval and authorizes an injunction. As the Appellate Division has held:

> Where injunctions are creatures of statute, all that need be proven is a statutory violation … Further, when considering the appropriateness of imposing a statutory injunction, courts are instructed "to consider the nature, quality and effect of the noncompliance and fashion a corrective remedy appropriate to the particular situation, always mindful that it is the courts' responsibility to safeguard the public interest." (citations and internal quotations omitted)

*Burnett v. Gloucester County Bd. of Chosen Freeholders*, 409 N.J. Super. 219, 242 (App. Div. 2009).

The Legislature has mandated that "[t]he governing body of a municipality *shall* enforce [the Municipal Land Use Law] and any ordinance or regulation made and adopted [t]hereunder." N.J.S.A. 40:55D-18 (emphasis added). The statute continues:

> In case … any building, structure or land is used in violation of this act or of any ordinance or other regulation made under authority conferred hereby, the proper local authorities of the municipality … in addition to other remedies, may institute any appropriate action or proceedings to prevent such unlawful … use, to restrain, correct or abate such violation, to prevent the occupancy of said building,

> structure or land, or to prevent any illegal act, conduct, business or use in or about such premises.

*Id.*

The Town's code likewise authorizes the Town, "[i]n the event of a failure to comply with any condition of site plan approval," to "seek to enjoin the violation or take such other steps as permitted by law." Kearny Municipal Ordinance § 36-9.9(d).

New Jersey courts have long recognized a municipality's right to enjoin zoning violations. *See e.g., Frizen v. Poppy*, 17 N.J. Super. 390, 393 (Ch. Div. 1952); *Cahill v. Heckel*, 87 N.J. Super. 201, 204 (Ch. Div. 1965) ("Municipal officials can bring suit in the name of the municipality for an injunction to restrain an alleged zoning violation."). The Supreme Court has explained why:

> Where the property rights of many citizens are involved, it is proper for the government upon their behalf to invoke the powers of equity. Here, the constitutional function to enact 'general laws' for the local regulation of zoning *ex necessitate* comprehends the power to make such laws effective. The Legislature may make the injunctive remedy available to the local authority for the enforcement of its regulations, and especially to prevent continuing transgressions, actual or threatened, irrespective of the penalties prescribed by the local rule, which in themselves are not deemed an adequate legal remedy. (citations omitted)

*Borough of Alpine v. Brewster*, 7 N.J. 42, 53 (1951).

An applicant's sworn representations, accepted by a board as a basis for its approval, are enforceable conditions of that approval, even if those conditions are not expressly set forth in the memorializing resolution. *See Park Ctr. At Route 35, Inc. v. Zoning Bd. of Adjustment of Twp. of Woodbridge*, 365 N.J. Super. 284, 289 (App. Div. 2004).

Defendants are violating those conditions. The Board approved the application "subject to" Mr. Hyman's testimony in response to Comment No. 3, hours of operation. Mr. Hyman's testimony therefore supplies the content of that condition. In the same sworn statement he represented that "[h]is facilities would offer no helicopter tours." That representation continued a line of non-passenger representations dating to 2005, and it described the operation the Board approved. (Exhibits 1-5)

The violations are not marginal. Tours are the facility's dominant activity and nearly a quarter of all operations occur outside the represented hours, every month. (Exhibit 13)

Because "all that need be proven is a statutory violation," *Burnett*, 409 N.J. Super. at 242, an injunction must issue.

**POINT II**

**THE TOWN'S ENFORCEMENT ACTION IS NOT PREEMPTED BY FEDERAL LAW.**

The ADA's preemption clause provides that no State "shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier." *Wolens*, 513 U.S. at 222–23 (quoting 49 U.S.C. App. § 1305(a)(1)).[2]

The Supreme Court read "relating to" to mean "having a connection with, or reference to," airline rates, routes, or services, while leaving room for state actions "too tenuous, remote, or peripheral . . . to have pre-emptive effect." *Id.* at 223–24 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 390 (1992)).

[2] Congress later recodified the clause at 49 U.S.C. § 41713(b)(1) without substantive change. *Id.* at 223 n.1.

In *Wolens*, the Supreme Court held Illinois consumer fraud claims were preempted because that statute served "as a means to guide and police the marketing practices of the airlines." *Id.* at 227–28. But it allowed the contract claims to proceed:

> We do not read the ADA's preemption clause, however, to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings.

*Id.* at 228.

The preemption clause "stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who claims and proves that an airline dishonored a term the airline itself stipulated." *Id.* at 232–33. The dispositive question is the source of the obligation: "what the State dictates" versus "what the airline itself undertakes." *Id.* at 233.

In this matter, the Town did not impose the limits. The Town Engineer asked HHI to confirm its hours after HHI's submission contemplated around-the-clock operations. HHI chose narrower hours and volunteered that it would offer no tours. They are terms HHI "itself stipulated." *Wolens*, 513 U.S. at 232–33.

Similarly, the Town does not ask the Court to set a fare, route, or altitude or to dictate what services an operator may sell. The Town merely seeks to enforce legally binding conditions of a discretionary land use approval HHI itself proposed under oath. Defendants may still fly any lawful route from any lawfully approved facility. Any connection to rates, routes, or services is "too tenuous, remote, or peripheral" to be preempted. *Wolens*, 513 U.S. at 224.

## POINT III

### THE TOWN SATISFIES THE REQUIREMENTS FOR INJUNCTIVE RELIEF.

An applicant for preliminary relief must show: (1) irreparable injury will result if relief is denied; (2) the claim rests on a settled legal right; (3) there is a likelihood of success on the merits; and (4) the applicant will suffer greater harm if relief is denied than the opposing party will suffer if it is granted. *See Crowe v. De Gioia*, 90 N.J. 126, 132–134 (1982). The Town satisfies each.

**Irreparable harm.** "Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." *Crowe*, 90 N.J. at 132–133. Black's Law Dictionary includes within irreparable injury harm "of such constant and frequent occurrence" and "[w]rongs of a repeated and continuing character." Black's Law Dictionary (5th ed.). The Town's injury fits both descriptions. Defendants have operated outside the represented hours every month for nearly two years, averaging roughly twenty such operations per day. (Exhibit 13) The Town cannot recover money damages. Neither the notice of violation, two compliance deadlines, nor the pending municipal summonses has changed defendants' conduct. Such penalties "in themselves are not deemed an adequate legal remedy." *Alpine*, 7 N.J. at 53.

**Settled legal right.** N.J.S.A. 40:55D-18 requires the Town to enforce its land use laws and authorizes it to restrain any use that violates them.

**Likelihood of success on the merits.** The Town is likely to succeed on the merits. Its claim rests on the Board's public records, defendants' own statements, and independently verified flight data.

First, the conditions are established. The 2014 Resolution records Mr. Hyman's sworn testimony on hours and tours, and approves the application subject to the Board's acceptance of that testimony. (Exhibit 5) Those representations are enforceable conditions of the approval, even if the resolution does not list them expressly. *Park Ctr. at Route 35, Inc.*, 365 N.J. Super. at 289.

Second, the violations are established. The FlyNYON Defendants market their flights as tours departing from Kearny and sell them by the seat. FlyNYON conducted 65.6% of all operations at HHI. A fifteen-day spot check identified 479 closed-loop circuits flown over two recurring sightseeing routes. The Town's expert recomputed the operations data from raw records, with 100% record-level agreement, and found that 23.8% of all operations fell outside the represented hours, in every month. (Exhibits 9-13)

Third, defendants' anticipated defense fails. Federal law does not preempt enforcement of undertakings HHI made itself. *Wolens*, 513 U.S. at 228–29, 232–33.

Accordingly, the Town has shown a likelihood of success on the merits.

**Balance of hardships.** The balance favors the Town, which has a statutory duty to enforce its land use laws on the public's behalf. Defendants have no right to operate beyond their approval. The restraints leave defendants free to operate within the hours HHI proposed and to conduct every non-tour activity it described to the Board. Any hardship is self-inflicted. (Exhibit 13)

## CONCLUSION

For the foregoing reasons an order to show cause with temporary restraints must be immediately entered enjoining defendants from: (1) operating, or permitting operations at, the Property beyond the Permitted Hours and (2) operating, or permitting, helicopter tours at or from the Property.

Respectfully,

Schuyler Abbott

# EXHIBIT 1

**Memorialized**
**RESOLUTION**
**Kearny Zoning Board of Adjustment**
**Application No. 2515**

## APPLICATION

Application No.2515 was filed by Helo Holdings, Inc., 53 Park Place, Suite 10G, New York, NY (herein after referred to as the "Applicant") for premises located in the SKI-S Zone and being designated on the Town Tax Map as Block 288 Lot 10.01 and commonly known as 100 Central Avenue, Kearny, New Jersey.

The purpose of this Application is to seek Preliminary and Final Site Plan, Variance Approvals and Design Waivers in order to construct a new building for office use and two other buildings to be used as hangars and maintenance shop along with a fueling area and landing pad all to be used in conjunction with the operations of a helicopter fixed base of operations.

## HEARING

## PROCEDURE

A public hearing was held on this matter on May 12, 2005 at which time the following Board members were present:

Chairwoman Carol Swanstrom
Vice-Chairman Albino Cardoso
Commissioner Janice Barton
Commissioner John Campbell
Commissioner Joseph Slavik
Commissioner Gina Bigelow
Commissioner John Martello
Town Engineer: Dominick Valano
Construction Code Official/Zoning Officer: Michael J. Martello

Board Secretary: Susan A. Evanchick
Board Attorney: Frank W. Jablonski

Applicant was represented at the time of hearing by William Sullivan, Jr., Esq.

Applicant has filed an affidavit showing compliance with all statutory and jurisdictional requirements.

Members of the Kearny Zoning Board of Adjustment have reviewed the Application form submitted by the Applicant and the plans prepared by Bohler Engineering, P.C. , dated November 22, 2004 and a boundary and topographic survey dated June 25, 2004 prepared by Control Point Associates, Inc.

## DEFICIENCIES

The proposed lots and existing and proposed buildings would violate the following sections of the Zoning Ordinance and Site Plan Ordinance:

Chapter XXXVIII

| | |
|---|---|
| Article IV, Schedule I (SKI-S Requirements) | Synopsis of deficiency<br>Heliports are not a permitted use in the zone. There are therefore no requirements listed for this use. |
| Section 38-4.3 | Any use which is not specifically designated as a principal permitted use, an accessory use or a conditional use is specifically prohibited from that zone district in the Town of Kearny. |
| Section 38-7.1 | The total required parking spaces for a heliport is subject to the Land Use Regulation of the Town of Kearny which shall be determined by the approving authority. Thirty-six (36) 10' x 20' parking spaces and two handicapped accessible parking spaces have been proposed by the applicant. |

Chapter XXXVI

| Section | Synopsis of deficiency |
|---|---|
| 36-12.2a | Parking requirements must be established by the approving authority. |
| 36-12.3 (a) | Off-street loading spaces. |
| 36-12.8 | Refuse or storage plan is required by Land Use Regulations. |

And more specifically set forth in the Construction Official's Notice of Denial and Referral dated February 8, 2005 and updated to April 20, 2005.

The Town Engineer has reviewed the application and the original and revised plans and has reported to the Board by letter dated April 12, 2005 and revised to April 20, 2005.

| | Required | Existing | Proposed | Complies |
|---|---|---|---|---|
| Min. Lot Area (acre) | 1.38 | 105.24 | 105.24 | Yes |
| Min. Lot Width (ft) | 150.00 | >150 | >150 | Yes |
| Min. Lot depth (ft) | 150.00 | >150 | >150 | Yes |
| Min. Front yard (ft) | 35.00 | 36.70 | 36.70 | Yes |
| Min. Side Yard (ft) | 20.00 | <20 (1) | <20 (1) | No |
| Min. Other side Yard (ft) | NA | NA | NA | |
| Min. Rear Yard (ft.) | 30.00 | 50.09 | 22.59 | No |
| Max. Improved Lot coverage (%) | 90.00 | 87.50 | 87.60 | Yes |
| Max. Bldg. Coverage (%) | 40.00 | 31.50 | 31.30 | Yes |
| Max. Building Height, ft/stories | 80.00/6.00 | Not given | Not given | ? |

(1) Existing Nonconformity * variance required

Correspondence was read into and is hereby incorporated into this record as if set forth at length from the following Town agencies:

Kearny Board of Health
Kearny Fire Department
Kearny Water Department
Kearny Beautification and Environmental Committee

Mr. Sullivan opened the presentation with a brief statement.

**EVIDENCE**

Michael J. Martello, the Construction Code/Zoning Code Official and Dominick Valano, a representative of the Town Engineer, were sworn in anticipation of their testimony or expression of opinion regarding this application.

Testifying under oath on behalf of the Applicant was Mr. James Foster, a representative of Helo Holdings. He presented an overview of the concept of a helicopter fixed base of operations and indicated that this type of facility is unique in the northerly section of the state. He explained helicopter traffic in general and the need for a facility that would provide a staging area for equipment and support closer than the present facilities providing support. He explained that the project would be in stages and that the present application was the first phase. He indicated the number of employees that would work at the site would be about 24 and that he hoped that he would be able to implement an internship program with Kearny High School at the site. He indicated that the facility had to be approved by the State of New Jersey as well as the Federal Aviation Agency.

Mr. Jeff Hyman, another representative of the applicant testified under oath that he was a helicopter pilot and was in charge of the company operations in New Jersey. He explained helicopter traffic and indicated that the helicopters followed strict flight lanes and that the traffic would be away from the residential areas of Kearny and over the waters of Newark Bay and the lower Hudson River.

Mr. Keith Cahill, from Bohler Engineering was sworn and qualified as an expert

Civil Engineer. He was responsible for the preparation of the Site Plan and testified as to the preparation of same. In his opinion the parking spaces provided for in the plan were more than adequate for the first stage of the project and he indicated that there was sufficient land available for additional parking if it were needed in subsequent phases. He indicated that he felt a waiver was in order for a detailed plan of parking for the entire 100+ acres which comprises lot 10.01. He further testified that the warehouse parking requirements were not applicable to the hangars that were to be built. He also felt that loading berths were not needed for the proper operation at the site. He indicated that the applicant would be able to comply with all of the items set forth in Mr. Neglia's letter of April 20, 2005, other than the parking comments and the need for a buffer zone on the northerly property line in view of the geographic location of routes 1 and 9.

Mr. Benjamin Muller, was sworn and was qualified as an expert in the field of noise control. He explained in detail tests that he had conducted concerning noise that would be generated from the site due to the operation of helicopters. His research led to the conclusion that the noise generated at the site would have no effect on the residents of the Town as well as those individuals incarcerated in the Kearny Jail.

Mr. David Zimmerman, was sworn and qualified as a Professional Planner. His testimony was centered around the requirements that the applicant needed to establish special reasons in order to be successful in its attempt to obtain a use variance. He testified that the site in his opinion was particularly suited for the operation proposed because of its location near the waters of the lower Hudson River and the flight lanes established for helicopters. He indicated that the site was a large site suited for the operation in a largely industrial area away from the residential uses of the upland of Kearny. He indicated that the site was a secure site and natural boundaries of the water helped in this regard. He indicated that the site was going to be rehabilitated by the removal of a unsightly building and replacement of the new office building. He felt that the community as a whole would benefit by the addition of new jobs that would be generated. He testified that several of the purposes of the Municipal Land Use law would be promoted by the granting of the use variance. He stated that in his opinion the relief could be granted without any detriment to the public good and reviewing the Master Plan that the use would not impair the intent or purpose of the zone plan.

**PUBLIC**

The meeting was opened to the public. No one spoke either in favor or in opposition to the application.

The Board closed the public portion of the meeting.

**FINDINGS AND CONCLUSIONS**

After hearing presentation of the Applicant's application and considering all of the testimony of the witnesses both expert and lay testimony and after reviewing the reports submitted by the Applicant, the Board found as follows:

The Board agrees that the granting of the application for Preliminary and Final Site Plan in this case would advance the objectives of the Town's Zoning Ordinance, and

The Board agrees that it may grant the use variance in accordance with N.J.S.A. 40:55D-70 d. as the applicant has established to the Board's satisfaction that special reasons exist to grant same as has been testified to by the applicant's expert which was not rebutted.

The Board agrees that the granting of all the variances in this case would advance the objectives of the Town's Zoning Ordinance, and

The Board agrees that the granting of all the variances requested in this application can be granted without substantial detriment to the public good, and

The Board agrees that the granting of all the variances requested in this application would not substantially impair the intent and purpose of the Kearny Zoning Ordinance or zoning plan, and

The Board has considered and will affirmatively approve this application conditioned upon the applicants agreement to all of the provisions of the Town Engineer's letter of April 20, 2005, with the exception of the parking requirements and the buffer along the northerly property line.

The Board also specifically conditions it's approval upon the applicant complying with the following requirements:

1) Two (2) sets of plans revised in accordance with the Board's Approval should be submitted to the Town Engineer's office when complete.

2) Applicant will obtain any and all other governmental approvals as may be necessary. It shall be the obligation of the applicant to determine the same.

3) The applicant will be required to post a bond to cover the cost of the proposed improvements and establish and escrow account to cover the necessary legal administrative and inspection fees pursuant to Section 36-13.2 and Section 36-3.2 of the Town's Land Subdivision and Sit Plan Ordinance

4) Pursuant to Section 36-13.5 of the Town's Subdivision and Site Plan Ordinance, the applicant is required to notify the office of the Town Engineer twenty-four (24) hours prior to the start of construction

5) No building permits should be issued until approved final plans have been signed and received, and the applicant has posted sufficient escrows to the municipality.

6) Foundation survey to be submitted and approved by the Construction Code Official/Zoning Officer prior to the construction on the foundation proceeding above ground level.

7) The applicant shall be responsible for any and all escrows required of the applicant and all escrows shall be paid in full prior to the board secretary being obligated to sign this resolution. Should any escrows remain unpaid, the application shall be deemed incomplete.

8) The applicant shall be responsible for the satisfaction of any and all conditions placed upon this application. A building permit shall not issue until all approvals are received and all conditions have been satisfied as directed by this resolution. Should a building permit/zoning permit be issued without the above conditions being satisfied, the Construction Code Official shall revoke the building permit/zoning permit, which revocation shall deny the use of the land, until all conditions of the resolution have been satisfied.

9) Any construction or improvements made, not in accordance with the action and decisions of this Board as set forth in this resolution, shall be at the applicant's peril. The applicant acknowledges that if any construction should take place, not in

accordance with the approved plans (as amended, as the case may be) even if such construction or improvements were allowed under the building permit, the zoning permit shall be revoked until the applicant removes such improvement at the applicant's cost and expense.

10) Any Variance from the terms of the Kearny Zoning Ordinance granted by the Kearny Zoning Board of Adjustment permitting the erection or alteration of any structure or structures shall expire by limitation unless such construction or alteration shall have been actually commenced on each and every structure permitted by variance, within 9 months from the date of entry of the judgement of determination of the Kearny Zoning Board of Adjustment; except however, that the running period of limitation herein provided shall be tolled from the date of filing an appeal from the decision of the Kearny Zoning Board of Adjustment to the Governing Body, or to a Court of competent jurisdiction, until the termination in any manner of such appeal or proceeding.

## RESOLUTION

Now Therefore Be It Resolved by the Kearny Zoning Board of Adjustment on this 2nd day of June, 2005, application # 2515 seeking, a Use Variance, Preliminary and Final Site Plan Approvals is granted subject to the conditions stated above.

Votes Affirmative: Swanstrom, Cardoso, Barton, Campbell, Slavik, Bigelow, Martello

Vote Negative: None

Susan A. Evanchick, Secretary

Carole Swanstrom, Chairwoman

# EXHIBIT 2

**Memorialized**
**RESOLUTION**
**Kearny Zoning Board of Adjustment**
**Application No. 2814**

## SITE PLAN APPLICATION

Application No. 2814 was filed by RTC Properties, Inc./Helo Holdings, 100 Central Avenue, Kearny, NJ 07032 (hereinafter referred to as the "Applicant") for premises located in the SKI-S Zone and being designated on the Town Tax Map as Block 288, Lot 10.01 and commonly known as 100 Central Avenue, Kearny, NJ.

The purpose of this application was to amend a previously approved Kearny Zoning Board Application No. 2515 and seek amended preliminary and final site plan approval in order to construct a new building approximately 49,080 square feet for office use and a maintenance shop area with two 12,000 gallon above fuel tanks and to construct a new helicopter hangar.

## HEARING

PROCEDURE

A special public hearing was held on this matter on May 1, 2008 at which time the following Board members were present:

Commissioner Carole F. Swanstrom, Chairwoman
Commissioner Albino Cardoso, Vice-Chairman
Commissioner Janice Barton
Commissioner John Martello
Commissioner Richard Konopka
Commissioner Gina Bigelow
Commissioner Joseph Slavik

Also present were:

Alternate Member Anthony Capitti
Alternate Member Sebastian Viscuso
Town Engineer: Neglia Engineering Associates, Anthony Kurus, P.E.
Constr/Zoning Official: Michael J. Martello
Board Secretary: Susan A. Evanchick
Board Attorney: Michael R. Pichowicz, Esq.

Applicant was represented at the hearing by William C. Sullivan, Jr., Esq., for the firm Scarinci & Hollenbeck, LLC.

Applicant has filed an affidavit showing compliance with all statutory and jurisdictional requirements.

Mr. Sullivan opened the meeting with a brief statement that the Applicant desires a few changes to previous approvals and sought amended site plan approval.

## EVIDENCE

The Zoning Board reviewed the amended site plan application and plans submitted in the matter, including, but not limited to, Boundary & Topographic Survey by Control Point Associates, Inc.; Amended Preliminary and Final Site Plan by Bohler Engineering; Preliminary Architecture Plans by Cubellis Architects; Storm Water Management Report with Maps by Bohler Engineering; Review Letter by Neglia Engineering Associates dated May 1, 2008; Prior Resolutions of the Kearny Zoning Board of Adjustment. In addition, the Board considered the Denial/Referral of Permit executed by the Construction Official/Zoning Officer, Michael J. Martello dated 03/11/2008.

Jeff Hyman, VP Marketing/Sales for Helo Holdings was sworn-in. He summarized the amendments to the application and stated that the footprint for proposed facility was reduced from 9.02 acres to appx. 6.8 acres.

Keith Cahill, PE was sworn-in and was accepted as an expert in the field of engineering. He reviewed exhibits with the Board and briefly explained them. Specifically, the site would occupy 6.8 acres of appx. 250 acres under the control of the owner, RTC Properties, Inc. The site would not be used for people just looking for a helicopter ride. He testified the 10,000 sq. ft. office would be exactly the same as before. The new hangar would be slightly smaller, 44,080 sq. ft. whereas the previously approved hanger was 44,300 sq. ft. In addition, it would be a single hangar, not two hangars. There would be an 18,800 sq. ft. area internal mezzanine area for use by mechanics and pilots. There would be the same twenty-four employees, so there would be no increase in parking. The Applicant is still providing thirty-eight parking spaces. Access would be through a private road that would be thirty feet from the property line. There would be two external above-ground fuel tanks, 12,000 gallons each, with extended pumps. The sound wall would be reduced from eighteen feet to twelve feet. Emergency access would be provided on the south side of the facility. There would be a chain link fence approximately ten feet high along the north, south and east sides. It was stated that this was the safest type of fence due to air currents. There would be no increase in asphalt and no increase in lot coverage.

Robert Neu, principal of RTC Properties, Inc. was sworn-in and described the proposed operation. He set forth the area would have five security guards at all times. The lease term was for twenty-five years with a five year option. There was no option to lease additional land.



#2814

Mr. Sullivan and the Applicant's expert, Keith Cahill, PE, then reviewed Neglia Engineering Associates letter dated May 1, 2008. It was their opinion that thirty-eight parking spaces were sufficient. They reviewed the sections dealing with zoning; parking; drainage and grading; utilities; landscaping & lighting, details, other agency approvals and final comments. Specifically, it was set forth there are no flooding problems in the area and the drainage is sufficient and will continue to be sufficient. Those aspects are handled by RTC Properties, Inc.

It was set forth that the approval of this application will not negatively impact the Town of Kearny.

Further, the Applicant would submit a copy of lease agreements for review and would voluntarily interact with Kearny High School to the extent possible in educational/ training exercises.

PUBLIC

The meeting was opened to the public.
No one else spoke either in favor or in opposition to the application.
The Board closed the public portion of the meeting.

**FINDINGS AND CONCLUSIONS**

After hearing presentation of the Applicant's application and submissions and considering the testimony of the witnesses and upon review of the plans submitted by the Applicant, the Board found as follows:

The Board finds that the applicant seeks relief under N.J.S.A. 40:50D-76(2)(b) and that sufficient reasons were set forth to approve the amended preliminary and final site plan. It further finds that the relief to be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the Zone Plan of the Town of Kearny or the Zoning Ordinance of Kearny.

Specifically, the Commissioners found that the proposed use is a positive, was a less intensive use than was previously granted and would result in good land use development for the area.

**RESOLUTION**

Now Therefore Be It Resolved by the Zoning Board of Adjustment of the Town of Kearny on this 5th day of June, 2008, that application number 2814 is approved subject to the following conditions:

**a)** **Conditions #1 through #10 contained in the Board's resolution dated the 2nd day of June, 2005 are hereby incorporated and made conditions of this approval and are set forth at length hereinafter:**

1) Two (2) sets of plans revised in accordance with the Board's Approval should be submitted to the Town Engineer's office when complete.

2) Applicant will obtain any and all other governmental approvals as may be necessary. It shall be the obligation of the applicant to determine the same.

3) The applicant will be required to post a bond to cover the cost of the proposed improvements and establish and escrow account to cover the necessary legal administrative and inspection fees pursuant to Section 36-13.2 and Section 36-3.2 of the Town's Land Subdivision and Sit Plan Ordinance

4) Pursuant to Section 36-13.5 of the Town's Subdivision and Site Plan Ordinance, the applicant is required to notify the office of the Town Engineer twenty-four (24) hours prior to the start of construction

5) No building permits should be issued until approved final plans have been signed and received, and the applicant has posted sufficient escrows to the municipality.

6) Foundation survey to be submitted and approved by the Construction Code Official/Zoning Officer prior to the construction on the foundation proceeding above ground level.

7) The applicant shall be responsible for any and all escrows required of the applicant and all escrows shall be paid in full prior to the board secretary being obligated to sign this resolution. Should any escrows remain unpaid, the application shall be deemed incomplete.

8) The applicant shall be responsible for the satisfaction of any and all conditions placed upon this application. A building permit shall not issue until all approvals are received and all conditions have been satisfied as directed by this resolution. Should a building permit/zoning permit be issued without the above conditions being satisfied, the Construction Code Official shall revoke the building permit/zoning permit, which revocation shall deny the use of the land, until all conditions of the resolution have been satisfied.

9) Any construction or improvements made, not in accordance with the action and decisions of this Board as set forth in this resolution, shall be at the applicant's peril. The applicant acknowledges that if any construction should take place, not in accordance with the approved plans (as amended, as the case may be) even if such construction or improvements were allowed under the building permit, the zoning permit shall be revoked until the applicant removes such improvement at the applicant's cost and expense.

10) Any Variance from the terms of the Kearny Zoning Ordinance granted by the Kearny Zoning Board of Adjustment permitting the erection or alteration of any structure or structures shall expire by limitation unless such construction or alteration shall have been actually commenced on each and every structure permitted by variance, within 9 months from the date of entry of the judgement of determination of the Kearny Zoning Board of Adjustment; except however, that the running period of limitation herein provided shall be tolled from the date of filing an appeal from the decision of the Kearny Zoning Board of Adjustment to the Governing Body, or to a Court of competent jurisdiction, until the termination in any manner of such appeal or proceeding.

b) Comments #2 through #5 – Utilities Section of Neglia Engineering Associates review letter dated May 1, 2008 shall be complied with and resolved in good faith by the Applicant to the satisfaction of Neglia Engineering Associates and are hereby incorporated and made conditions of this approval and are set forth at length hereinafter:

2. The applicant shall provide testimony (ie- photographs, televising, etc.) as to the condition of all existing utilities (sanitary, storm, water, etc.) which are to remain and be used as a part of the site improvements. Any utilities below municipal standards shall be replaced as needed.

3. The applicant shall provide testimony that all proposed fire hydrants and hydrant locations fall within the Town of Kearny standards as approved by the Kearny Water Department and the Kearny Fire Department.

4. Fire flow testing should be performed on the existing watermain servicing the subject property to assure adequate pressure is available to accommodate the anticipated water demand.

5. Concrete encasement should be provided for all utility crossings 18" or less.

c) Comments #1 through #6 – Details Section of Neglia Engineering Associates review letter dated May 1, 2008 shall be complied with and resolved in good faith by the Applicant to the satisfaction of Neglia Engineering Associates are hereby incorporated and made conditions of this approval and are set forth at length hereinafter:

1. The fire hydrant assembly detail should be revised to note two 5/8" tie rods to be installed between the gate valve and fire hydrant.

2. All details should note a concrete strength of 4,000 PSI. This includes but is not limited to details for thrust blocks, curbs, fence post footings, bollard footings and sign footings.

3. All soil subgrades should be noted to be compacted to 95% proctor.

4. The 2" Water Service Connection detail should be revised to indicate 3'-6" minimum cover.

5. A detail should be provided for the existing storm drains that are to remain under the proposed hanger.

6. The concrete sidewalk detail should be revised to note expansion joints and control joints to be installed at alternating 5' intervals.

Votes Affirmative: (Swanstrom, Cardoso, Barton, Martello, Konopka, Bigelow, Slavik)

Christine Nee, Secretary Pro-Tem

Carole F. Swanstrom, Chairwoman



#2814

# EXHIBIT 3

**Memorialized**
**RESOLUTION**
**Kearny Zoning Board of Adjustment**
**Application No. 2912**

## PRELIMINARY & FINAL SITE PLAN & VARIANCE APPLICATIONS

Application No. 2912 was filed by RTC Properties, Inc./Helo Holdings, Inc., 100 Central Avenue, Kearny, NJ 07032 (hereinafter referred to as the "Applicant") for premises located in the SKI-S Zone and being designated on the Town Tax Map as Block 288, Lot 10.01 and commonly known as 100 Central Avenue, Kearny, NJ (hereinafter referred to as the "Property").

The purpose of this application was to utilize a new warehouse building #185 (26,997 sq. ft.) as a maintenance building for helicopters; place three trailers and install two above ground fuel tanks on the Property.

RTC Properties, Inc./Helo Holdings, Inc. was returning to the Kearny Board of Adjustment (hereinafter referred to as "Board") to amend prior approvals, in light of changes in the scope of the project.

## HISTORY

By Resolution adopted June 2, 2005, the Board granted Helo's Application #2515, for a use variance, a parking variance, a variance from the requirement for a loading space and site plan approval, for a 9.02 acre portion of Block 288, Lot 10.01, for a helicopter Fixed Base of Operations. Helo would lease the property from the owner, RTC Properties, Inc. (RTC).

By Resolution adopted June 5, 2008, the Board granted Helo's Application #2814 amending the site plan approval of June 2, 2005 as to Phase I of the project. In this 2008 application for amended approval, the project footprint was reduced from 9.02 to 6.8 acres. The size of Hangar #1, closest to the private street, was reduced, the Hangar was shifted 5 feet further away from that street, and the two fuel tanks were increased in size. The Board also granted a variance for the front yard setback for Hangar #1.

By Resolution adopted September 3, 2008, the Kearny Planning Board granted RTC's Application #484, for site plan approval, bulk variances and design waivers to construct a 26,997 sq. ft warehouse on the 2.5 acre southerly portion of the original 9.02 acre parcel that was part of the June 2005 approval but was removed from the project for the June 2008 amended approval. The variances were 1) for relief from the requirement for a 10 foot wide landscaping buffer along all property lines; 2) to permit 41 parking spaces, whereas 52 were required; and 3) a rear yard setback variance, because a 30 foot setback was required, the existing setback was 25 feet and the applicant proposed 22.6 feet. The design waivers were related to driveway dimensions.

**HEARING**

PROCEDURE

A special public hearing was held on this matter on July 22, 2009 at which time the following Board members were present:

Commissioner Carole F. Swanstrom, Chairwoman
Commissioner Janice Barton
Commissioner Richard Konopka
Commissioner Gina Bigelow
Commissioner Joseph Slavik
Alternate Member Anthony Capitti

Also present were:

Town Engineer: Neglia Engineering Associates, Brian Intindola, P.E. and
Kevin O'Sullivan, P.E.
Board Secretary: Susan A. Evanchick
Board Attorney: Michael R. Pichowicz, Esq.

Applicant was represented at the hearing by William C. Sullivan, Jr., Esq., for the firm Scarinci & Hollenbeck, LLC.

Applicant has filed an affidavit showing compliance with all statutory and jurisdictional requirements.

Correspondence from the Kearny Police Department, Kearny Public Works Department and Kearny Water Department was read into the record.

In addition, a six-page review letter from Neglia Engineering Associates dated April 23, 2009, signed by Michael J. Neglia, P.E., P.L.S., P.P., Town Engineer, Town of Kearny and Kevin O'Sullivan for the Town Engineer (hereinafter referred to as: "Town Engineer's Letter") was incorporated into the record.

Mr. Sullivan opened the meeting with an introduction.

EVIDENCE

The Zoning Board reviewed the variance application, amended site plan application, and plans submitted in the matter, including, but not limited to, thirteen page set of plans dated 03/03/09 – revised 03/26/09 from Bohler Engineering, 35 Technology Drive, Warren, NJ 07059, prepared by K.B. Cahill, P.E. (cover sheet, overall existing conditions plan, overall site plan, demolition plan, site plan, grading plan, utilities plan, lighting plan, landscape plan, soil erosion & sediment control plan, detail sheets – three pages); Boundary & Topographic Survey by Control Point Associates, Inc. – four pages;

Stormwater Management Report dated March, 2009 from Bohler Engineering, 35 Technology Drive, Warren, NJ 07059, prepared by K.B. Cahill, P.E. (including existing drainage areas map, proposed drainage areas map, inlet drainage area map, water quality map). In addition, the Board considered the Denial/Referral of Permit executed by the Construction Official/Zoning Officer, Michael J. Martello dated 03/19/2009 updated June 30, 2009.

As set forth in the Applicant's Rider to Application, due to the need to reduce the initial project costs and other changes to the project scope, Helo and RTC proposed the following:

1. Instead of building a hangar on the 6.8 acre parcel, as approved by this Board in 2008, Helo proposes to lease space in the RTC building approved by the Planning Board in 2008 and to carry out in that building the maintenance and other activities planned for the hangar. The hangar may be constructed in the future, as the business expands. To use the RTC building, Helo needs the Board to renew the 2005 use variance it granted to Helo for the southerly 2.5 acres (part of the original 9.02 acre parcel).
2. RTC requires new site plan approval for that southerly 2.5 acres, due to several site changes to accommodate Helo's use, including additional parking and parking lot configuration.
3. Helo requires new site plan approval to remove from its FBO project a 1.94 acre area that was part of the amended site plan approval for 6.5 acres this Board granted in 2008, because that 1.94 acre parcel is not being leased by Helo from RTC at this time. Amended site plan approval for Helo is also required for the 4.506 remainder of the 6.5 acre parcel that was the subject of this Board's 2008 approval, primarily to add three proposed 24' x 60' trailers on foundation to use for offices for Helo, the pilot's lounge and related purposes.
4. Site plan approval for RTC for the 1.94 acre parcel in #3 above. RTC proposes to relocate truck parking spaces previously located on the entire 9+ acre tract, for use by nearby industrial tenants. Therefore, these spaces are simply a continuation, at a somewhat different location and with a proper configuration, of accessory parking already existing on this tax lot. Because this parcel included the first Helo building in the plan approved by this Board in 2008, a new site plan approval is required to stripe and curb the area for this accessory truck parking.

As the Applicant's Rider explained, instead of building the hangar originally intended for this parcel, Helo intends, at least for the short term, to lease space in the RTC building described in #1 for helicopter parking and maintenance. Helo will not lease the 1.94 acre parcel from RTC at this time. As the FBO business grows, Helo and RTC may then enter into a lease for this parcel, at which point they will need to return to the Board for approvals for a hangar on that parcel.

As the Applicant's Rider set forth, most of the proposed facilities have been previously approved by the Board or the Planning Board. The use variance application simply asks the Board to reinstate a use variance it gave Helo in 2005. The only bulk variances required are the following, all of which were previously approved by this Board in 2005 and 2008:

38-7.1 Parking for a heliport is not listed in the Land Use Regulations. The Applicants propose 69 parking spaces, including four handicapped accessible spaces, 33 more spaces than proposed in 2005. Under the Ordinance, adequacy of parking must be determined by the Board.

36-12.3(a) Two loading spaces required. None proposed.

2008-(O)-04 All operations, activities and storage (except off-street parking including trucks, tractors, trailers or similar vehicles and unloading/loading, accessory lumber yards and home improvement centers) shall be conducted in completely enclosed buildings, whereas parking of helicopters will be stored outside of enclosed buildings and/or a 10 foot landscape buffer area around all property lines, whereas a grass buffer is proposed.

No other variances are required. The changes described above are primarily technical or relatively minor. However, those changes require new site plan approval.

The Applicant is in the first phase of a multi-phase project and Helo expects to return in the future with site plan applications for later phases. Helo and RTC submit that the proposed changes are relatively minor alterations to a project this Board and the Planning Board endorsed in 2005 and 2008.

Keith Cahill, PE was sworn-in and was accepted as an expert in the field of engineering. Mr. Cahill reviewed with the Board the history of application and approvals previously granted. He explained: A-1 aerial exhibit; A-2 plans from 5/10/05; A-3 plans from 9/27/07; A-4 plans from 2008; A-5 Sheet #5 from present application. He set forth the application was to use the 26,997 square foot building that is in the process of being constructed as a hangar. The parcel occupies 7.26 acres. He stated another parcel occupying 1.94 acres would become truck parking for an existing tenant, Newbreed, who occupies Building #73. Newbreed, who is the current occupant of the property for truck parking, would only lose the area of the heliport area they are presently using. Mr. Cahill described the mezzanine area of the building would be used as added storage for the hangar, as well as, office space. He testified there would now be 31 parking stalls, including two handicap stalls, near the operation of the hangar. In addition, there would be 38 parking stalls, including two handicap stalls, near the three trailers. He set forth the use of the three trailers: for Helo operations, administrative offices and for the pilots in the waiting area. Mr. Cahill stated the rear yard conditions on the Passaic River were existing and the overall site was secure. He introduced A-6, a full plan phase-out dated 3/26/09 prepared by his firm. Further, Mr. Cahill addressed drainage and utilities aspects and stated the hangar would not be on top of the existing

drainage pipe. He discussed the overall conditions of the site by referring to the submitted plans. When asked by Chairwoman Swanstrom that the truck parking seems close to the hangar operations, he stated it was safe and was an FAA approved site. Mr. Cahill reiterated that the current plan added 31 parking stalls, as compared to previous approvals, for a total of 69 stalls. He stated there would be a total of 40 to 45 employees total on one shift and the total proposed parking was sufficient for the site. Mr. Cahill introduced Exhibit A-7, a 3-D photo rendering of the site. In response to the Town Engineer's question, he agreed to relocate the fence approximately seven feet so that the ramp railing could not be used to climb the fence. Mr. Cahill testified the truck parking area was for trailers and there would be no stacking of trailers/containers. When questioned by the Town Engineer, he agreed to supply a signage and striping package for the parking area and to associate it with Building #73. In addition, Mr. Cahill agreed to design a handicap ramp for the office trailers as a gang ramp system. Exhibit A-8 was introduced, a picture of the trailer set-up.

Robert Neu, VP and principal of RTC Properties, Inc. was sworn-in and briefly described the proposed operation. He stated the proposed 1.94 acre parking area was a replacement area for tenant, Newbreed, who occupies Building #73, who had occupied the entire 9.02 acre site. Mr. Neu agreed to add guard rails along the westerly side of the parking area bordering the heliport operations as an extra protection to separate the Helo operations from Newbreed's trailer parking.

It was set forth that the approval of this application will not negatively impact the Town of Kearny.

**PUBLIC**

The meeting was opened to the public.

Frank Capece, Esq., Westfield, NJ, counsel appeared for Linden Airport. He stated the increase in aircraft noise and straight-line routes should be considered by the Board. He stated that NJDOT approval was not obtained and that Applicant is required to obtain NJDOT approval for helicopter routes. He segued into the next objector, Paul Dudley, who works for his client.

Paul Dudley, 101 W. Metro Road, Linden, NJ was sworn-in. Mr. Dudley testified he is a helicopter pilot and director of Linden Municipal Airport. He set forth his concerns for noise, airspace congestion, flying over residential areas, safety and adequate planning for emergency landings. He referred to a committee report that was not offered into the record. On cross-examination from Mr. Sullivan, Mr. Dudley stated the committee report was a report from Jeff Smith, Wings Air, but it was not available for the hearing. Mr. Sullivan reminded everyone that a use variance for the heliport had been granted in the past. In addition, Mr. Sullivan elicited from Mr. Dudley that Linden Airport was a public facility and as such it did not require land use approvals.

Mr. Dudley stated that helicopters landed at Linden Airport, but stopped short of stating that the proposed operation could be classified as a competitor of Linden Airport,

which is located approximately fifteen miles away. Mr. Dudley set forth that he was concerned for the helicopter industry, pilots, air traffic controllers, people on the ground, and the flying public in general and opposed the Application.

After a brief recess, Robert Neu, who was already sworn-in, testified in rebuttal. He stated there was no adverse noise impact and any noise from trains/trucks/airplanes in the air was ambient. He testified an application was in fact filed with NJDOT.

No one else spoke either in favor or in opposition to the application.

Mr. Sullivan set forth there was no adverse past testimony involving this Applicant and the objectors should be categorized as a classic competitor situation.

The Board closed the public portion of the meeting.

## FINDINGS AND CONCLUSIONS

After hearing presentation of the Applicant's application and submissions and considering the testimony of the witnesses and the public and upon review of the plans submitted by the Applicant, the Board found as follows:

Regarding the use variance at issue herein, this Board granted a use variance for the entire 9.02 acre parcel in 2005, including the heliport operations. The Board finds the proposed uses for a scaled down heliport operation and scaled down truck parking (the present use) are less intensive ones, albeit the same uses than those previously granted. The proposed application harmonizes the uses of the property to the use previously obtained in 2005 while maintaining truck parking for the existing tenant.

The Board is mindful that prior approvals granted by the Board and Planning Board, as modified, are protected by virtue of the Permit Extension Act, P.L. 2008, c.78, until at least July 1, 2010.

In the pending application, the Board took notice of and recognized the prior approvals referenced herein. The Board cited and relied upon the 2005 use variance approval, which found that Helo had met the statutory criteria for that use variance

The Board finds that the applicant seeks relief under N.J.S.A. 40:50D-70(d)(1) and that special reasons support the granting of the variances. In addition, sufficient reasons were set forth to approve the amended preliminary and final site plan and to grant design waivers.

Specifically, the Board determines that the prior findings of this Board in support of the use variance for the entire property subject to this application remain unchanged and valid, and that the testimony during the hearing on this application, coupled with those prior findings of the Board, support the granting of the relief requested herein.

In addition, regarding the bulk variances and design waivers, the Board determines that they were of the types that were previously granted and that parking is sufficient and was more than proposed previously.

In this proceeding, RTC/Helo offered unconditional and uncontroverted testimony, accepted and relied upon by the Board, that the facility operations and impacts, including but not limited to flight paths and noise impacts, would be the same as in the operations approved by the use variance in 2005.

The Board finds that the expert testimony of Keith Cahill was credible to support the relief requested, i.e., the adequacy of the parking spaces for the facility's operation, the lack of a need for loading spaces, the necessity of outdoor helicopter parking and the continuation of trailer parking.

In addition, the Board finds that the relief requested would be without substantial detriment to the public good and will not substantially impair the intent and purpose of the Zone Plan of the Town of Kearny or the Zoning Ordinance of Kearny.

Specifically, the Commissioners discussed safety concerns during the application and found they would be remedied with added guard rails, movement of a ramp railing and compliance with certain recommendations in the Town Engineer's letter.

The Commissioners considered and weighed the concerns from Mr. Capece, the Attorney for Linden Airport, and Mr. Dudley, the Director of Linden Airport. The Board determines those issues were addressed in the past and remain unchanged.

The Board determines that the conditions to be placed on the application will adequately protect the pubic health, safety and welfare.

The Board finds the proposed uses are positive ones and less intensive ones than was previously granted and would result in good land use development for the area.

## RESOLUTION

Now Therefore Be It Resolved by the Zoning Board of Adjustment of the Town of Kearny on this 4th day of **August, 2009**, that application number 2912 is approved subject to the following conditions:

Relative to Neglia Engineering Associates' letter dated April 23, 2009 (copy attached):

**a) Items, under the PARKING section:**

1. **69 spaces are accepted as sufficient – variance and design waivers granted.**
2. **No off-street loading spaces are needed – variance and design waivers granted.**

3. The truck parking area for the 1.94 acre parcel is assigned to Newbreed, the occupant of Building #73, the trailers shall be unstacked only; a guard rail barrier shall be installed between the hangar operations and the truck parking; and the railing for the handicap ramp near the fence for the hangar building parking shall be configured so that there will not be a gap in order to prevent anybody from climbing the railing to jump over the fence.

4. The Board is mindful that the applicant may apply to eliminate truck parking in the future.

5. The Board finds the 69 parking spaces to be sufficient.

6. The Applicant shall provide and submit plans to the Town Engineer, subject to his approval: a one-way signage and striping package for the truck parking area and the handicap ramp for the office trailers shall be a gang ramp system.

7. The Board finds 9' x 20' parking spaces to be sufficient.

b) Items #1 through #8 under the DRAINAGE AND GRADING section of the Town Engineer's Letter shall be resolved by the Applicant in their revised plans and revised specifications to the satisfaction of the Town Engineer.

c) Items #1 through #5, under UTILITIES section of the Town Engineer's Letter, shall be resolved by the Applicant in their revised plans and revised specifications to the satisfaction of the Town Engineer; the reasons why a loop connection is not possible shall be provided.

d) Item #1, under the LANDSCAPING & LIGHTING section of the Town Engineer's Letter, the Board approves same in accordance with F.A.A. requirements.

e) Items #1 through #4, under the DETAILS section of the Town Engineer's Letter shall be resolved by the Applicant in their revised plans and revised specifications to the satisfaction of the Town Engineer.

f) Items #1 through #5, under the OTHER AGENCY APPROVALS section of the Town Engineer's Letter, shall be resolved by the Applicant in their revised plans and revised specifications to the satisfaction of the Town Engineer. In addition, new item #6, NJDOT approvals shall be obtained by Applicant and new item #7, Hudson County Planning Board approval shall be obtained by the applicant.

g) **Item #1, under GENERAL section of the Town Engineer's Letter, shall be indicated on the revised plans and revised specifications as set forth at the hearing to the satisfaction of the Town Engineer;**

h) **Items #2 through 7, under FINAL COMMENTS section of the Town Engineer's Letter, shall be complied with and specifically, preliminary and final approval shall be for Phase I only.**

i) **Except as applicable to these approvals, Applicant shall comply with all other conditions set forth in Kearny Planning Board Application #484.**

j) **Applicant is granted design waivers for the parking spaces and loading docks and as applicable shall submit the design waivers and pay all fees.**

k) **Applicant shall follow flight patterns of prior approvals;**

l) **Any variance from the terms of the Kearny Zoning Ordinance granted by the Kearny Zoning Board of Adjustment permitting the erection or alteration of any structure of structures shall expire by limitation unless such construction or alteration shall have been actually commenced on each and every structure permitted by variance, within 9 months from the date of entry of the judgement of determination of the Kearny Zoning Board of Adjustment to the Governing Body, or to a Court of competent jurisdiction, until the termination in any manner of such appeal or proceeding.**

Votes Affirmative: (Swanstrom, Barton, Konopka, Bigelow, Slavik, Capitti)

Votes Negative: NONE

Susan A. Evanchick, Secretary

Carole F. Swanstrom, Chairwoman



#2912

# EXHIBIT 4

**Memorialized**
**RESOLUTION**
**Kearny Zoning Board of Adjustment**
**Application No. 2012.19**

## PRELIMINARY & FINAL SITE PLAN & VARIANCE APPLICATIONS

Application No. 2012.19 was filed by RTC Properties, Inc./Helo Holdings, Inc., 100 Central Avenue, Suite 630, Kearny, NJ 07032 (hereinafter referred to as the "Applicant") for premises located in the SKI-S Zone and being designated on the Town Tax Map as Block 288, Lot 10.01 and commonly known as 100 Central Avenue a/k/a 165 Western Road, Kearny, NJ (hereinafter referred to as the "Property").

The purpose of this application was to construct a building containing approximately 9,420 sq. ft. to be used as offices and approximately 39,960 sq. ft. for Hangar #2, including maintenance shop areas.

## HISTORY

By Resolution adopted June 2, 2005, the Board granted Helo's Application #2515, for a use variance, a parking variance, a variance from the requirement for a loading space and site plan approval, for a 9.02 acre portion of Block 288, Lot 10.01, for a helicopter Fixed Base of Operations. Helo would lease the property from the owner, RTC Properties, Inc. ("RTC").

By Resolution adopted June 5, 2008, the Board granted Helo's Application #2814 amending the site plan approval of June 2, 2005 as to Phase I of the project. In this 2008 application for amended approval, the project footprint was reduced from 9.0 to 6.8 acres. The size of Hangar #1, closest to the private street, was reduced, the Hangar was shifted 5 feet further away from that street, and the two fuel tanks were increased in size. The Board also granted a variance for front yard setback for Hangar #1.

By Resolution adopted September 3, 2008, the Kearny Planning Board granted RTC's Application #484, for site plan approval, bulk variances and design waivers to construct a 26,997 sq. ft warehouse on the 2.5 acre southerly portion of the original 9.02 acre parcel that was part of the June 2005 approval but was removed from the project for the June 2008 amended approval. The variances were 1) for relief from the requirement for a 10 foot wide landscaping buffer along all property lines; 2) to permit 41 parking spaces, whereas 52 were required; and 3) a rear yard setback variance, because a 30 foot setback was required, the existing setback was 25 feet and the applicant proposed 22.6 feet. The design waivers were related to driveway dimensions.

By Resolution adopted August 4, 2009, the Board granted RTC's application #2912 for preliminary and final site plan and variance approvals, to amend prior approvals for various changes in the scope of the project. Specifically, the Board approved the Applicant to utilize a new warehouse building #185 (26,997 sq. ft.) as a maintenance building for helicopters; place three trailers and install two above ground fuel tanks on the Property.

**HEARING**

PROCEDURE

A public hearing was held on this matter on September 4, 2012 at which time the following Board members were present:

Commissioner Anthony Capitti, Vice-Chairman, (Chairman Pro-Tem)
Commissioner Janice Barton
Commissioner Gina Bigelow
Commissioner Carole Swanstrom
Commissioner Sebastian Viscuso
Alternate Member James Hill
Alternate Member Cecilia Lindenfelser

Also present were:

Town Engineer: Neglia Engineering Associates, Kevin O'Sullivan, P.E.
Board Secretary: Susan A. Evanchick
Board Attorney: Michael R. Pichowicz, Esq.

Applicant was represented at the hearing by Steven J. Tripp, Esq., for the firm Wilentz, Goldman & Spitzer, P.A.

Applicant has filed an affidavit showing compliance with all statutory and jurisdictional requirements.

In addition, a five-page review letter from Neglia Engineering Associates dated August 28, 2012, signed by Kevin O'Sullivan, P.E., for the Town Engineer, Town of Kearny (hereinafter referred to as: "Town Engineer's Letter") was incorporated into the record.

Mr. Tripp opened the meeting with an introduction. He described the history of the project. He stated Phase I was built and the Applicant now desired to construct Phase II, which was consistent with the overall plan. Specifically, the Applicant was requesting approvals for a second hangar and an additional building for offices and a pilot lounge.

EVIDENCE

The Zoning Board reviewed the variance application, amended site plan application, and plans submitted in the matter, including, but not limited to, twelve pages of plans dated 06/22/12 – revised 06/22/11 from Bohler Engineering, 35 Technology Drive, Warren, NJ 07059, prepared by K.B. Cahill, P.E. (cover sheet, overall existing conditions plan, overall site plan, demolition plan, site plan, grading plan, drainage & utilities plan, landscape & lighting plan, soil erosion & sediment control plan, detail sheets – three pages); Boundary & Topographic Survey by Control Point Associates, Inc. – four pages, last revised on 04/20/12 by James C. Weed, NJPLS;

Stormwater Management Report dated May 2012 from Bohler Engineering, 35 Technology Drive, Warren, NJ 07059, prepared by Keith B. Cahill, P.E. (including existing drainage areas map, proposed drainage areas map, proposed inlet areas map). In addition, the Board considered the Denial/Referral of Permit: a) for #30377 executed by the Construction Official/Zoning Officer, Michael J. Martello, originally prepared: 07/24/12, amended 08/08/12, 08/09/12 and 08/30/12; and b) for #30378 executed by the Construction Official/Zoning Officer, Michael J. Martello, dated 07/24/12.

PUBLIC HEARING

Jeff Hyman, 165 Western Road, Kearny, New Jersey was sworn-in and testified on behalf of the Applicant. Mr. Hyman is the CEO of operations. He described the current operations at the site. The existing, approximately 27,000 sq. ft. hangar houses twenty (20) aircraft and typically operates from the peak hours of 7 am and 9 pm every day. He described the existing trailers along with his seven (7) employees, which are three (3) executives, three (3) crew members and one (1) executive assistant. Four (4) employees maximum are present at any one given time. He stated there are two main tenants who have fifteen (15) employees at peak times. The new hangar would house twenty-seven (27) smaller aircraft or twenty (20) larger aircraft. Flights would increase by up to forty-five (45) per day.

In addition, Mr. Hyman testified that between thirteen (13) and thirty-four (34) parking spaces were used presently. With the new hangar added, he described how the eighty-one (81) spaces were more than sufficient. Further, he stated loading zones were not needed since many deliveries were small and they can be effectively controlled at the gate. He set forth larger deliveries occur at the hangar, i.e. aircraft parts. Mr. Hyman reiterated the site does not permit passengers and is basically for storage, maintenance and fueling.

Keith Cahill, PE was sworn-in and was accepted and qualified as an expert in the field of engineering. Mr. Cahill reviewed with the Board: A-1 aerial exhibit of overall site; A-2 aerial exhibit of area covered by this application; A-3 Phase II use variance plan from prior approval; A-4 Phase I site plan from prior approval; A-5 the new site plan. He explained the history of the site, including the sizes of the buildings approved in the past and the ones that were being proposed. The new buildings were actually smaller than previously proposed and approved which allowed for an additional twelve (12) parking spaces.

Mr. Cahill stated the existing storm water system would be utilized. He also reviewed the utilities plan and the site lighting. With respect to the Town Engineer's Letter, Mr. Cahill stated the Applicant would comply with the parking delineation for the proposed parking areas in #5- Parking and that the new parking stalls were 10' x 20' (in order to comply with #6 Parking). Also, Mr. Cahill indicated that the Applicant is in the process of videotaping the existing utilities and that the present sanitary sewers were adequate. He indicated the Applicant would comply with the 'Utilities' section of the Town Engineer's letter and will install additional fire hydrant(s) if needed by the fire department. He stated all other agency approvals, including the FAA, are either still valid or will be complied with.

Elizabeth Leheny, 33-41 Newark Street, Hoboken, New Jersey was sworn-in. She placed her credentials on the record and was accepted and qualified by the Board in the area of professional planning. She reviewed the series of approvals granted by the town's land use boards. She reviewed the parking plan and concluded the proposed eighty-one (81) spaces were sufficient. Ms. Leheny reviewed the legal requirements for granting approvals. She set forth the reasons for granting the relief requested and opined that the positive and negative criteria were met. Specifically, she stated that numerous purposes of the N.J.S.A. 40:55D-2 were promoted including (a) and (g). She noted that the property was far away from residential uses and that waivers of certain site plan deficiencies were supported in the record. Ms. Leheny stated that the Applicant's proposal would not negatively impact the Town of Kearny.

## PUBLIC PARTICIPATION

The meeting was opened to the public.

No one spoke either in favor or in opposition to the application.

The Board closed the public portion of the meeting.

## FINDINGS AND CONCLUSIONS

After hearing presentation of the Applicant's application and submissions and considering the testimony of the witnesses and the public and upon review of the plans submitted by the Applicant, the Board found as follows:

Regarding the variance at issue herein, this Board granted a use variance for a 9.02 acre portion of the Property in 2005, and again for a 9.2 acre portion of the Property in 2009, including the heliport operations. The Board finds the proposed uses for a scaled down heliport operation with additional parking is consistent with prior approvals, albeit not as extensive as the ones previously granted. The proposed application for Phase II is consistent with the approvals previously granted, with additional parking.

The Board finds that the variances sought are of the type found in N.J.S.A. 40:50D-70c(2) and it is for a specific piece of property and that some of the purposes of the Municipal Land Use Act would be advanced by a deviation from the requirements of the Kearny Zoning Ordinance. It further finds that the benefits of the deviation would substantially outweigh any detriment. It is further convinced that the applicant has shown that the relief requested can be granted without substantial detriment to the public good and the relief will not substantially impair the intent and purpose of the Zoning Ordinance of Kearny.

## RESOLUTION

Now Therefore Be It Resolved by the Zoning Board of Adjustment of the Town of Kearny on this ***2nd day of October, 2012***, that application number 2012.19 is approved subject to the following conditions:

a) **Items, under the PARKING section of the Town Engineer's Letter,**

1. **81 spaces are accepted as sufficient – variance and design waivers granted.**

2. **No off-street loading spaces are needed – variance and design waivers granted.**

3. **The current truck parking area, i.e. eight (8) small truck and thirty-two (32) large trucks is eliminated.**

4. **The Board finds the 10' x 20' parking space size for the new spaces to be sufficient.**

b) **Item #2 under the DRAINAGE AND GRADING section of the Town Engineer's Letter, the Applicant shall comply with and provide information to the satisfaction of the Town Engineer.**

c) **Item #2 under UTILITIES section of the Town Engineer's Letter shall be resolved by the Applicant; specifically Applicant will install additional fire hydrant(s) at its own expense if determined to be needed by the Fire Department and or Town Engineer.**

d) **Item #1, under the LANDSCAPING & LIGHTING section of the Town Engineer's Letter, the Board approves same in accordance with F.A.A. requirements.**

e) **Items #1 through #5, under the OTHER AGENCY APPROVALS section of the Town Engineer's Letter, shall be resolved by the Applicant in their revised plans and revised specifications to the satisfaction of the Town Engineer.**

f) **Items #2 through 7, under FINAL COMMENTS section of the Town Engineer's Letter, shall be complied with. Except as applicable to these approvals. Applicant is granted design waivers for the parking spaces and loading docks and as applicable shall submit the design waivers and pay all fees.**

Votes Affirmative: (Capitti, Barton, Bigelow, Swanstrom, Viscuso, Hill, Lindenfelser)

Votes Negative: NONE

Susan A. Evanchick, Secretary

Anthony Capitti, Vice-Chairman

# EXHIBIT 5

**Memorialized**
**RESOLUTION**
**Kearny Zoning Board of Adjustment**
**Application No. 2014.14**

**PRELIMINARY & FINAL SITE PLAN & VARIANCE APPLICATIONS**

Application No. 2014.14 was filed by RTC Properties, Inc./Helo Holdings, Inc., 100 Central Avenue, a/k/a 165 Western Road, Kearny, NJ 07032 (hereinafter referred to as the "Applicant") for premises located in the SKI-S Zone and being designated on the Town Tax Map as Block 288, Lot 10.01 and commonly known as 100 Central Avenue, Kearny, NJ (hereinafter referred to as the "Property").

The purpose of this application was to construct a new helicopter maintenance facility with offices and lounge for a total of 40,464 sq. ft.

**HISTORY**

By Resolution adopted June 2, 2005, the Board granted Helo's Application #2515, for a use variance, a parking variance, a variance from the requirement for a loading space and site plan approval, for a 9.02 acre portion of Block 288, Lot 10.01, for a helicopter Fixed Base of Operations. Helo would lease the property from the owner, RTC Properties, Inc. ("RTC").

By Resolution adopted June 5, 2008, the Board granted Helo's Application #2814 amending the site plan approval of June 2, 2005 as to Phase I of the project. In this 2008 application for amended approval, the project footprint was reduced from 9.0 to 6.8 acres. The size of Hangar #1, closest to the private street, was reduced, the Hangar was shifted 5 feet further away from that street, and the two fuel tanks were increased in size. The Board also granted a variance for front yard setback for Hangar #1.

By Resolution adopted September 3, 2008, the Kearny Planning Board granted RTC's Application #484, for site plan approval, bulk variances and design waivers to construct a 26,997 sq. ft warehouse on the 2.5 acre southerly portion of the original 9.02 acre parcel that was part of the June 2005 approval but was removed from the project for the June 2008 amended approval. The variances were 1) for relief from the requirement for a 10 foot wide landscaping buffer along all property lines; 2) to permit 41 parking spaces, whereas 52 were required; and 3) a rear yard setback variance, because a 30 foot setback was required, the existing setback was 25 feet and the applicant proposed 22.6 feet. The design waivers were related to driveway dimensions.

By Resolution adopted August 4, 2009, the Board granted RTC's application #2912 for preliminary and final site plan and variance approvals, to amend prior approvals for various changes in the scope of the project. Specifically, the Board approved the Applicant to utilize a new warehouse building #185 (26,997 sq. ft.) as a maintenance building for helicopters; place three trailers and install two above ground fuel tanks on the Property.



#2014.14.docx

By Resolution dated October 2, 2012, the Board granted RTC's application #2012.19 for preliminary and final site plan and variance approvals, to construct a building containing approximately 9,420 sq. ft. to be used as offices and approximately 39,960 sq. ft. for Hangar #2, including maintenance shop areas.

## HEARING

### PROCEDURE

A public hearing was held on this matter on November 6, 2014 at which time the following Board members were present:

Commissioner Anthony Capitti, Chairman
Commissioner Carole Swanstrom
Commissioner Janice Barton
Commissioner Joseph Slavik
Commissioner Sebastian Viscuso
Commissioner Cecilia Lindenfelser

Also present were:

Town Engineer: Neglia Engineering Associates, David Juzmeski, P.E.
Board Secretary: Susan A. Evanchick
Board Attorney: Michael R. Pichowicz, Esq.

Applicant was represented at the hearing by Gary D. Bennett, Esq., for the firm Koch, Koch, Bennett & Buono, P.C.

Applicant has filed an affidavit showing compliance with all statutory and jurisdictional requirements.

In addition, an eight-page review letter from Neglia Engineering Associates dated July 9, 2014, revised October 21, 2014, signed by Michael J. Neglia, P.E., P.P., P.L.S., Town Engineer and David Juzmeski, P.E., P.P., for the Town Engineer, Town of Kearny (hereinafter referred to as: "Town Engineer's Letter") was incorporated into the record.

Mr. Bennett introduced himself and provided a brief history back to the year 2005. He indicated although the last Application was approved back in September 2012, the project did not materialize because Superstorm Sandy intervened and caused the Applicant to modify the plans. The Applicant found it necessary to maintain a fifteen (15) foot elevation and file the instant Application. Basically, the Applicant sought to shrink the proposed second building, relocate it further away from the Passaic River and increase parking.

## EVIDENCE

The Zoning Board reviewed the variance application, site plan application, and plans submitted in the matter, including, but not limited to, twelve pages of plans dated 06/09/14 – revised 07/30/14 from Bohler Engineering, 35 Technology Drive, Warren, NJ 07059, prepared by K.B. Cahill, P.E. (cover sheet, overall existing conditions plan, overall site plan, demolition plan, site plan, grading plan, drainage & utilities plan, soil erosion & sediment control plan, lighting plan, detail sheets (A), (B) and (C) – three pages); Boundary & Topographic Survey by Control Point Associates, Inc., 35 Technology Drive, Warren, NJ 07059, four pages, last revised on 07/23/14 by James C. Weed, NJPLS; two sheets marked building floor plan and building elevations prepared by John A. Buchholz, AIA, LEED AP, The Buchholz Architectural Group, P.C., 123 Columbia Turnpike, Florham Park, NJ 07932. In addition, the Board considered the Denial/Referral of Permit executed by the Construction Official/Zoning Officer, Michael J. Martello, originally prepared: 07/14/14, amended 08/18/14.

## HEARING

Keith Cahill, PE was sworn-in and was accepted and qualified as an expert in the field of engineering. Mr. Cahill reviewed with the Board: A-1 aerial exhibit from Google Earth; A-2 aerial exhibit zoom-in of A-1 and the 9.2 acre site; A-3 phase II use variance plan prepared in the year 2009; A-4 site plan approved and constructed with 7.4 acres and parking of tractor trailers; A-5 last approval from the year 2012 – 82,377 sq. ft. and 81 parking spaces with a finished floor elevation of 11.2 feet; A-6 site plan approval 5 of 12 revised 7/30/14 showing 15.2 feet elevation with 76,527 sq. ft. and 88 parking spaces.

Mr. Cahill opined that even though more parking was being provided the Applicant would not require more than sixty (60) parking spaces especially since there will be only one or two customers. Engineer Cahill set forth that Western Road has been realigned and that an updated NJDEP Waterfront Development Permit will be obtained.

He also outlined the area of 26 truck parking spaces to the north and stated that they would be up to 62' in length. He indicated that there is more green space with the new plans, but that a waiver would be necessary from shrubs and trees because they are an attraction for birds which becomes a safety hazard for the helicopters.

Mr. Cahill then reviewed the 88 space parking configuration, the six foot high fence details and displayed Exhibit A-7, a 3D rendering. He reviewed the Lighting Plan for the hangar and parking lot, including the free standing lights and building lights. He stated there would be ADA access on the north and south sides of the building. In addition, he stated the plans were for six (6) people in the office and there would be other offices within the hangar, but at peak times there would be sixty (60) employees during 8 am and 5 pm.

Robert Neu, President of RTC Properties, Inc. 100 Central Avenue, Kearny, New Jersey 07032, was sworn-in and testified. He stated that trees are important on his entire

site and that he has planted many recently. He actively looks for spots he can place them safely for the tenants.

Elizabeth Leheny, P.P. 33-41 Newark Street, Hoboken, New Jersey was sworn-in. She placed her credentials on the record and was accepted and qualified by the Board in the area of professional planning. She pointed out that the site was particularly suited for the use as it was far away from residents and surrounded by a vast industrial site. She stated that the use was a special unique one that is usually not permitted. Ms. Leheny reviewed the legal requirements for granting approvals. She noted that the Board had approved the Application in the past which was more intense with less parking spaces. Given the situation, she stated that the Applicant was not an expansion of a prior use. She set forth the reasons for granting the relief requested and opined that the positive and negative criteria were met. Specifically, she stated that numerous purposes of the N.J.S.A. 40:55D-2 were promoted including (a) and (g). Ms. Leheny stated that the Applicant's proposal would not negatively impact the Town of Kearny and there was no substantial detriment if the Application was approved.

Jeff Hyman, 165 Western Road, Kearny, New Jersey was sworn-in and testified on behalf of the Applicant. Mr. Hyman is the CEO of operations. He described the current operations at the site. Specifically, he estimated that the hours of operation during the periods March/April to September/October would be 8 am to 7 pm and during the winter months 8 am to 5 pm. At any given time, Mr. Hyman stated there would be sixty (60) employees maximum. His facilities would offer no helicopter tours.

## PUBLIC

The meeting was opened to the public.

No one spoke either in favor or in opposition to the application.

The Board closed the public portion of the meeting.

## FINDINGS AND CONCLUSIONS

After hearing presentation of the Applicant's application and submissions and considering the testimony of the witnesses and the public and upon review of the plans submitted by the Applicant, the Board found as follows:

Regarding the use variance at issue herein, this Board granted a use variance for the parcel in the past. The proposed use is less intensive that what was approved in the past and provides for additional parking. The Board finds the proposed use for a scaled down building moved away from the Passaic River is consistent with prior approvals and provides for better preparation in case of flooding. Notwithstanding, the Board finds that the use variances sought are of the type found in N.J.S.A. 40:50D-70d(2) and that the Applicant provided sufficient special reasons that would permit the use proposed.

With respect to the balance of the variances and waivers, the Board finds that they are of the type found in N.J.S.A. 40:50D-70c(2) and they relate to a specific piece of property and that some of the purposes of the Municipal Land Use Act would be advanced by a deviation from the requirements of the Kearny Zoning Ordinance.

Regarding all variances and waivers granted by the Board, it finds that the benefits of the deviation would substantially outweigh any detriment. It is further convinced that the Applicant has shown that the relief requested can be granted without substantial detriment to the public good and the relief will not substantially impair the intent and purpose of the Zoning Ordinance of Kearny.

## RESOLUTION

Now Therefore Be It Resolved by the Zoning Board of Adjustment of the Town of Kearny on this 8th day of December 2014, that application number 2014.14 is approved subject to the following conditions:

a) **Items under the Completeness Section of the Town Engineer's Letter**

1. **Applicant confirmed there will be no signage proposed under #4.**

b) **Items under the Waivers Section of the Town Engineer's Letter.**

1. **For #1, a waiver of the landscape plan is granted as submitted.**
2. **For #2, 88 spaces are accepted as sufficient – variance and design waivers are granted as submitted.**
3. **For #3, a waiver for sidewalks is granted as submitted.**
4. **For #4, screening of refuse will be with fence with slats.**

c) **Items under Variances Section of the Town Engineer's Letter**

1. **Applicant's Variances are granted as listed.**

d) **Items under Engineering and Planning Comments Section of the Town Engineer's Letter**

1. **Applicant's testimony was accepted as satisfying #1, #3, #4, #5, #6 and #7.**

e) **Items under Grading, Drainage & Utility Comments Section of the Town Engineer's Letter**

1. **Applicant will obtain an updated NJDEP Waterfront Development Permit for #1, #2 and #3.**

2. **Applicant's testimony was accepted as satisfying #4.**

3. **Applicant shall comply and address #5 with the Town Engineer.**

4. **Applicant shall not be required to re-route, etc. and accepts Applicant's testimony as satisfying #7.**

5. **Applicant shall comply and address #8 and #9 with the Town Engineer.**

**f) <u>Item under Traffic Section of the Town Engineer's Letter</u>**

1. **Applicant's testimony was accepted as satisfying #1.**

**g) <u>Items under Lighting and Landscaping Comments Section of the Town Engineer's Letter</u>**

1. **Applicant's testimony for seeded grass areas was accepted as satisfying #1 and #2 due to safety concerns the planting of trees and shrubs in the vicinity were not appropriate.**

2. **Applicant's testimony addressed #3 and #4 with dusk to dawn lighting and shall comply with F.A.A. requirements.**

**h) <u>Items under Final Comments Section of the Town Engineer's Letter</u>**

1. **Applicant shall comply with #1 through #6.**

Votes Affirmative: (Capitti, Swanstrom, Barton, Slavik, Viscuso, Lindenfelser)

Votes Negative: NONE

Susan A. Evanchick, Secretary

Anthony Capitti, Chairman



#2014.14.docx

# EXHIBIT 6

NEGLIA
ENGINEERING ASSOCIATES

Joseph E. Neglia, PE, PP, PLS
CEO, Chairman of the Board

Michael J. Neglia, PE, PP, PLS
President

Gregory Polyniak, PE, PP

Michael F. Berliner

Thomas R. Solfaro, PE, CME

Daniel Kaufman, PE, PP

Brian Intindola, PE

Joann Signa

Civil Engineering

Municipal Engineering

Landscape Architecture

Traffic Engineering

Planning

Land Surveying

Construction Management

34 Park Avenue

PO Box 426

Lyndhurst, NJ 07071

Tel: 201.939.8805

Fax: 201.939.0846

www.negliaengineering.com

**Via: E-mail & Hand Delivery**

July 9, 2014
**Revised: October 21, 2014**

Zoning Board of Adjustment
Town of Kearny
Town Hall Annex – 410 Kearny Avenue
Kearny, NJ 07032

Attn: Ms. Susan A. Evanchick, Secretary

Re: **Site Plan Application**
**RTC Properties, Inc. / Helo Hanger #2**
100 Central Avenue a/k/a 165 Western Road
Block 288, Lot 10.01
NEA No.: KEARSPL14.016

Dear Ms. Evanchick:

As requested, we have reviewed the recently submitted revised Site Plan Application. The submittal included the following documents:

- Zoning Permit Application, dated May 15, 2014.
- Site Plan Set entitled "Preliminary & Final Major Site Plan for River Terminal Development, Helo Holding Hanger #2, Block 288, Lot 10.01, 165 Western Road, Town of Kearny, Hudson County," consisting of twelve (12) sheets, prepared by K.B. Cahill, P.E. of Bohler Engineering, dated April 14, 2014, **last revised July 30, 2014.**
- **Survey Plan Set entitled, "Boundary & Topographic Survey for RTC Properties, Inc., 100 Central Avenue, Lots 8, 9, 10.01 & 10.02, Block 288, Town of Kearny, Hudson County, New Jersey," consisting of four (4) sheets, prepared by James C. Weed, P.L.S. of Control Point Associates, Inc., dated September 25, 2000, last revised August 12, 2014.**
- **Lot Line Adjustment Plan entitled, "Lot Line Adjustment Plan for RTC Properties, Inc., 100 Central Avenue, Lots 8, 9, 10.01 & 10.02, Block 288, Town of Kearny, Hudson County, New Jersey," consisting of one (1) sheet, prepared by James C. Weed, P.L.S. of Control Point Associates, Inc., dated February 27, 2014. As originally submitted as part of Application #33231.000.**
- **NJDEP Amended Waterfront Development Permit, dated August 8, 2008.**
- **Bohler Engineering Comment Response Letter, dated August 12, 2014.**
- **Architectural Plan Set entitled "Helo Hanger Two, Block 288, Lot 10.01, 165 Western Road, Kearny, NJ 07032" consisting of two (2) sheets, prepared by John A. Buchholz, AIA; LEED AP of The Buchholz Architectural Group, P.C. dated August 21, 2014.**
- **Denial / Referral of Permit letters dated August 12, 2014 Numbers 33611 & 33612 from the Construction Code Enforcement Department**

NEGLIA
ENGINEERING ASSOCIATES

## General Information

The subject property is located just south of State Route 1 & 9 Bypass on the South Kearny Peninsula with primary frontage along the Passaic River to the west and Central Avenue to the east. The subject property consists of one parcel known as Block 288, Lot 10.01. The subject property is **105.784 acres** in size and is located within the SKI-S District ("South Kearny Industrial – South"). The subject property is part of an industrial complex owned and operated by RTC Properties, Inc.

The proposed improvements are located within the northwest corner of the subject property. The Applicant proposes the construction of Hanger #2 as an improvement to an existing helicopter facility. The proposed improvements include a **43,530 square foot HELO building (40,465 square foot footpring)**, parking facilities, and associated stormwater management facilities. The helo building is comprised of a **32,300 square foot hanger, 9,665 square foot office, and 1,565 square foot pilot's lounge**. This facility proposes 24 hour / 7 days a week operations with a total of 20 employees.

The Applicant is seeking preliminary and final major site plan approval with respect to Block 288, Lot 10.01.

## Completeness Review

Based on the submitted Site Plan information as it relates to completeness established under Chapter §36-11.1 "Site Plan Details, Required Information" of the Town of Kearny Ordinance, the following information is missing from the application:

1. Item 3: A key map showing the location of the tract with reference to surrounding properties, existing railroads, streets, streams, rivers, drainage rights-of-way and water or utility rights-of-way or easements within five hundred (500) feet of the boundaries of the subject premises. While a key map showing the location of the area of interest is provided on the Cover Sheet, the entire subject property is not shown. The plans shall be revised to show the existing railroads, streets, streams, rivers, drainage rights-of-way and water or utility rights-of-way or easements within five hundred (500) feet of the boundaries of the subject premises or a waiver shall be requested. **The Applicant's Engineer has provided a USGS map on the Cover Sheet of the revised Site Plan Set depicting the entire subject property and all features within 500 feet of the boundary. This item has been addressed. No further action required.**
2. Item 5: A map indicating all parcels and lots, together with the names of all owners of adjacent property within two hundred (200) feet of the subject premises with the respective block and lot numbers of the properties, as shown on the current municipal tax records. The Applicant shall submit a list of the names of all owners of adjacent property within two hundred (200) feet of the subject premises with the respective block and lot numbers of the properties. **The Applicant's Engineer has revised the Tax Map on the Cover Sheet of the revised Site Plan Set depicting the entire subject property and all adjacent properties within 200 feet of the boundary. In addition, a list of property owners within 200 feet of the boundary has been included on the Cover Sheet. This item has been addressed. No further action required.**
3. Item 11: Location plans and elevations of all proposed buildings and other structures, including required yard and setback areas, building height in feet and stories and lot coverage calculations. The Applicant shall submit elevations of all proposed buildings and other structures. **Architectural Plans have been submitted. This item has been addressed. No further action required.**
4. Item 12: Location, height, dimensions and details of all signs either freestanding or affixed to a building. Where signs are not to be provided, a notation to that effect shall be indicated on the site plan. The plans

NEGLIA
ENGINEERING ASSOCIATES

shall be revised to include details of all signs either freestanding or affixed to the building. **The submitted Architectural Plans do not depict any signage. This item has been addressed. No further action required. However, the applicant shall confirm if any signage is proposed.**

Based upon the submitted Site Plan information as it relates to completeness established under Chapter §36-11.1 "Site Plan Details", the application is **complete**. **The applicant shall include all legends identified under Chapter §36-11.2 "Legends to be Indicated" of the Town of Kearny Ordinance.**

**Waivers**

No waivers related to the aforementioned Site Plan submission have been requested in conjunction with this application.

The following waivers related to the aforementioned Site Plan submission are required in conjunction with this application.

1. Landscaping (§36-12.1(e)): Landscaping shall be provided as part of the overall plan designed and integrated into building arrangements, topography and parking and buffering requirements. Landscaping shall include trees, bushes, shrubs, ground cover, perennials, annuals, plants, sculpture, art, street furniture and the use of building and paving materials in an imaginative manner. **The Applicant's Engineer has indicated that the proposed landscaping on this site is limited to seeded grass areas only. A Landscape Plan has not been submitted to date. Therefore, a waiver will be required.**
2. Parking Requirements ((§36-12.2(a & h)): If any applicant can clearly demonstrate to the approving authority that, because of the nature of the operation or use, the parking requirements of this section are unnecessary or excessive, the approving authority shall have the power to approve a site plan showing less paved parking area than required by this section; provided, however, that a landscaped area of sufficient size to meet the deficiency shall be set aside and reserved for the purpose of meeting future off-street parking requirements in the event that a change of use of the premises shall make such additional off-street parking spaces necessary. **The Applicant's Engineer, per the submitted response letter, has indicated that testimony regarding parking requirements as it relates to this application will be provided at the Zoning Board hearing.**
3. Sidewalks (§36-12.7(c)(4)): Sidewalks between parking areas and principal structures, along aisles and driveways and wherever pedestrian traffic shall occur shall be raised six (6) inches or more above the parking area except when crossing streets or driveways. Sidewalks, when constructed along a building, shall be located not less than three (3) feet from the building. The proposed improvements provide sidewalks directly adjacent to the buildings. **The Applicant's Engineer has indicated that the proposed sidewalk is located directly adjacent to the building due to the elevations and grading design of the site and that this is the most desirable location for pedestrian circulation around the building. However, a waiver will be requested.**
4. Screening of refuse (§36-12.8): Provision shall be made for the proper storage and collection of refuse. All such storage shall be maintained within the confines of an enclosed building or structure and shall be reasonably accessible for vehicular collection on the site or shall be appropriately screened and landscaped where outdoor storage is necessary. The application does not provide provisions for proper storage and collection of refuse. NEA recommends that the all dumpster pads be screened. **The Applicant's Engineer, per the submitted response letter, has indicated that testimony regarding the proper storage and collection of refuse shall be provided at the Zoning Board hearing.**

NEGLIA
ENGINEERING ASSOCIATES

**Zoning Requirements**

| **Bulk Requirements** | **Required (SKI-S Zone)** | **Existing (Lot 10.01) (Per Application #33231)** | **Proposed Before Conveyance (Lot 10.01)** | **Proposed After Conveyance (Lot 10.01)** |
|---|---|---|---|---|
| Minimum Lot Area | 60,000 | 4,809,937 sf (110.421 acres) | 4,809,937 sf (110.421 acres) | 4,607,946 sf (105.784 acres) |
| Minimum Lot Width | 150 | > 150 ft | > 150 ft | > 150 ft |
| Minimum Lot Depth | 150 | > 150 ft | > 150 ft | > 150 ft |
| Minimum Front Yard Setback | 35 | 36.7 ft | 36.7 ft | 36.7 ft |
| Minimum Side Yard Setback – Single | 20 | **0 ft [EN]** | **0 ft [EN]** | **0 ft [EN]** |
| Minimum Side Yard Setback – Both | 20 | 82.1 ft | 82.1 ft | 82.1 ft |
| Minimum Rear Yard Setback | 30 | 43.4 ft | 43.4 ft | 43.4 ft |
| Maximum Building Coverage | 40% | 30.3% (1,456,497 sf) | 31.0% (1,492,642 sf) | 32.4% (1,492,642 sf) |
| Maximum Floor Area Ratio (F.A.R.) | 2.5 | 0.305 (1,465,697 sf) | 0.313 (1,504,907 sf) | 0.327 (1,504,907 sf) |
| Maximum Improved Lot Coverage (%) | 90% | 85.2% (4,097, 161 sf) | 84.7% (4,075,936 sf) | 86.9% (4,004,030 sf) |
| Maximum Building Height | 6 stories / 80 feet | 40 feet ± | 40 feet ± | 40 feet ± |

**[EN] Existing Non-Conformity, [V] Variance Required**

**Parking Requirements**

| **Existing** | **Previously Approved Per Application #2019.19** | **Proposed** |
|---|---|---|
| **SKI-S Zone Parking Requirements** | **SKI-S Zone Parking Requirements** | **SKI-S Zone Parking Requirements** |
| Floor Area<br>Office = 10,320 sf<br>Warehouse = 26,997 sf | Floor Area<br>Office = 15,420 sf<br>Warehouse = 66,957 sf | Floor Area<br>Office = 17,230 sf<br>Warehouse = 59,297 sf |
| Office = 1 space / 250 sf<br>10,320 sf x 1 space / 250 sf = 41 spaces | Office = 1 space / 250 sf<br>15,420 sf x 1 space / 250 sf = 62 spaces | Office = 1 space / 250 sf<br>17,230 sf x 1 space / 250 sf = 69 spaces |
| Warehouse = 1 space / 600 sf<br>26,997 sf x 1 space / 600 = 45 spaces | Warehouse = 1 space / 600 sf<br>66,957 sf x 1 space / 600 = 112 spaces | Warehouse = 1 space / 600 sf<br>59,297 sf x 1 space / 600 = 99 spaces |
| Total = 86 spaces required | Total = 174 spaces required | Total = 168 spaces required |
| **Existing Provided Parking** | **Proposed Provided Parking** | **Proposed Provided Parking** |
| 9 ft x 20 ft required | 9 ft x 20 ft required | 9 ft x 20 ft required |
| 9 ft x 20 ft and 10ft x 20 ft existing (car) | 10 ft x 20 ft proposed | 9 ft x 20 ft proposed (car) |
| Total Spaces Provided = **69 spaces [EN]** | Total Spaces Proposed = **81 spaces [V]** (including 4 ADA spaces) | Total Spaces Proposed = **88 spaces [V]** (including 4 ADA spaces) |

**[EN] Existing Non-Conformity, [V] Variance Required**

NEGLIA
ENGINEERING ASSOCIATES

**Variances**

The following variances related to the aforementioned Site Plan submission have been requested in conjunction with this application:

1. Parking Variance (§38-7.1): In all districts, in connection with every industrial, business, institutional, recreational or residential or any other use, there shall be provided, at the time any building or structure is erected or is enlarged or increased in capacity, off-street parking and loading spaces for automobiles and other vehicles in accordance with the requirements set forth in the Land Subdivision and Site Plan Review Ordinance of the Town of Kearny. **The Applicant proposes 88 total parking spaces (including 4 ADA spaces), whereas 168 parking spaces are required as part of this application.**

The following variances related to the aforementioned Site Plan submission are required in conjunction with this application:

1. Application of Regulations Variance (§38-4.2(a)): No new building shall be altered nor shall any open space surrounding any building be encroached upon, except in conformity to the yard, and building location regulations hereinafter designated for the district in which such building or open space is located.
2. General Use Restriction Variance (§38-4.3): Any use which is not specifically designated as a principal permitted use, an accessory use or a conditional use is specifically prohibited from that zone district in the Town of Kearny. **Helicopter facilities are not a permitted use in the SKI-S Zone. This application proposes an expansion of a non-conforming use.**

The applicant's engineer shall provide testimony addressing all the proposed variances as well as any additional required waivers.

**Engineering and Planning Comments**

1. The applicant shall provide testimony addressing the previous approvals for the site and the proposed improvements relating to this Site Plan submittal. **This comment still applies.**
2. A signed and sealed survey shall be submitted. NEA reserves the right to make further comments based on receipt of said plans. **The Applicant has submitted a signed and sealed Boundary and Topographic Survey. This comment has been addressed. No further action required.**
3. The applicant shall provide testimony regarding the hours of operation, number of shifts, employees per shift, and any other information that might aid the Board in evaluating the proposed application. **This comment still applies.**
4. Outdoor storage, where permitted, shall be suitably located and approved by the approving authority, which shall consider the relationship of such areas to adjacent properties and roadways; provided, however, that in all such cases where storage is permitted, such areas shall be suitably screened pursuant to Chapter §36-12.9(b). Should any outdoor storage be proposed, this requirement shall be addressed accordingly. **The Applicant's Engineer has acknowledged this requirement. This comment still applies, as applicable.**
5. The applicant shall coordinate any and all proposed test pits and televising of sewer and drain lines with NEA. NEA shall be notified a minimum of 48 hours prior to the start of any activity. **The Applicant's Engineer has acknowledged this requirement. This comment still applies.**

NEGLIA
ENGINEERING ASSOCIATES

6. The applicant shall provide a vehicle maneuvering plan indicating the proposed vehicle maneuvering for all site operations, each of the hangars, as well as emergency fire apparatus. The Applicant shall confirm with the Kearny Fire Department that the movements for emergency fire apparatus are acceptable. **The Applicant's Engineer has indicated that a vehicle maneuvering plan shall be provided and submitted to the Kearny Fire Department for their review. This comment still applies.**
7. The applicant shall provide testimony addressing the design standards identified within the Town Ordinance as they relate to the proposed improvements. **This comment still applies.**
8. The curb radii shall be dimensioned and identified on the Site Plan. **The Applicant's Engineer has addressed this comment through submission of a revised Site Plan. This comment has been addressed. No further action required.**
9. All proposed handicap spaces shall be dimensioned. In addition, handicap ramps and handicap signs shall be graphically indicated at all handicap spaces. **This comment has been addressed. No further action required.**
10. The western parking lot indicates 8 total parking spaces closest to the building. However, this area is only striped for 7 parking spaces. The parking count and parking table shall be updated accordingly. **This comment has been addressed. No further action required.**

**Grading, Drainage & Utility Comments**

1. The subject property is located within the FEMA Flood Hazard Area. The applicant's engineer shall provide testimony addressing the measures proposed on-site to prevent and / or mitigate potential damage from flood waters. The applicant shall discuss existing flood elevations as they relate to the proposed first floor elevations of the buildings and any required / acquired NJDEP Permits. **The Applicant has submitted a copy of the NJDEP Amended Waterfront Development Permit for this project, dated September 8, 2008. The Applicant's Engineer is in the process of further amending this permit per the revised site plans. A copy of the amended permit shall be submitted. Testimony addressing the same shall be provided.**
2. The proposed improvements will disturb over one (1) acre of land. Based upon the Stormwater Management Rules N.J.A.C. 7:8, the site is defined for "Major Development". A stormwater management report shall be submitted addressing compliance with N.J.A.C. 7:8 and the Town of Kearny Ordinance requirements for stormwater. **The Applicant has submitted a copy of the NJDEP Amended Waterfront Development Permit for this project, dated September 8, 2008. Since this permit confirms that this area is tidally influenced, stormwater runoff reductions are not required. In addition, the overall impervious coverage will be reduced on-site. Therefore, additional stormwater management measures are not required. However, a copy of the amended permit shall be submitted.**
3. Pursuant to N.J.A.C. 7:8-5.2, a "Major Development" must incorporate a maintenance plan compliant with N.J.A.C. 7:8-5.8 for the proposed stormwater management measures. A maintenance plan shall be submitted to the Town, and subsequently forwarded to NEA, for review. **The Applicant has submitted a copy of the NJDEP Amended Waterfront Development Permit for this project, dated September 8, 2008. The Applicant's Engineer is in the process of further amending this permit per the revised site plans. A copy of the amended permit shall be submitted.**
4. The Applicant shall provide testimony that all ADA accessible routes, parking spaces, sidewalk ramps, etc. will conform to the local ordinance and the 2010 ADA Standards for Accessible Design provided by the Department of Justice, latest revised. **This comment still applies.**

NEGLIA
ENGINEERING ASSOCIATES

5. The applicant shall provide storm conveyance pipe capacity calculations for all proposed storm conveyance pipes. **This comment still applies.**

6. The proposed grades within the eastern parking lot will direct stormwater to the handicap spaces rather than the proposed inlets. Additional spot elevations shall be provided to confirm the drainage patterns. **This comment has been addressed. No further action required.**

7. The applicant proposes to construct the Helo Building over a 24 inch RCP pipe, a 48 inch RCP pipe, an unknown storm pipe and a concrete utility duct. The applicant shall provide testimony addressing if these utilities are currently active. NEA recommends that these utilities be re-routed for the purposes of future maintenance or additional structures and / or cleanouts shall be constructed. **This comment still applies.**

8. Due to the size of the proposed sanitary sewer main, manholes shall be utilized instead of cleanouts for maintenance purposes. **The Applicant's Engineer has indicated that a proposed sanitary manhole has been provided at the junction in the area to the south of the building. An additional manhole shall be provided at the tee north of the oil / water separator.**

9. The applicant proposed a wet-tap for a 12 inch fire service. Information on the existing flow and pressure available at the existing water main, and the expected pressure at the proposed buildings shall be provided. **This comment still applies.**

**Traffic Comments**

1. The applicant's engineer shall provide testimony addressing the impact on traffic with the proposed improvements as they relate to existing conditions. **This comment still applies.**

**Lighting and Landscaping Comments**

1. Pursuant to Chapter §36-12 of the Town's Land Subdivision and Site Plan Review Ordinance, landscaping shall include trees, bushes, shrubs, ground cover, perennials, annuals, etc. The applicant shall provide testimony addressing the on-site landscaping as it relate to the ordinance. **The Applicant's Engineer has indicated that the proposed landscaping on this site is limited to seeded grass areas only. Testimony addressing on-site landscaping shall be provided.**

2. Neglia Engineering Associates recommends that should any trees be removed that they be replaced with a shade tree at a 1:1 ratio, minimum size of 2.5" caliper. **The Applicant's Engineer has acknowledged this requirement. This comment still applies, as applicable.**

3. The proposed lighting appears to sufficiently illuminate the parking areas. Testimony addressing the layout, intensity, and illumination hours shall be provided. **This comment still applies.**

4. The applicant shall provide testimony indicating that all lighting design standards required by the F.A.A. have been addressed and approved by said administration. **This comment still applies.**

**Final Comments**

1. It is the applicant's responsibility to determine what, if any, permits are required from outside agencies and internal municipal agencies and departments in order to construct the proposed development. These agencies include, but are not limited to Hudson County Planning/Engineering, Hudson-Essex-Passaic County Soil Conservation District, municipal fire / police departments, KMUA, NJDOT and NJDEP. **This comment still applies, as required.**

NEGLIA
ENGINEERING ASSOCIATES

2. If the Board approves this plan, two (2) sets of plans revised in accordance with the Board's approval should be forwarded to this office as soon as they are complete. **This comment still applies.**
3. Pursuant to Chapter §36-13.5 of the Town's Land Subdivision and Site Plan Review Ordinance, the applicant is required to notify this office twenty-four (24) hours prior to the start of any construction. **This comment still applies.**
4. No building permits should be issued until approved final plans have been signed and received, and the applicant has posted sufficient Escrows to the municipality. **This comment still applies.**
5. Should the Board look favorably upon this application, a performance bond and inspection escrow will be required for any site improvements. The Board Engineer will prepare this estimate to address the cost of all site improvements plus a 20% contingency, in accordance with the Municipal Land Use Law. **This comment still applies.**
6. NEA recommends that a response letter be submitted that addresses each of the comments noted above. **This comment still applies.**

I trust you will find the above in order. Should you have any questions or require additional information, please do not hesitate to contact the undersigned.

Very truly yours,
**Neglia Engineering Associates**

Michael J. Neglia, P.E., P.P., P.L.S.
Town Engineer
Town of Kearny

Very truly yours,
**Neglia Engineering Associates**

David Juzmeski, P.E., P.P.
For the Town Engineer
Town of Kearny

MJN/DJ/jrv

cc: Michael Martello, Construction Official / Zoning Officer *via e-mail*
Michael R. Pichowicz, Esq., Board Attorney *via e-mail*
Emilio Guarino, Jr., P.E., Applicant *via regular mail*
Rob Neu, Applicant *via regular mail*
Keith B. Cahill, P.E., Applicant's Engineer *via regular mail*
Nicholas J. Watson, Applicant's Engineer *via e-mail*


M:\Kearny\KEARSPL14.016 (165 Western Rd, Blk 22, Lot 10.01)\Correspondence\Site Plan Review Letter Revision 1 102114.docx

# EXHIBIT 7

Kearny Town
410 Kearny Ave
Kearny NJ 07032
(201) 955-7880
tchisari@kearnynj.org

Violation Number: ZV-25-00064
Issue Date: 9/17/2025
Notice Date: 9/17/2025

# Zoning Violation

Zoning Violation

Owner: RTC PROPERTIES, INC
Address: 140 CENTRAL AVE
STE 100
KEARNY NJ 07032

Block: **288**
Lot: **10.01**
Qualifier:

Site of Violation:

**RE: 165 WESTERN ROAD**
**HELO HOLDINGS, INC c/o JEFF HYMAN**
**Kearny NJ 07032**

A zoning violation has been issued for the above property.

Issuing Officer: Tony Chisari
Violation Type: Zoning Violation
Statute: 36-9.9 d
Code: d.Revocation of Building Permit or Certificate of Occupancy. In the event of a failure to comply with any condition of site plan approval, the Construction Official, on his own initiative or upon recommendation from the Engineer, may revoke the building permit or certificate of occupancy, as the case may be, and seek to enjoin the violation or take such other steps as permitted by law.

Infraction Summary:

*Be advised that it has come to the attention of this department that the facility administered by Helo Holdings, Inc has been operating outside the scope of the approved conditions in Zoning Board Resolution 2014.14. Specifically, that the hours of operation were proposed in testimony to be "March/April to September/October would be 8 am to 7 pm and during the winter months 8am to 5 pm." Also stated was that the "facilities would offer no helicopter tours." Be advised that failure to comply with all conditions set forth in the approved resolution would require resubmission to, and an amended approval by, the Kearny Zoning Board. Please contact this office directly for additional information.*

Compliance Date: 9/26/2025 Inspection Date:
Compliance:

Abatement Date:
Summons Date: Summons Numbers:
Fine:

If you have any questions, please contact this office at: (201) 955-7880.

Zoning Officer

9/17/2025
Date

# EXHIBIT 8

COURT I.D. 0907 PREFIX SC COMPLAINT NUMBER 016433

TOWN OF KEARNY MUNICIPAL COURT
~~Town Hall~~, 404 Kearny Avenue
Kearny, NJ 07032

**Complaint**

## The State of New Jersey vs.

(Please Print)

Defendant's Name: First / Initial / Last: Halo Holdings c/o Jeff Hyman
Address: 165 Western Rd City: Kearny
State: NJ Zip Code: 07032 Telephone: Check if cell phone ☐
Birth Date: Mo. Day Yr. | Sex | Eyes | Weight | Height | Restrictions
Email Address | Ethnicity | Race
Driver's Lic. No. | State | Exp. Date

STATE OF NEW JERSEY
COUNTY OF HUDSON

Complaining Witness: Tony Chisari (Name)
of 410 Kearny Ave (Identify Dept./Agency Represented) (Badge No.)
Residing at
by certification or on oath, says that to the best of his/her knowledge or information and belief, the named defendant on or about the Sept (Month) 17 (Day) 2025 (Year) (Time)
in KEARNY County of HUDSON NJ
did commit the following offense: Operating outside the scope of the approved conditions - Zoning Violation (DESCRIPTION) @ 165 Western Rd (Halo Holdings) B288 L-10.01

in violation of (one charge only) (Statute, Regulation or Ordinance Number)

LOCATION OF OFFENSE: C O D E | Describe Location

OATH: Subscribed and sworn to before me this 5 day of Feb, yr 26
(Signature of Complaining Witness)
(Signature of Person Administering Oath)

OR

CERTIFICATION: I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment. 2/5/26 (Date)
(Signature of Complaining Witness)

### PROBABLE CAUSE DETERMINATION FOR ISSUANCE OF PROCESS:

| COURT USE ONLY | LAW / CODE ENFORCEMENT USE ONLY |
|---|---|
| Probable cause is found for the issuance of this Complaint-Summons<br>☒ Yes ☐ No (Signature of Judicial Officer)<br>☐ Yes ☐ No (Signature of Judge) | ☐ The complaining witness is a law enforcement officer or a code enforcement officer with territorial and subject matter jurisdiction and a judicial probable cause determination is not required prior to the issuance of this Complaint-Summons. |

**YOU ARE HEREBY SUMMONED TO APPEAR**
BEFORE THIS COURT TO ANSWER THIS COMPLAINT. IF YOU FAIL TO APPEAR ON THE DATE AND AT THE TIME STATED, A FINANCIAL SANCTION MAY BE IMPOSED, A WARRANT MAY BE ISSUED FOR YOUR ARREST, OR BOTH.

**NOTICE TO APPEAR**
☒ COURT APPEARANCE REQUIRED | COURT DATE Month 3 Day 26 Year 26 | Time 10:30 AM/PM

2-9-2026 (Date Summons Issued) (Signature of Person Issuing Summons)

Complaint-Summons CN: 12518 (Revised: 4/14/21)

---

COURT I.D. 0907 PREFIX SC COMPLAINT NUMBER 016432

TOWN OF KEARNY MUNICIPAL COURT
Town Hall, ~~404 Kearny~~ Avenue
Kearny, NJ 07032

**Complaint**

## The State of New Jersey vs.

(Please Print)

Defendant's Name: First / Initial / Last: RJC Properties Inc c/o Robert Ney
Address: 410 Central Ave #100 City: Kearny
State: NJ Zip Code: 07032 Telephone: Check if cell phone ☐
Birth Date: Mo. Day Yr. | Sex | Eyes | Weight | Height | Restrictions
Email Address | Ethnicity | Race
Driver's Lic. No. | State | Exp. Date

STATE OF NEW JERSEY
COUNTY OF HUDSON

Complaining Witness: Tony Chisari (Name)
of 410 Kearny Ave (Identify Dept./Agency Represented) (Badge No.)
Residing at
by certification or on oath, says that to the best of his/her knowledge or information and belief, the named defendant on or about the Sept (Month) 17 (Day) 2025 (Year) (Time)
in KEARNY County of HUDSON NJ
did commit the following offense: Operating outside scope of the approved conditions - Zoning Violation (DESCRIPTION) @ 165 Western Rd (Halo Holdings) B288 L-10.01

in violation of (one charge only) (Statute, Regulation or Ordinance Number)

LOCATION OF OFFENSE: C O D E | Describe Location

OATH: Subscribed and sworn to before me this 5 day of Feb, yr 26
(Signature of Complaining Witness)
(Signature of Person Administering Oath)

OR

CERTIFICATION: I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment. 2/5/26 (Date)
(Signature of Complaining Witness)

### PROBABLE CAUSE DETERMINATION FOR ISSUANCE OF PROCESS:

| COURT USE ONLY | LAW / CODE ENFORCEMENT USE ONLY |
|---|---|
| Probable cause is found for the issuance of this Complaint-Summons<br>☒ Yes ☐ No (Signature of Judicial Officer)<br>☐ Yes ☐ No (Signature of Judge) | ☐ The complaining witness is a law enforcement officer or a code enforcement officer with territorial and subject matter jurisdiction and a judicial probable cause determination is not required prior to the issuance of this Complaint-Summons. |

**YOU ARE HEREBY SUMMONED TO APPEAR**
BEFORE THIS COURT TO ANSWER THIS COMPLAINT. IF YOU FAIL TO APPEAR ON THE DATE AND AT THE TIME STATED, A FINANCIAL SANCTION MAY BE IMPOSED, A WARRANT MAY BE ISSUED FOR YOUR ARREST, OR BOTH.

**NOTICE TO APPEAR**
☒ COURT APPEARANCE REQUIRED | COURT DATE Month 3 Day 26 Year 26 | Time 10:30 AM/PM

2-9-2026 (Date Summons Issued) (Signature of Person Issuing Summons)

Complaint-Summons CN: 12518 (Revised: 4/14/21)

# EXHIBIT 9

flynyon - Google Search

google.com/search?q=flynyon&sca_esv=ce9bda148a5d733d&rlz=1C1RXQR_enUS1071US1071&ei=c7TnaYGUK-2g5NoPoly82QU&biw=1280...

Google

flynyon

Sign in

FlyNYON
https://www.flynyon.com

FlyNYON: New York City Helicopter Tour | Helicopter Rides in ...

Book NYC's top-rated helicopter tour with **FlyNYON**. Doors-off & doors-on helicopter rides over Manhattan, Statue of Liberty & Brooklyn Bridge.

NYC Helicopter Tours
FlyNYON provides with the best helicopter rides over New York ...

NJ Doors-Off Helicopter Tour
Our doors-off helicopter flights provide you with the most ...

Nyc helicopter experience
This 16-minute helicopter flight offers signature downtown ...

Helicopter Tour FAQ
What is FlyNYON? The Ultimate Aerial Photo Experience. Fly ...

Doors-Off Helicopter Tour NYC
FlyNYON's signature doors-off helicopter tour over NYC. Fly ...

# EXHIBIT 10

US




*BOOK YOUR FLIGHT*

# NYC HELICOPTER EXPERIENCE

~~$603~~ **$149/Seat**

16-Minute Doors Open Flight

Departs from NYON Terminal in NJ

VOUCHERS PURCHASED DURING THIS PROMOTION REMAIN VALID FOR 24 MONTHS!

**Book Your Flight**

Not sure when you'd like to fly? **Buy Now Schedule Later**

This **16-minute** helicopter flight offers signature downtown skyline views from a **distinct vantage point** that gets you up close and personal with Lady Liberty like no one else.

Your experience starts at the **NYON Terminal**, an amazing 10,000 square foot space that features a helicopter fuselage with an **interactive floor**, and **relaxing lounge areas** featuring spectacular flight footage from around the country and local food and drinks.

Next, your group meets with your designated pilot to **preview your flight path** and hear expert tips and advice so that you have the best experience possible. Within just a short two minutes after takeoff, NYC will be

# WHAT YOU'LL SEE ON A 16 MINUTE DOORS-OFF FLIGHT

Statue of Liberty
Ellis Island
Wall St
Freedom Tower
9/11 Memorial
The Oculus
Lower Manhattan Money Shot

See more on a Classic 30 Minute doors-off flight
Read about NYON Safety Culture

**DYNAMIC PRICING:** Not sure when you want to fly? Purchase our Buy Now Schedule Later product to take advantage of savings and schedule your flight when you're ready. Please be sure to redeem your voucher as far in advance as possible to avoid surge pricing. Flights increase in price with demand. Buy Now Schedule Later vouchers will be subject to surge fees upon redemption.

Oct 2026

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

Time

**Select a time**

Quantity

1

| | | |
|---|---|---|
| 02:00 PM - ~~$603.00~~ $149.00 | | Off-Peak |
| 03:00 PM - ~~$603.00~~ $181.00 | | |
| 04:00 PM - ~~$603.00~~ $181.00 | | |
| 05:00 PM - ~~$603.00~~ $181.00 | | |
| 06:15 PM - ~~$906.00~~ $272.00 | 3 seat(s) left | **Sunset** |
| 07:15 PM - ~~$955.00~~ $287.00 | 14 seat(s) left | Night |
| 08:15 PM - ~~$955.00~~ $287.00 | | Night |

**NYC HELICOPTER EXPERIENCE - Regular**
Please select a time

Email

Phone (optional)

Card number Autofill

Restrictions apply. See Terms And Conditions and Privacy Policy.

I accept the Terms & Conditions

Purchase

Secured Payments By stripe

Questions? **Contact Us**

# EXHIBIT 11

# Facility Info

Built in 2010, the facility campus is comprised of two hangars and home to over 14 operators



eVTOL Operators Enterprise Clients Facility Info Reservations Contact

**The 10.80-acre "Helicopter-Only" FBO is located in Kearny, New Jersey, at 165 Western Avenue (just one-half mile from exit 15E off the New Jersey Turnpike) and is just 2 minutes flying time from Manhattan. It offers 70,000 sq. ft. of hangar space, 10,000 sq. ft. of leaseable hangar and administrative offices, ample landing and parking (up to 27 outdoor helicopter parking spaces), full Maintenance services, a pilot-friendly amenities building, and a 24,000-gallon fuel facility with two "hot" refueling pads. All within 2 minutes flying time of Manhattan.**

### Full-scale hangar & administrative space

70,000 sq ft of hangar area, plus 10,000 sq ft of leaseable hangar and administrative suites for operators and service providers.

### Landing, parking, and refuelling infrastructure

The facility provides ample outdoor heliparking (up to 27 spaced spots), two "hot" refuelling

eVTOL Operators Enterprise Clients Facility Info Reservations
Contact

Pilot-friendly amenities and line crew specialists support crew comfort and operational reliability.

### Location advantage & connectivity

Positioned half a mile from the NJ Turnpike (exit 15E) and mere minutes from Manhattan's core rotor environment, HHI delivers exceptional air and ground linkages.

### Landing permission & regulatory interface

Designated as FAA identifier 65NJ, privately owned and requiring coordinated landing clearance for use.

### Scalable development

The site has documented expansion phases (Phase 3 development) to support future EVTOL growth and use cases.

## Facility Info

### Heliport:

• Heliport Lights: PERI

• Helicopter Parking: Up to 26 Helicopter Parking Spots are available, as well as 2 "Hot - Refueling" pads.

## Landing Permission Required Sectional Chart:

***NEW YORK ARTCC: NEWARK TOWER 127.85 FSS: NEW YORK FLIGHT SERVICE STATION***

**HOURS OF OPERATION:**

MON - FRIDAY: 07:00 - 21:00

SATURDAY & SUNDAY: 07:00 - 21:00

**COMMUNICATIONS:**

Heliport Frequency: 131.97

Identifier: 65NJ

**HHI Route Map & Call In Points**

Call in at the Red and Green marked points on the Bridge and Holland Route.

## Route procedure and flow information




## Route Patterns




Helo Holding Inc.

eVTOL Operators Enterprise Clients Facility Info Reservations
Contact

**Email**

info@hhiheliport.com

**Phone**

973-813-2300
**Address**

165 Western Road, Kearny, NJ 07032

Copyright © 2025 Helo Holdings Inc. All rights reserved

# EXHIBIT 12

Top Content People Learning Jobs Games Get the app



NYONAIR

# NYONair

Airlines and Aviation

Kearny, NJ · 775 followers

The Ultimate Photo Experience!

Follow

Discover all 18 employees

## About us

NYONair is an aviation services company that bridges the worlds of aviation, customer experience and media by offering a diverse and complimentary suite of aerial products, social media reach and brand activations. Services include open door photo experience flights, aerial production services, transportation, private charters, and branded media collaborations. A continuously growing social media reach of 1.2 million followers, NYONair exceeds aviation industry peers as well as contemporary, non-aviation, brands. The company has operations in New York City, Las Vegas, Miami, San Francisco and Los Angeles. NYONair's flagship aerial experience terminal resides in Kearny, NJ, a 5-minute helicopter ride to Manhattan. NYONair caters to individuals and companies alike. Corporate client list includes Sony, Fox Sports, Time, ESPN, Ford, Travel Channel, Vogue and others.

| | |
|---|---|
| **Website** | http://www.NewYorkOnAir.com |
| **Industry** | Airlines and Aviation |
| **Company size** | 11-50 employees |
| **Headquarters** | Kearny, NJ |
| **Type** | Privately Held |
| **Founded** | 2012 |

**Specialties**

Aerial Photography, Aerial Cinematography, Experiential Event Coverage, Architectural Photography, Production Helicopters, Photo Experience, social media marketing, and content creation

## Locations

Primary
78 John Miller Way
103
Kearny, NJ 07032, US
**Get directions**

## Employees at NYONair

**Jill O'Brien**

**Erika Reichelscheimer**

**Filipe Monteiro**

Patrick Kevin Day

See all employees

## Similar pages

**FlyNYON**
Airlines and Aviation
Kearny, New Jersey

**Zip Aviation**
Airlines and Aviation
New York, New York

**HeliNY**
Aviation & Aerospace
Linden, New Jersey

**HeliFlite**
Airlines and Aviation
Kearny, New Jersey

Show more similar pages

## Browse jobs

**Flight Operations Specialist jobs**
1,999 open jobs

More searches

© 2026

About

Accessibility

User Agreement

Privacy Policy

Your California Privacy Choices

Cookie Policy

Copyright Policy

Brand Policy

Guest Controls

Community Guidelines

Language

# EXHIBIT 13

# THE ALOFT GROUP

The Aloft Group, LLC • Ashburn, Virginia USA | Aloft Aviation Consulting, Ltd • Dalkey, Co. Dublin, Ireland
*Real World Experience*

# OBSERVATIONS AND FINDINGS

**Helicopter Operations at HHI Heliport (FAA Identifier 65NJ), Kearny, New Jersey**

Compliance with the representations memorialized in Kearny Zoning Board of Adjustment Resolution, Application No. 2014.14

*Town of Kearny v. Helo Holdings, Inc.*

Prepared by Thomas M. Lintner, FRAeS • The Aloft Group, LLC • 13 September 2026
Flight-data analysis prepared in partnership with Vianair, LLC and independently verified by The Aloft Group

## I. Purpose and Scope

The Aloft Group specializes, in part, in conducting post-accident and incident forensic analysis for law offices in support of civil actions. We conduct our analysis by reviewing documentation associated with the matter and, as necessary, applicable research. We applied the same approach in this matter, and our opinions are based on documentation we were provided, listed in Appendix B, our experience and knowledge of FAA ATC and flight operations procedures and regulations, and personal experience with helicopter operations in the New York Metro area. For this project, we teamed with Vianair, which specializes in analyzing aircraft flight tracks and performance in support of the development of safer and more efficient ATC operations. This report combines the expertise of both organizations.

This report addresses two questions put to us: whether the assembled documents support the allegation that helicopters are being operated from HHI Heliport contrary to the criteria under which the Kearny Zoning Board of Adjustment ("ZBA" or "the Board") approved the facility — specifically,

(1) whether sightseeing tours are being operated from the facility, and

(2) whether the facility is operating outside the approved hours.

For context, this report also examines the correspondence between the National Transportation Safety Board ("NTSB") and the Federal Aviation Administration ("FAA") Office of the Chief Counsel concerning the regulatory status of the FlyNYON operating model, and what that correspondence does — and does not — indicate about the FAA's interest in this matter.

Preparer's qualifications. I am an aviation safety and air traffic control professional with more than fifty years of aviation experience spanning the Federal Aviation Administration, interagency and national defense assignments, and private consulting. I am a 30-year FAA veteran who served as Manager of the Air Traffic Investigations Division and in senior air traffic oversight roles, and I have led or participated in the air traffic investigations of more than two dozen major accidents and operational incidents. I hold an Airline Transport Pilot certificate, multiple flight instructor ratings, an Aircraft Dispatcher certificate, and an FAA Air Traffic Control Specialist certificate for LaGuardia tower and New York Terminal Radar Approach Control (TRACON), and I am a Fellow of the Royal Aeronautical Society. The flight-data analysis supporting this report was prepared with James K. Allerdice Jr. of Vianair, our subject-matter expert partner for radar and surveillance data analysis, a retired FAA air traffic control professional of more than three decades, including Atlanta TRACON, and an internationally recognized expert in performance-

based navigation. The curricula vitae of both preparers appear in Appendix D.

Our conclusions are based on the exhibits listed in full in Appendix B, including:

- the memorialized ZBA resolutions of 2005, 2008, 2009, 2012, and 2014, obtained via the New Jersey Open Public Records Act (OPRA);
- the Town Engineer's Site Plan Review Letter of July 9, 2014, revised October 21, 2014;
- the JETNET commercial flight-data export for FAA identifier 65NJ, as refreshed through August 16, 2026 (Exhibit D-3);
- the recorded NTSB investigative interviews and NTSB Report AAR-19/04 from investigation ERA18MA099;
- the April 27, 2018 FAA Office of the Chief Counsel memorandum and the April 11, 2019 FAA follow-up correspondence;
- the Town of Kearny zoning violation notice of September 17, 2025.

Vianair's independent assessment, dated August 3, 2026, has been integrated into this report and is cited where its findings bear on ours. In addition, The Aloft Group and Vianair independently recomputed the entire JETNET dataset from the raw records, as described in Section V.C.

We have provided a glossary at the back of the report (Appendix C) to assist with aviation terminology and FAA legal offices and regulations.

## II. Four Matters That Frame the Analysis

### A. The controlling zoning record is a closed loop

Three documents fix what HHI represented and what the Board relied upon.

- First, the Town Engineer's letter (Exhibit A-1) states that helicopter facilities are not a permitted use in the SKI-S zone under §38-4.3 of the Kearny Zoning Ordinance and that the application proposed an expansion of a non-conforming use; approval therefore turned on the Board's discretionary variance authority.

- Second, Engineering and Planning Comment No. 3 of that letter — marked "This comment still applies" as of October 21, 2014 — required the applicant to provide testimony regarding the hours of operation, number of shifts, and employees per shift.

- Third, the memorialized Resolution for Application No. 2014.14 (Exhibit A) records verbatim the sworn testimony of Jeff Hyman, CEO, on November 6, 2014, and records that "Applicant's testimony was accepted as satisfying #1, #3, #4, #5, #6 and #7" of the Engineering and Planning Comments. The testimony was therefore not volunteered in passing; it was the applicant's formal response to an outstanding condition of review, and the Board accepted it as satisfying that condition. I have verified each of these passages against the source documents.

  *"Jeff Hyman, 165 Western Road, Kearny, New Jersey was sworn-in and testified on behalf of the Applicant. Mr. Hyman is the CEO of operations. He described the current operations at the site. Specifically, he estimated that the hours of operation during the periods March/April to September/October would be 8 am to 7 pm and during the winter months 8 am to 5 pm. At any given time, Mr. Hyman stated there would be sixty (60) employees maximum. His facilities would offer no helicopter tours." (Exhibit A, at 4.)*

### B. The federal regulatory frame gives "helicopter tours" a settled meaning

Under 14 CFR §§ 110.2 and 136.1(d), a "commercial air tour" is a flight conducted for compensation or hire in an airplane or helicopter where a purpose of the flight is sightseeing. Such flights must be conducted either under a Part 119 certificate subject to Part 135 (or 121) operating rules, or under Part 91 pursuant to a Letter of Authorization ("LOA") issued under § 91.147 within the nonstop-air-tour exception of § 119.1(e)(2). The FAA determines eligibility from the overall character of the flight, not from the label the operator chooses. This frame matters here for two reasons: it supplies an objective, federal definition against which the "no helicopter tours" representation can be measured, and it is the analytical basis of the FAA Chief Counsel correspondence assessed in Section V.D.

### C. What one data record represents

The JETNET export (Exhibit D, as refreshed at Exhibit D-3) is derived from ADS-B surveillance data. Our examination of the raw records establishes that each record is a single flight operation — a takeoff or a landing at 65NJ — recorded with a UTC timestamp: the 59,495 records in the analysis window comprise 29,438 takeoffs and 30,057 landings. The dossier's use of the word "flights" for these records should be conformed to "flight operations (takeoffs and landings)" throughout; the count of individual aircraft sorties is approximately half the operations count. This correction does not weaken the analysis — an operation outside the represented hours is an operation of the facility outside those hours regardless of whether it is counted at takeoff or touchdown — but precision here forecloses an avoidable line of cross-examination. ADS-B-derived data is also not necessarily a complete census of activity: coverage, equipage, and processing rules can cause undercounting, a limitation that runs in the Town's favor here because it can only understate activity.

### D. Federal legality and zoning compliance are separate questions

Whether a flight is conducted lawfully under the federal operating rules (Parts 91, 119, 135, 136) and whether the facility hosting it is operating within the terms of its local land use approval are independent questions. A commercial air tour flown in full compliance with a § 91.147 LOA is still a helicopter tour for purposes of the representation Mr. Hyman made to the Board. Conversely, a zoning violation says nothing about airworthiness or operating-rule compliance. Keeping the two frames separate is essential both to the tour analysis (Section V.A) and to the assessment of the FAA correspondence (Section V.D).

## III. Observations and Findings, in Sequence

### 2005–2012: The approvals were sought and granted on non-passenger representations

The approval history is consistent and cumulative. The 2005 use variance (Application #2515, Exhibit A-5) was presented as a staging and support facility. At the June 5, 2008 hearing (Application #2814, Exhibit A-4), the applicant's engineer testified that "[t]he site would not be used for people just looking for a helicopter ride." At the September 4, 2012 hearing (Application #2012.19, Exhibit A-2), Mr. Hyman, sworn, described peak activity between 7 a.m. and 9 p.m. and "reiterated the site does not permit passengers and is basically for storage, maintenance and fueling." I verified both quoted passages against the memorialized resolutions. Each successive approval was thus obtained on the representation that this was an industrial support facility, not a passenger operation.

**October 21, 2014: The Town Engineer's letter frames the November hearing**

The Neglia Engineering letter (Exhibit A-1) does three things that frame the November 6 hearing:

- It establishes the baseline: helicopter facilities are not a permitted use in the SKI-S zone, and the application proposed an expansion of a non-conforming use requiring a General Use Restriction Variance under §38-4.3 of the Kearny Zoning Ordinance.
- It demands operational testimony: Engineering and Planning Comment No. 3 — still marked "This comment still applies" as of October 21, 2014 — required the applicant to testify to the hours of operation, number of shifts, and employees per shift.
- It records, under General Information, that the submitted proposal contemplated "24 hour / 7 days a week operations with a total of 20 employees."

**November 6, 2014: The controlling sworn testimony**

Mr. Hyman's testimony, quoted in full in Section II.A, made two representations material here: seasonal hours of operation (8 a.m.–7 p.m. March through October; 8 a.m.–5 p.m. November through February) and that "[h]is facilities would offer no helicopter tours." The Board voted unanimously to approve, and the December 8, 2014 memorialized resolution accepted the testimony as satisfying the outstanding engineering comments, including the hours-of-operation comment. The testimony drew no distinction among categories, brands, or regulatory characterizations of helicopter tours.

**November 2014: FlyNYON's first paying customers fly from HHI**

In recorded NTSB investigative interviews from investigation ERA18MA099 (Exhibit B; Operations Attachment 1), Patrick Day, Jr., CEO and founder of FlyNYON/NYONair LLC, told investigators that he started FlyNYON in November 2014 and that its first load of paying customers flew in November 2014. A NYONair employee who joined in October 2014 recalled going on her first flight "a week or two" after joining, with the first booked flight in 2014. I concur with Vianair's two qualifications: these are recorded investigative interviews summarized by NTSB staff, not testimony shown to have been given under oath, and they should be described as such; and the interviews do not fix whether the first paying flight preceded or followed November 6. What they do establish — from the operator's own CEO — is that commercial passenger sightseeing operations from HHI commenced in the same calendar month in which Mr. Hyman testified that his facilities would offer no helicopter tours, and they have continued since.

**2016–2026: The operators marketed HHI departures as tours, by name and by the seat**

Exhibit C assembles archived operator website captures, Google business listings, customer reviews, and TripAdvisor entries spanning 2016 through 2026. A June 28, 2018 capture of the FlyNYON booking page lists four products — NYC Experience, NYC Classic, NYC Intro, NYC VIP — each "Departs from Kearny, NJ," priced from $99 to $499 per seat. FlyNYON's Google listing styles the business "FlyNYON Helicopter Tours"; its website advertises operating hours of 8 a.m. to 11 p.m., seven days per week, and the company states it has flown more than 750,000 passengers. New York Helicopter marketed sightseeing tours "Departing from HHI Heliport" until the FAA grounded the company after the fatal April 10, 2025 accident of N216MH. The ADS-B track exhibits (C-1, C-2) show the looping depart-and-return circuits over New York Harbor and the Manhattan waterfront that are the operational signature of sightseeing flights; they are not the tracks of point-to-point charter, corporate, or repositioning flights.

**2018–2019: The federal record classifies the FlyNYON operating model**

Following the fatal March 11, 2018 accident of N350LH (a Liberty Helicopters AS350B2 flying a FlyNYON-branded, doors-off flight; five passengers drowned in the East River), the NTSB asked the FAA which operating rules governed the flight, which Liberty and NYONair had characterized as "aerial photography" under the § 119.1(e)(4)(iii) exception. The FAA Office of the Chief Counsel memorandum of April 27, 2018 (Operations Attachment 14) and the FAA's April 11, 2019 follow-up are assessed in detail in Section V.D. In brief, the Chief Counsel rejected the premise of the operator's characterization as applied to the facts and concluded the flight "would likely qualify as a commercial air tour, even though it was not conducted as such"; the FAA's final determination, reported to the NTSB in April 2019, was that the flight was operated as a commercial air tour under Liberty's § 91.147 LOA. NTSB Report AAR-19/04 (Exhibit B-1) went further, concluding that Liberty and NYONair "exploited the exception at 14 CFR 119.1(e)(4)(iii)" and documenting deliberate efforts — including training customer-experience staff to be alert to anyone using the words "tour" or appearing to be "FAA" — to avoid any indication that FlyNYON flights were commercial air tours.

**October 2024 – August 16, 2026: The verified operations data**

The Aloft Group independently recomputed the JETNET dataset from the raw records (methodology and corrections in Section V.C; monthly detail in Appendix A). Over the analysis window of October 1, 2024 through August 16, 2026 — 22 complete months plus a 16-day partial period — the verified figures are: 59,495 total flight operations at 65NJ; 39,007 FlyNYON operations, 65.6% of all activity at the facility; 1,648 New York Helicopters operations, the last of them on April 10, 2025, the date of the N216MH accident; and 14,172 operations — 23.8% — outside the hours Mr. Hyman represented to the Board, applying the seasonal cutoffs from his testimony with all timestamps converted from UTC to Eastern Time across all daylight-saving transitions in the window. Operations occurred outside the represented hours in every one of the 23 periods, ranging from 15.0% (October 2024) to 32.1% (February 2026). FlyNYON accounts for 8,896 of the 14,172 outside-hours operations (62.8%); 22.8% of all FlyNYON operations fell outside the represented hours.

**September 17, 2025 and after: Formal notice, no change in operations**

The Town issued zoning violation ZV-25-00064 on September 17, 2025 (Exhibit E), citing operations "outside the scope of the approved conditions in Zoning Board Resolution 2014.14" and quoting both the hours and the no-tours representations, with a compliance date of September 26, 2025. The verified data shows no operational response — and, on volume, the opposite of one. Over the ten complete months following the notice (October 2025 through July 2026), 6,132 of 24,978 operations — 24.5% — were outside the represented hours, against 23.8% for the full window; extending through August 16, 2026 leaves the post-notice rate unchanged at 24.5% (6,557 of 26,773). February 2026, at 32.1%, remains the worst period in the entire dataset, and every month of 2026 to date falls between 20.7% and 32.1%. Activity has also increased sharply: May through July 2026 produced 10,775 flight operations against 7,521 in the same three months of 2025, a 43% increase, and June 2026 (3,952 operations) is the busiest month in the dataset. FlyNYON's share of activity was likewise undiminished. Whatever legal significance attaches to the notice, the operational record after it is indistinguishable from — and in volume terms heavier than — the record before it.

## IV. Spot Check of Helicopter Flight Operations, July 1–15, 2026

### A. Purpose and method

The primary JETNET dataset analyzed in Section III has since been refreshed through August 16, 2026 and now covers the spot-check period itself. The spot check nevertheless remains a separate line of evidence, because it examines the geometry of the flights rather than only their counts and times. Vianair conducted a spot check of helicopter flight activity associated with 65NJ for the fifteen-day period July 1 through July 15, 2026, working from a further JETNET extract covering that period (Exhibit D-4). The spot check was directed at a different question than the primary dataset: not when flights occur, but where they go and whether their routing repeats.

The significance of these checks lies in the FAA criteria that determine how a sightseeing flight may lawfully be conducted. A commercial air tour flown under Part 91 rather than Part 135 must fall within the exception at 14 CFR § 119.1(e)(2), which requires that the flight be nonstop, that it "begin and end at the same airport," and that it be "conducted within a 25-statute mile radius of that airport," in an aircraft of 30 or fewer passenger seats and a maximum payload capacity of 7,500 pounds or less, in compliance with a Letter of Authorization issued under § 91.147. The FAA Office of the Chief Counsel recited those criteria in the memorandum reproduced at Operations Attachment 14, and § 91.147 states the same geometry in defining the operator to whom it applies: a person conducting nonstop passenger-carrying flights for compensation or hire that "begin and end at the same airport and are conducted within a 25-statute mile radius of that airport." In short, the criterion is a round trip — the flight originates and concludes at the same location, without an intermediate stop, inside a 25-statute-mile radius.

The spot check of the recorded radar data was accordingly used to document flights meeting that geometry: departing 65NJ, operating without an intermediate stop, and returning to 65NJ. Both observed routes lie well inside the radius limit; the farthest point of either route is approximately eight statute miles from the heliport, against the 25-statute-mile ceiling. Note that this was a sampling of the data; the actual number of flights flown over the period in question was not calculated.

The nonstop, same-airport, 25-statute-mile geometry is the eligibility envelope for conducting a commercial air tour under Part 91; it is not by itself the test of whether a flight is a tour. That test, at 14 CFR §§ 110.2 and 136.1(d), asks whether the flight is conducted for compensation or hire and whether a purpose of the flight is sightseeing. The same round-trip geometry also appears in the aerial work exception at § 119.1(e)(4)(iii), which the FAA construes to require that such flights "depart and arrive at the same point" — which is precisely the characterization the operators of the 2018 accident flight advanced, and which the Chief Counsel rejected on those facts. What the observed geometry therefore establishes is that these flights sit squarely inside the operational profile of the Part 91 nonstop commercial air tour exception, and that if a purpose of them is sightseeing — as the marketing, per-seat pricing, and passenger evidence in Sections III and V.A indicates — the operator must hold either Part 135 commercial air tour authority or a § 91.147 LOA. The geometry narrows the lawful possibilities to two; the evidence of purpose resolves which one applies.

### B. Observed route structure

Two recurring route patterns were identified. The image below depicts two representative flight tracks that illustrate those patterns. The red flight track represents what may be characterized as the "long route," which was observed to be used consistently throughout the spot-check period. The blue flight track represents a

"short route," which was likewise observed repeatedly during the period reviewed.

Note: due to the nature of the playback software, the background is dark. The flight tracks are overlaid on the New York/New Jersey map with the heliport 65NJ on the left, Manhattan toward the right, and the tracks running up the East River, west into Central Park, and returning. The northernmost portion of the long route extends beyond the top of the captured view.




*Figure 1. Representative flight tracks, 65NJ, July 1–15, 2026. Red: the recurring "long route." Blue: the recurring "short route." Source: Vianair analysis of JETNET data. Presented as a demonstrative: the capture is cropped to the extent of the plotted tracks, and the track strokes are widened and color-saturated for legibility in print. Track geometry is unaltered. The unaltered source capture is retained and available at Exhibit D-5.*

## C. Findings

During the 15-day spot-check period, a total of 479 flights were identified as departing from and subsequently returning to 65NJ. Of those operations, 372 flights — approximately 78 percent — were conducted by Bell 206 JetRanger (B06) helicopters. These aircraft were observed departing 65NJ, flying one of the two recurring route patterns illustrated above, and subsequently returning to 65NJ.

The counting basis of the spot check differs from that of the primary dataset and is the more conservative of the two. Section II.C explains that each record in the JETNET dataset is a single flight operation — a takeoff or a landing. The 479 figure counts complete closed-loop circuits: a departure from 65NJ paired with a return to 65NJ. It therefore excludes point-to-point arrivals and departures altogether and represents a subset of total facility activity, not its total. The refreshed primary dataset now permits that reconciliation to be stated directly. Over the same July 1–15, 2026 window the primary dataset records 1,733 flight operations at 65NJ, of which 1,033 were flown by B06-type aircraft, 984 by FlyNYON, and 427 (24.6%) fell outside the represented hours. The 479 closed-loop circuits correspond to approximately 958 of those 1,733 operations, and the 372 B06 circuits to approximately 744 of the 1,033 B06 operations. The two counts are therefore consistent, and the spot check understates total facility activity by roughly a factor of two, exactly as its counting basis implies.

### D. Assessment

The repetitive nature of these flight tracks, their routing in relation to the New York City and Manhattan area, and the fact that the flights originate and terminate at the same heliport are consistent with operational patterns commonly associated with helicopter sightseeing or tour activity. In particular, the repeated use of substantially similar "long" and "short" routes suggests structured and recurring flight activity rather than flights conducted solely for point-to-point transportation. A charter or corporate operation carries a passenger from an origin to a destination; it does not fly the same two circuits over the same landmarks day after day and land where it started. A scheduled tour product does exactly that, and the existence of precisely two dominant route patterns is the signature of a published menu of tour options rather than of demand-driven point-to-point travel.

### E. Corroboration against the verified dataset

The Aloft Group cross-checked the spot check's aircraft-type finding against the verified October 2024 – August 16, 2026 dataset, and the two are mutually reinforcing. Across that window, 40,350 of 59,495 operations at 65NJ (67.8%) were flown by B06-type aircraft. FlyNYON's fleet at 65NJ is composed almost entirely of Bell 206L-3 and 206L-4 helicopters, which carry the B06 type designation: 96.4% of FlyNYON's 39,007 operations were B06, and FlyNYON accounted for 37,599 of the 40,350 B06 operations at the facility — 93.2% of all B06 activity. The second-largest B06 operator at 65NJ, New York Helicopters, conducted its last recorded operation on April 10, 2025, the date of the N216MH accident; excluding that operator, FlyNYON accounts for 97.2% of B06 activity in the verified window. It follows that the 372 B06 closed-loop circuits observed in July 2026 are, to a high degree of confidence, predominantly FlyNYON operations. The spot check thus provides route-geometry evidence for the same conclusion the operations dataset supports on volume and timing, and the refreshed dataset documents that pattern continuing through August 16, 2026 — approximately eleven months after the Town issued its zoning violation notice.

### F. Limitations

While flight-track data alone does not establish the commercial purpose of any individual flight, the frequency, routing, aircraft type, and recurring origin-and-destination pattern observed during this spot check provide a reasonable basis for concluding that these operations are consistent with the characteristics one would expect to observe in helicopter tour operations serving the New York City/Manhattan sightseeing market. The spot check is a fifteen-day sample and is not offered as a census; the ADS-B coverage and completeness limitations described in Section II.C apply to it as they do to the primary dataset, and they operate in the same direction — such limitations can cause activity to be missed, not invented.

## V. Findings That Span the Entire Record

### A. Allegation One — sightseeing tours: supported

In my professional opinion, helicopter sightseeing tours are being operated from HHI contrary to the representation on which the 2014 approval was based. That opinion is supported by independent, mutually corroborating strands of different character:

- the operator's own account of commencing paying passenger flights in November 2014;
- a decade of the operators' own marketing selling seats on named tour products departing Kearny;
- customer reviews and photographs on Google and TripAdvisor;

- ADS-B tracks showing tour-signature depart-and-return circuits;
- the July 2026 spot check (Section IV), which found 479 closed-loop circuits in fifteen days flying two recurring route patterns, 78% of them by the aircraft type that is overwhelmingly FlyNYON's at this facility;
- the FAA's determination that the FlyNYON-model accident flight was a commercial air tour;
- the NTSB's finding that the operators deliberately avoided tour terminology while conducting operations functionally resembling commercial tours; and
- the sheer scale of the activity — FlyNYON alone is roughly two-thirds of everything that moves at HHI.

No single strand carries the allegation alone; together they are, in my opinion, compelling.

I adopt Vianair's qualification that operator identity alone does not establish mission type, and that the 39,007-operation FlyNYON total necessarily includes some repositioning, maintenance, training, and other non-tour activity. That qualification should be embraced rather than resisted, because the allegation does not require that every FlyNYON operation be a tour. The representation was categorical — the facilities "would offer no helicopter tours" — so the allegation is established by proof that tours are offered and flown from HHI at all, and a fortiori by proof that they are the facility's dominant activity. The evidence of the latter is overwhelming; the mission-mix caveat goes only to the precision of the 65.6% figure as a measure of tour volume, not to whether tours are operated.

### B. Allegation Two — hours of operation: supported

As a factual matter, the data conclusively establishes that the facility operates substantially and persistently outside the hours Mr. Hyman represented: 14,172 of 59,495 operations (23.8%) across the window, in every month without exception, with no improvement — indeed the worst month, and the highest monthly volumes in the dataset — after formal notice. I independently reproduced these figures from the raw records, including the UTC-to-Eastern conversion across all daylight-saving transitions, and they are correct as computed against the represented seasonal windows.

Mr. Hyman's testimony was the required response to Comment No. 3 — the Board demanded operational hours, the applicant swore to them, and the Board accepted them in the resolution as satisfying the comment; an estimate given to satisfy a condition of discretionary approval is not thereby rendered meaningless. It also bears noting that the observed pattern is not the occasional late arrival that "estimated" hours might tolerate: nearly one operation in four falls outside the windows, FlyNYON advertises an 8 a.m.–11 p.m. operating day that is facially incompatible with the represented hours.

### C. Data verification, corrections, and methodology disclosures

Provenance of the flight data. The flight-data record before me proceeded in three stages. The compilation produced with the dossier as Exhibit D, covering October 2024 through April 24, 2026, was first spot-checked against JETNET source data, and the operations it recorded were plotted as flight tracks, to establish that the records described the operations they were represented to describe. At the request of counsel, a further JETNET extract was then requested and obtained to bring the dataset to a more current date; that extract, designated Exhibit D-3 and covering September 2024 (partial) through August 16, 2026, supersedes Exhibit D and is the dataset analyzed throughout this report. The Aloft Group then recomputed Exhibit D-3 from its raw records, as set out below, without reliance on any summary sheet, workbook, or compilation methodology furnished with either production. The ADS-B screenshots at Exhibit D-2 were captured from the originally produced spreadsheet; they illustrate the character and content of the individual records, and any record counts visible in them correspond to Exhibit D rather than to the refreshed dataset

and its figures.

The Aloft Group recomputed the full refreshed JETNET dataset (Exhibit D-3; 59,698 records as delivered, 59,495 within the analysis window) from the raw records, independently of the workbook's summary sheets and of any compilation methodology supplied with the original production: operator normalization, UTC-to-Eastern conversion from first principles using the IANA time-zone database, seasonal cutoff classification per the 2014 testimony, and monthly aggregation. The recomputation reproduces the workbook's outside-hours flag exactly (100% record-level agreement) and confirms the dossier's headline percentages. It also surfaced the following corrections and disclosures, each of which should be carried into the filing; none is material to the conclusions, and the counting corrections run modestly in the Town's favor:

**1.** The analysis window has been extended. The figures throughout this report now run October 1, 2024 through August 16, 2026 — 22 complete months plus the August 1–16, 2026 partial period, or 23 reporting periods — replacing the October 2024 – April 19, 2026 window used in earlier drafts. Every complete-month figure from October 2024 through March 2026 reproduces exactly against the earlier extract.

**2.** The refreshed JETNET extract contains five additional records inside the earlier October 2024 – April 19, 2026 window (46,011 operations against 46,006; FlyNYON 31,261 against 31,257; outside-hours 10,854 against 10,849). The differences are consistent with routine ADS-B backfill in the provider's dataset and are immaterial; the percentages are unchanged. Any earlier filing or exhibit quoting the 46,006 / 31,257 / 10,849 figures should be conformed to the current extract rather than reconciled record by record.

**3.** Each record is a takeoff or landing operation, not a flight; the dossier should say "flight operations" and note that sorties are approximately half the operations count (29,438 takeoffs; 30,057 landings).

**4.** New York Helicopters operations in the window total 1,648, all of them on or before April 10, 2025; the operator does not appear in the dataset after that date.

**5.** FlyNYON appears under two capitalization variants in the operator field ("FlyNYON," 37,094; "FLYNYON," 1,913); the 39,007 total correctly merges them, and the methodology section should disclose the normalization.

**6.** The post-notice outside-hours rate is 24.5%, whether measured over the ten complete months from October 2025 through July 2026 or extended through August 16, 2026; the 22.3% and 24.7% figures appearing in earlier summaries should be corrected.

**7.** The outside-hours classification treats an operation timed exactly at the seasonal cutoff (5:00:00 p.m. or 7:00:00 p.m. ET) as outside the represented hours. This convention reproduces the workbook's flag with 100% record-level agreement and should be disclosed rather than left implicit.

**D. The FAA correspondence: what it shows and what it does not**

The correspondence at Operations Attachment 14 comprises the April 27, 2018 memorandum from Lorelei D. Peter, Assistant Chief Counsel for Regulations (AGC-200, FAA Office of the Chief Counsel), prepared by Francisco E. Castillo, Attorney (AGC-220, Regulations Division, FAA Office of the Chief Counsel), to Jeffrey Guzzetti, Director, Accident Investigation Division (AVP-100, FAA Office of Accident Investigation and Prevention), responding to NTSB Information Request 18-102; and an April 11, 2019 e-mail from FAA Accident Investigation (AVP-100) to the NTSB Operational Factors Division (AS-30) responding to Request

19-078. The offices appearing in the correspondence are identified in full in Appendix C. This correspondence presents three questions:

**1. Is the FAA's concern solely the legal operation of the helicopters under Parts 91 and 135, with no interest in the zoning matter?** Yes. The memorandum is devoted entirely to a single question of federal operating rules: whether the March 11, 2018 flight could be conducted under Part 91 pursuant to a § 119.1(e) exception, or should have been conducted under Part 135. Its analysis runs exclusively through Parts 119, 91, 135, and 136 — the § 119.1(e)(7) helicopter exception (inapplicable; five paying passengers against a two-passenger limit), the aerial-work/aerial-photography exception (inapplicable to flights whose primary purpose is sightseeing, with "some indication" that this flight's primary purpose was sightseeing), the commercial air tour definition and its eight factors, and the Part 135 default. Neither document contains a single reference to land use, zoning, local approvals, heliport siting, or municipal authority. The FAA's interest, as reflected in this correspondence, begins and ends with which federal operating rules governed the flight.

**2. Does the correspondence indicate the FAA would move to prevent county or municipal zoning from stopping the helicopter operation?** No. Nothing in the correspondence asserts federal exclusivity over where a heliport may operate or the local conditions attached to its land use approval, and nothing in it suggests any FAA interest in intervening in such a matter. I note the limit of the inference: the correspondence is silent on zoning rather than affirmatively disclaiming interest, because the question was never before the Chief Counsel. But that silence sits alongside the FAA's long-published position that land use planning and zoning around aviation facilities are state and local responsibilities, and the correspondence supplies no support whatever for a claim that the FAA would act to shield this operation from local land use enforcement. The Town's theory — enforcement of the operator's own sworn land use representations — challenges no FAA airspace decision, route, or altitude.

**3. Does the correspondence indicate the FAA believes illegal flight operations may be involved, warranting FAA action beyond any zoning issue?** It indicates the framework under which that would be so, and it documents the FAA's rejection of the operating model's regulatory characterization on the facts before it. The Chief Counsel concluded that the accident flight could not have been operated under the § 119.1(e)(7) exception; that the aerial-photography exception "does not extend to operations in which the primary purpose is sightseeing"; and that the flight "would likely qualify as a commercial air tour, even though it was not conducted as such." The memorandum stopped short of a violation finding only for want of complete facts. The FAA's ultimate determination, reported in the April 2019 e-mail — reflecting the finding of the responsible Flight Standards District Office (FSDO), the local FAA office charged with operator oversight — was that the flight was operated as a commercial air tour under Liberty's § 91.147 LOA; that is, the FAA classified the flight by its character, not by the operator's "aerial photography" label. The NTSB went further in AAR-19/04, concluding that Liberty and NYONair deliberately exploited the aerial-photography exception to avoid the requirements and oversight applicable to commercial air tours.

**The authorization record: who held the required authority.** The Chief Counsel memorandum leaves no third path: a flight for compensation or hire whose character is sightseeing must be conducted either under a Part 119 certificate with commercial air tour authority in the operator's operations specifications (operating under Part 135), or under Part 91 within the § 119.1(e)(2) exception pursuant to a § 91.147 LOA — nonstop, departing and returning to the same airport, within 25 statute miles. The aerial-photography exception does not extend to flights whose primary purpose is sightseeing, and the § 119.1(e)(7) helicopter exception — capped at two passengers and six flights per calendar year — cannot support a commercial operation. An operator holding neither Part 135 air tour authority nor a § 91.147 LOA therefore has no lawful means of conducting the FlyNYON product.

The record documents that authority for exactly one operator. The memorandum's factual recitals state that Liberty Helicopters — the operator of the 2018 accident flight — held a Part 119 certificate, Part 135 common-carriage and commercial air tour authority per its operations specifications, and a § 91.147 LOA; the April 2019 e-mail confirms that "Liberty Helicopters was the holder of a Part 91 sightseeing (air tours) LOA" and that the FSDO determined the accident flight was conducted under that authority. The NTSB interview record corroborates this. By contrast, nothing in the record indicates that NYONair/FlyNYON held a § 91.147 LOA for its New York operation: the responsible FSDO inspector's stated understanding was that the FlyNYON flights were conducted under the § 119.1(e) aerial-photography exception — an arrangement he described as requiring no operating certificate, no LOA, and no surveillance basis — and NYONair's own Part 135 certificate was obtained for its Grand Canyon operation, where the 25-mile exception was unavailable. That asymmetry is the foundation of the NTSB's conclusion that Liberty and NYONair exploited the aerial-photography exception to avoid the oversight that attaches to commercial air tours conducted under Part 135 or under Part 91 with an air tour LOA.

The current operations data sharpens the point. Neither Liberty nor East West Helicopters — the two 2018-era operators the record shows holding air tour authority for New York operations — appears among the operators in the October 2024 – August 2026 dataset. FlyNYON's 39,007 operations are flown on Bell 206L-3 and 206L-4 helicopters registered to Meridian Helicopters LLC, GM Leasing Co. LLC, and NY ON AIR LLC — the same aircraft category NYONair historically operated itself under the aerial-photography characterization. In short: the one operator documented to hold the required authority is gone from HHI, while the operator for which no authority is documented remains and accounts for roughly two-thirds of the facility's activity. Whether FlyNYON's present flights are conducted under after-acquired Part 135 authority or a later-issued LOA cannot be determined from this record — which is precisely why the discovery and FOIA requests recommended below matter. One caution applies: the FAA's after-the-fact classification of the 2018 flight under Liberty's LOA shows the agency will classify an operation by its character, but such a classification cannot retroactively authorize an operator that holds no authority at all.

Two implications follow for this matter. First, the correspondence concerns a 2018 flight operated by Liberty; it does not adjudicate any current operation at HHI, and the current record before me does not establish under what authority — Part 135, § 91.147 LOA, or a continued aerial-photography characterization — FlyNYON's present flights from HHI are conducted. Second, and precisely because of that gap, the correspondence defines the test that current operations must meet: a flight whose character is sightseeing for compensation is a commercial air tour regardless of labeling, and if such flights are being conducted without Part 135 authority or a § 91.147 LOA, they would violate the federal operating rules independently of any zoning question — a matter within the FAA's enforcement jurisdiction, not the Town's. Whether FlyNYON's tours are federally authorized or not, they are helicopter tours operated from a facility whose approval rests on the sworn representation that there would be none.

**E. Federal funding status and curfew authority**

A related question was presented: whether HHI receives federal funding. Current FAA facility data records 65NJ as privately owned by Helo Holdings, Inc. and designated private use. Our searches of FAA grant materials and USAspending.gov surfaced no federal award to Helo Holdings, Inc. or to the facility. (The Joby Aviation electric air-taxi charger installed at HHI in 2024 was a private installation, not a federal award.) The facility is not federally funded, and no federal funding conditions attach to it.

That answers the funding question but not the question underneath it. The operative facts here are the operator's own. Mr. Hyman swore that the facilities would offer no helicopter tours, and he stated the hours he expected the facility to keep. The verified flight data establishes that commercial sightseeing tours are

the dominant activity at the facility and that 23.8% of all operations fall outside the hours he stated. The Town's enforcement action imposes no curfew and no noise restriction on anyone; it addresses conditions of a discretionary land use approval that the applicant itself proposed under oath.

**F. Clarifying terms and authorizations: "Fixed Base of Operations" vs. "Fixed Base Operator" — they are not the same**

Counsel asked whether "Fixed Base of Operations," the phrase appearing in the approval history, is a defined or regulated term, and how it relates to what was approved. It is worth answering with care, because the phrase used in the Kearny record and the term of art used in federal aviation practice are two different things, and neither of them describes a passenger sightseeing business.

Where the phrase came from. The term entered this record through the applicant, not the Board. The 2005 application (Exhibit A-5, Application No. 2515) describes its purpose as the construction of an office building, two buildings for hangars and a maintenance shop, a fueling area and a landing pad, all to be used in conjunction with the operations of a helicopter fixed base of operations — lower case, in the applicant's own description of the project. Testifying under oath for the applicant at the May 12, 2005 hearing, Mr. James Foster gave the Board an overview of the concept and explained the need as a facility that would provide a staging area for equipment and support closer than the facilities then providing that support. That sworn explanation is the source of the characterization used earlier in this report. The 2008 resolution (Exhibit A-4) does not use the phrase at all. The capitalized form, "Fixed Base of Operations," appears only afterward, in the HISTORY recitals of the 2009, 2012 and 2014 resolutions (Exhibits A-3, A-2 and A), in what is word for word the same recital sentence carried forward three times. The abbreviation "FBO" appears twice, both in the 2009 resolution.

What the federal term means. In federal aviation usage the term is Fixed-Base Operator, and it denotes a business, not a place. FAA Order 5190.6C, the Airport Compliance Manual, defines an FBO as a commercial entity providing multiple aeronautical services — fueling, maintenance, storage, ground and flight instruction — to the public. FAA Advisory Circular 150/5190-8, Minimum Standards for Commercial Aeronautical Activities, defines it as a commercial business granted the right by the airport sponsor to operate on an airport and provide aeronautical services. Two elements of those definitions do the work. The first is service to the public. The second is the grant of rights by an airport sponsor, which the same guidance defines as a public agency or the private owner of a public-use airport that applies to the FAA for financial assistance. Both presuppose a public-use airport.

FAA guidance distinguishes a public-use airport, available to the general public without prior approval of the owner, from a private-use airport, available only to the owner and to those the owner authorizes. Current FAA facility data records 65NJ as privately owned and designated private use. A facility cannot at the same time be restricted to owner-authorized users and be providing aeronautical services to the public. I note the limit of that observation: nothing in federal law prohibits a private-use facility from using the label, and the term appears nowhere in 14 CFR. It is not a certificate, a rating, or a regulated status. It is a description.

What an FBO does, and does not, do. The aeronautical services enumerated in the federal definitions are consistent and specific: fueling, hangaring, tie-down and parking, aircraft rental, aircraft maintenance, and flight instruction. Commercial passenger sightseeing is not among them. The FAA treats a commercial operator providing a single specialized service as a different category altogether — a Specialized Aviation Service Operator, addressed separately in FAA Order 5190.6C — and distinguishes that operator from a full-service fixed-base operator. An air tour operator conducting sightseeing flights for compensation is a specialized service operator in that framework. It is not an FBO by virtue of operating from one.

Two conclusions follow, and they run in the same direction. The phrase used in the 2005 approval describes a place — a base from which helicopters operate, explained under oath as a staging and support facility for equipment. The federal term describes a business that services other people's aircraft. Neither one encompasses the carriage of paying passengers on sightseeing flights. Whichever sense of the term is applied, the activity documented in this report is outside it.

A note on New Jersey law, and the limit of this report. New Jersey defines "fixed base operator" by statute at N.J.S.A. 6:1-21(j), and defines it as a person who holds out services to the public rather than as a category of facility. Separately, the State licenses aeronautical facilities and the activities conducted at them under N.J.A.C. 16:54, which defines an "aeronautical activity" to include sightseeing and attributes such activity to the licensed facility whether it is conducted by the licensee or by the licensee's tenants or invitees. That the State layer exists here is not speculative: Mr. Foster testified in 2005 that the facility had to be approved by the State of New Jersey as well as by the Federal Aviation Administration. I raise the point because it may bear on the question counsel asked, and I identify the authorities so they can be located. I express no opinion on their application. New Jersey aeronautical licensing was not within the scope of the engagement under which this report was prepared, and I have not examined the State licensing record for this facility.

## VI. Summary Finding

In my professional opinion, based on the documents reviewed and on The Aloft Group – Vianair independent verification of the underlying flight data: the record strongly supports the allegation that commercial helicopter sightseeing tours have been operated from HHI Heliport continuously since November 2014 and constitute the dominant activity at the facility, contrary to the sworn representation memorialized in ZBA Resolution 2014.14 that the facilities would offer no helicopter tours. The record likewise establishes as a matter of fact that the facility has operated substantially and persistently outside the hours represented in that same testimony — 23.8% of all verified flight operations across the 22-month-plus window ending August 16, 2026, in every month without exception, without improvement after formal notice of violation and at materially higher volumes in the summer of 2026 than in the summer of 2025. The FAA correspondence in the record is confined to the classification of flight operations under the federal operating rules; it expresses no interest in the zoning matter, provides no support for a claim that the FAA would act to prevent local land use enforcement, and — read with NTSB Report AAR-19/04 — documents a federal determination that the FlyNYON operating model, as marketed, is commercial air touring whatever label the operator applies to it. The July 2026 spot check confirms that the route structure and aircraft mix characteristic of tour operations were continuing at the facility, and the refreshed operations data documents that continuation through August 16, 2026. I hold each opinion stated here to a reasonable degree of professional certainty and reserve the right to supplement or amend should additional materials become available.

Respectfully submitted,

*Thomas Lintner*

---

**Thomas Lintner, FRAeS**
President & CEO | The Aloft Group, LLC, USA
Managing Director | Aloft Aviation Consulting, Ltd., Ireland
Fellow | Royal Aeronautical Society, London, England
Member | Flight Safety Foundation
Member | American Institute of Aeronautics and Astronautics
Member | Aviation Lawyers Association
+1.571.643.3313 (Intl Mobile)
The Aloft Group, LLC • 23650 Havelock Walk Terrace, Suite 401 • Ashburn, Virginia 20148 USA

Dated: 13 September 2026

## Appendix A. Verified Monthly Operations, HHI Heliport (65NJ), October 2024 – August 16, 2026

All figures independently recomputed by The Aloft Group from the raw records of the refreshed JETNET extract (Exhibit D-3, September 2024 (partial) through August 16, 2026). "Outside hours" applies the seasonal windows from the November 6, 2014 testimony (before 8:00 a.m. ET, or at or after 7:00 p.m. ET March–October / 5:00 p.m. ET November–February), with UTC timestamps converted to Eastern Time across all daylight-saving transitions in the window. Each operation is a takeoff or landing at 65NJ.

| Period | Season | Cutoff | Total ops | FlyNYON ops | Outside hours | % outside |
|---|---|---|---|---|---|---|
| October 2024 | Summer | 7:00 p.m. | 4,162 | 3,053 | 625 | 15.0% |
| November 2024 | Winter | 5:00 p.m. | 3,268 | 2,359 | 860 | 26.3% |
| December 2024 | Winter | 5:00 p.m. | 3,090 | 2,232 | 725 | 23.5% |
| January 2025 | Winter | 5:00 p.m. | 1,996 | 1,281 | 504 | 25.3% |
| February 2025 | Winter | 5:00 p.m. | 1,721 | 1,074 | 534 | 31.0% |
| March 2025 | Summer | 7:00 p.m. | 1,987 | 1,386 | 357 | 18.0% |
| April 2025 | Summer | 7:00 p.m. | 2,296 | 1,708 | 529 | 23.0% |
| May 2025 | Summer | 7:00 p.m. | 2,228 | 1,555 | 535 | 24.0% |
| June 2025 | Summer | 7:00 p.m. | 2,363 | 1,569 | 704 | 29.8% |
| July 2025 | Summer | 7:00 p.m. | 2,930 | 1,829 | 799 | 27.3% |
| August 2025 | Summer | 7:00 p.m. | 3,557 | 2,403 | 847 | 23.8% |
| September 2025 | Summer | 7:00 p.m. | 3,124 | 2,050 | 596 | 19.1% |
| October 2025 | Summer | 7:00 p.m. | 2,555 | 1,810 | 393 | 15.4% |
| November 2025 | Winter | 5:00 p.m. | 2,120 | 1,400 | 601 | 28.3% |
| December 2025 | Winter | 5:00 p.m. | 2,183 | 1,474 | 589 | 27.0% |
| January 2026 | Winter | 5:00 p.m. | 1,774 | 1,122 | 504 | 28.4% |
| February 2026 | Winter | 5:00 p.m. | 1,474 | 876 | 473 | 32.1% |
| March 2026 | Summer | 7:00 p.m. | 1,751 | 1,085 | 363 | 20.7% |
| April 2026 | Summer | 7:00 p.m. | 2,346 | 1,551 | 517 | 22.0% |
| May 2026 | Summer | 7:00 p.m. | 3,214 | 1,936 | 811 | 25.2% |
| June 2026 | Summer | 7:00 p.m. | 3,952 | 2,122 | 1,007 | 25.5% |
| July 2026 | Summer | 7:00 p.m. | 3,609 | 2,050 | 874 | 24.2% |
| August 1–16, 2026 | Summer | 7:00 p.m. | 1,795 | 1,082 | 425 | 23.7% |
| **TOTAL (23 periods)** | | | **59,495** | **39,007** | **14,172** | **23.8%** |

*Post-notice reference: October 2025 – July 2026 (ten complete months): 6,132 of 24,978 operations outside hours (24.5%); October 1, 2025 – August 16, 2026: 6,557 of 26,773 (24.5%). Zoning violation ZV-25-00064 issued September 17, 2025. Prior-window reconciliation: the October 1, 2024 – April 19, 2026 window used in earlier drafts recomputes on the refreshed extract as 46,011 operations, 31,261 FlyNYON, and 10,854 outside hours (23.6%), against 46,006 / 31,257 / 10,849 previously; every complete-month figure from October 2024 through March 2026 is unchanged.*

## Appendix B. Materials Reviewed

- HHI Evidentiary Dossier v4 (September 2026), with Exhibits A, A-1 through A-5, B, B-1, C, C-1, C-2, D, D-1, D-2, and E
- Memorialized ZBA Resolutions: Application Nos. 2515 (2005), 2814 (2008), 2912 (2009), 2012.19 (2012), 2014.14 (2014) (Exhibits A-5, A-4, A-3, A-2, A)
- Neglia Engineering Associates Site Plan Review Letter, July 9, 2014, revised October 21, 2014 (Exhibit A-1)
- NTSB ERA18MA099 Operations Group Factual Report, Attachment 1 — Interview Summaries (recorded investigative interviews of Patrick Day, Jr. and NYONair staff)
- NTSB Aircraft Accident Report AAR-19/04, Capsized and Sank, East River, New York City, March 11, 2018 (Exhibit B-1 excerpts and full report)
- FAA Office of the Chief Counsel memorandum, April 27, 2018 (Peter/Castillo, AGC-200/AGC-220), and FAA AVP-100 e-mail of April 11, 2019 (Operations Attachment 14 — FAA Legal Interpretation)
- JETNET flight-data export, FAA identifier 65NJ, October 2024 through April 24, 2026 (Exhibit D, as produced with the dossier), with summary workbook (Exhibit D-1) and ADS-B screenshots (Exhibit D-2)
- JETNET flight-data export, FAA identifier 65NJ, September 2024 (partial) through August 16, 2026 (Exhibit D-3, refreshed extract obtained at the request of counsel; raw records independently recomputed) — the dataset analyzed throughout this report
- Exhibit C — online tour evidence: archived FlyNYON and New York Helicopter website captures (Wayback Machine), Google business listings and reviews, TripAdvisor entries, 2016–2026; FlyNYON "About Us" capture (750,000+ passengers)
- Town of Kearny Zoning Violation ZV-25-00064, September 17, 2025 (Exhibit E)
- Vianair, Evidentiary Assessment — Summary and Opinion Regarding the Veracity of Claims in the HHI Evidentiary Dossier, August 3, 2026, and companion tasking annotations
- Vianair, Spot Check of Helicopter Flight Operations, 65NJ, July 1–15, 2026 — JETNET extract (Exhibit D-4), route-pattern analysis, and representative flight-track imagery (Exhibit D-5) (Section IV; Figure 1)
- 14 CFR Parts 91, 110, 119, 135, and 136 (referenced provisions); National Air Tour Safety Standards Final Rule, 72 Fed. Reg. 6894 (Feb. 13, 2007) (as cited in the FAA memorandum)

## Appendix C. Glossary and Cited Authorities

### C.1 Acronyms and abbreviations

| Term | Meaning |
|---|---|
| ADS-B | Automatic Dependent Surveillance–Broadcast (aircraft surveillance transmission on which the JETNET/ADS-B Exchange data is based) |
| AIP | Airport Improvement Program (FAA airport grant program; public-use, NPIAS-listed facilities only) |
| ANCA | Airport Noise and Capacity Act of 1990, 49 U.S.C. §§ 47521–47534 |
| ATC | Air Traffic Control |
| B06 | ICAO aircraft type designator for the Bell 206 JetRanger series, including the 206L-3 and 206L-4 LongRanger variants that comprise FlyNYON's fleet at 65NJ |

| | |
|---|---|
| CFR | Code of Federal Regulations (14 CFR contains the Federal Aviation Regulations, "FARs") |
| DST | Daylight Saving Time |
| ET / EDT / EST | Eastern Time / Eastern Daylight Time / Eastern Standard Time |
| FAA | Federal Aviation Administration |
| FOIA | Freedom of Information Act |
| FRAeS | Fellow of the Royal Aeronautical Society |
| HHI | Helo Holdings, Inc. |
| JETNET | JETNET LLC, commercial aviation data provider; owner and operator of ADS-B Exchange |
| LADD | Limiting Aircraft Data Displayed (FAA program under which operators request suppression from public flight-tracking services) |
| LOA | Letter of Authorization (here, issued by the FAA under 14 CFR § 91.147) |
| NPIAS | National Plan of Integrated Airport Systems (FAA inventory of airports eligible for AIP funding) |
| NTSB | National Transportation Safety Board |
| N.J.S.A. | New Jersey Statutes Annotated |
| OPRA | Open Public Records Act (New Jersey) |
| SKI-S | South Kearny Industrial – South zoning district, Town of Kearny |
| UTC | Coordinated Universal Time |
| ZBA | Zoning Board of Adjustment (Town of Kearny) |

### C.2 FAA and NTSB offices referenced in the correspondence

| Office | Title and role |
|---|---|
| AGC-200 | Assistant Chief Counsel for Regulations, FAA Office of the Chief Counsel (author of the April 27, 2018 memorandum) |
| **Office** | **Title and role** |
| AGC-220 | Regulations Division, FAA Office of the Chief Counsel (preparing attorney) |
| AVP-100 | Accident Investigation Division, FAA Office of Accident Investigation and Prevention (memorandum addressee; author of the April 11, 2019 e-mail) |
| FSDO | Flight Standards District Office — the local FAA Flight Standards office responsible for certificate oversight and surveillance of an operator; the FSDO made the determination that the accident flight was conducted under the operator's air tour LOA |
| AS-30 | Operational Factors Division, NTSB Office of Aviation Safety (originator of the information requests to the FAA) |

### C.3 Regulations, statutes, and ordinances cited

| Citation | Full title / subject |
|---|---|
| 14 CFR Part 91 | General Operating and Flight Rules |
| 14 CFR § 91.147 | Passenger Carrying Flights for Compensation or Hire (basis for the Letter of Authorization under which nonstop commercial air tours may be flown under Part 91) |
| 14 CFR § 110.2 | Part 110, General Requirements — Definitions (defines "commercial air tour") |

| | |
|---|---|
| 14 CFR Part 119 | Certification: Air Carriers and Commercial Operators |
| 14 CFR § 119.1(e) | Applicability exceptions to Part 119 certification, including (e)(2) nonstop commercial air tours conducted within 25 statute miles under a § 91.147 LOA; (e)(4)(iii) aerial work operations — aerial photography or survey; and (e)(7) certain helicopter flights within a 25-statute-mile radius (two-passenger limit, six flights per year, among other conditions) |
| 14 CFR Part 121 | Operating Requirements: Domestic, Flag, and Supplemental Operations (referenced as an alternative certificate-holder operating regime) |
| 14 CFR Part 135 | Operating Requirements: Commuter and On Demand Operations and Rules Governing Persons On Board Such Aircraft |
| 14 CFR Part 136 / § 136.1(d) | Commercial Air Tours and National Parks Air Tour Management; § 136.1(d) defines "commercial air tour" and lists the factors the FAA may consider |
| N.J.S.A. 40:55D-1 et seq. | New Jersey Municipal Land Use Law (including § 40:55D-2, purposes; § 40:55D-70, powers of the board of adjustment / variances) |
| Kearny Zoning Ordinance § 38-4.3 | General Use Restriction — any use not specifically designated as a principal permitted, accessory, or conditional use is specifically prohibited (basis of the General Use Restriction Variance) |
| Kearny Ordinance § 36-9.9(d) | Revocation of Building Permit or Certificate of Occupancy — enforcement provision cited in zoning violation ZV-25-00064 |
| 72 Fed. Reg. 6894 (Feb. 13, 2007) | National Air Tour Safety Standards, Final Rule (source of the FAA's "overall character of the flight" and "experience flights" analysis quoted in the Chief Counsel memorandum) |
| FAA Order 5190.6C | Airport Compliance Manual (Feb. 20, 2026) — definition of Fixed-Base Operator; Specialized Aviation Service Operators |
| FAA AC 150/5190-8 | Minimum Standards for Commercial Aeronautical Activities (Dec. 7, 2023) — definitions of Fixed-Base Operator, aeronautical activity, airport sponsor, public-use airport |
| N.J.S.A. 6:1-21(j) | New Jersey Aeronautics — statutory definition of "fixed base operator" (cited for identification only; not analyzed) |
| N.J.A.C. 16:54 | New Jersey aeronautical facility licensing — definition of "aeronautical activity" (cited for identification only; not analyzed) |

## Appendix D. Curricula Vitae of the Preparers

### Thomas M. Lintner, FRAeS

*Principal, The Aloft Group, LLC / Aloft Aviation Consulting, Ltd • Ashburn, Virginia USA and Dalkey, Co. Dublin, Ireland*

*Air Traffic Control and General Aviation Flight Operations • Airline Transport Pilot • FAA Air Traffic Control Specialist • Thirty-Year FAA Veteran*

**SUMMARY**

- Aviation safety and air traffic control professional with more than fifty years of experience spanning the Federal Aviation Administration, interagency and national defense assignments, and private consulting.
- Thirty-year FAA veteran; served as Manager of the Air Traffic Investigations Division and in senior air traffic oversight roles.
- Led or participated in the air traffic investigation of more than two dozen major accidents and operational incidents.
- Holds the uncommon combination of an Airline Transport Pilot certificate, multiple flight instructor ratings, and an FAA Air Traffic Control Specialist certificate (control tower and radar approach control), permitting evaluation of accident and incident causation from both the cockpit and the controller position.
- Has provided expert analysis and testimony in aviation litigation for the U.S. Department of Justice, the FAA Office of the Chief Counsel, EUROCONTROL, and private parties on both the plaintiff and the defense side.
- Fellow of the Royal Aeronautical Society (FRAeS); dual citizen of the United States and Ireland.
- Principal, The Aloft Group, LLC and Aloft Aviation Consulting, Ltd, providing technical expertise for aviation litigation matters.

**AREAS OF EXPERT ANALYSIS AND TESTIMONY**

- Air traffic control operations, procedures, and phraseology (FAA Orders JO 7110.65, JO 7210.3, and 8020.11).
- General aviation flight operations, airmanship, and pilot decision-making.
- Aircraft accident and incident investigation and reconstruction analysis.
- Controller–pilot communications and human factors.
- Runway safety, runway incursions, and airport surface (ground) operations.
- Separation standards, radar control, sequencing, and traffic management.
- Terminal and approach control procedures (SOIA, PRM, LAHSO).
- TCAS/ACAS resolution advisories and collision avoidance.
- Emergency and abnormal situation handling by air traffic control.
- Federal Aviation Regulations (14 CFR) applicable to pilots and controllers.
- Standard-of-care analysis for air traffic controllers and pilots.
- Safety Management Systems (SMS) and Just Culture principles.

**CERTIFICATES AND RATINGS**

- Airline Transport Pilot — Airplane Single- and Multi-Engine Land.
- Certified Flight Instructor (CFI) — Airplane Single- and Multi-Engine Land; Instrument Airplane.
- Advanced Ground Instructor (AGI) and Instrument Ground Instructor (IGI).
- Aircraft Dispatcher — Turbojet.
- FAA Air Traffic Control Specialist — Control Tower Operator (Terminal) and Approach Control (Radar); certificated at LaGuardia Tower and New York Terminal Radar Approach Control (TRACON).

- FAA Remote Pilot — Small Unmanned Aircraft Systems (14 CFR Part 107).
- Former U.S. Coast Guard Ocean Operator (Master / Captain's License) — Atlantic waters.
- Approximately 3,000 hours flight time; last flight February 2024.

**PROFESSIONAL EXPERIENCE**

*Air Experts Consulting / The Aloft Group, LLC / Aloft Aviation Consulting, Ltd — Founder, President & CEO | 2006–Present | Ashburn, Virginia and Dalkey, Ireland*

- Provides air traffic control and aviation operations expert analysis, reports, and testimony in U.S. and international accident and incident litigation for government, plaintiff, and defense clients.
- Lead instructor for the EUROCONTROL Prosecutor Expert Course, conducted twice yearly for the past fourteen years, specializing in the forensic analysis of aviation accidents and incidents for a mixed audience of European Union state prosecutors, airline pilots, and air traffic controllers; founding contributor to EUROCONTROL Just Culture efforts.
- Lead instructor for aviation investigations courses developed and delivered for an aviation maintenance organization and a corporate flight operations organization, training technical and operational personnel in the investigation of accidents and incidents.
- Advises airlines, air navigation service providers, and airport ground-services firms on Safety Management System enhancement, investigation practice, and data analysis.
- Assembled and led a multidisciplinary team that analyzed national FIR airspace in the Middle East and developed an ICAO Proposal for Amendment, ultimately approved by the ICAO Council in 2022.
- Built an international network of partner firms and a university internship program for aeronautical engineering students.

*U.S. Federal Aviation Administration — Air Traffic Controller to Senior Headquarters Executive | 1979–2009 | National and International*

- Began a thirty-year FAA career as an air traffic controller at New York's LaGuardia Airport (controller, supervisory, and training-specialist positions), then radar controller and traffic management specialist at the New York TRACON, followed by the Eastern Region (New York) Regional Quality Assurance Office.
- Operations Manager and acting Deputy Manager at Washington Dulles International Airport.
- Manager, Air Traffic Investigations Division — directed air traffic investigations of major accidents and operational incidents and provided investigatory support to the U.S. Secret Service, the Federal Bureau of Investigation, and Senate and House aviation subcommittees.
- Manager, Air Traffic Terminal Procedures Branch, and Special Assistant to the Associate Administrator for Air Traffic; managed and interpreted key ATC requirements documents (FAA Orders 7110.65, 7210.3, and 8020.11).
- Initiated Simultaneous Offset Instrument Approach (SOIA) procedures at San Francisco; perfected precision runway monitor (PRM) approaches; managed development of simultaneous-runway (LAHSO) procedures; oversaw North Pacific route development and airspace analysis for simultaneous operations at Dallas–Fort Worth.
- Member of the initial TCAS development team; briefed government and industry leaders on aircraft collision avoidance (TCAS/ACAS).
- Interagency and national defense assignments: following September 11, 2001, served as FAA liaison to the North American Aerospace Defense Command (Southeast Air Defense Sector, Tyndall Air Force Base) and to the Department of Homeland Security, and as a member of the U.S. National Emergency Management Team for Continuity of Operations and Continuity of Government missions (TS-SCI).
- Developed, with EUROCONTROL, Imperial College London, regulators, airlines, and air navigation service providers, the Aerospace Performance Factor (APF) methodology for measuring system-wide organizational safety and performance.

*Prior flight instruction and operations — selected earlier aviation roles*

- Chief Instructor, Pan Am World Services.
- Instructor, FlightSafety International — Falcon Jet Center.
- Flight Instructor, Atlantic Airways, Leesburg, Virginia.

**EXPERT WITNESS AND LITIGATION SUPPORT**

*Retained as an air traffic control and aviation operations expert for government, plaintiff, and defense interests in U.S. and international matters. Representative engagements:*

- Warrington, et al. v. Watkins & Eager, PLLC, et al. — air traffic control expert (general aviation accident; NTSB ERA16FA289), Lafayette County Chancery Court, Mississippi, 2025–present.
- Peckham, et al. v. United States (N111SC) — U.S. Department of Justice, 2011.
- Maryland State Police "Trooper 2" medevac helicopter crash — plaintiff, 2012.
- TAROM Boeing 737 (YR-BGC) accident, Bucharest, Romania — negligence analysis under contract to EUROCONTROL, Brussels, 2012.
- BBA Aviation ramp fatality, Boston, Massachusetts — fatal ground-vehicle / ramp accident, 2013.
- Ow v. Port of Oakland — airport ground-vehicle injury, 2015.
- Donovan v. Loree — midair collision (all fatal), Court of Queen's Bench, Alberta, Canada, 2016.
- John F. Kennedy International Airport multi-party ground collision — ramp collision with damages exceeding $20 million, 2021.

**FAA ACCIDENT AND INCIDENT INVESTIGATIONS (REPRESENTATIVE)**

*Partial list of investigations supervised or conducted as Manager, FAA Air Traffic Investigations Division, Office of System Effectiveness:*

- Lear 35A, N535PC — accident (3 fatal), Aspen, Colorado, 2/13/91.
- Runway incursion: Southwest 659 (B-737) and Cessna 172 N12809, Runway 31C, Chicago Midway, 4/18/91.
- L'Express 508 (Beechcraft C99) — accident (13 fatal), Birmingham, Alabama, 7/10/91.
- Canair Cargo 401 (Convair 580) — accident (2 fatal), near Belvidere/Waterville, Vermont, 9/18/91.
- Surface collision: American 826 (MD-80) and Continental 554 (B-737-200), taxiways Kilo/Romeo, Newark, New Jersey, 10/16/91.
- CommutAir 821 (Beechcraft 1900) — accident (2 fatal), near Saranac Lake, New York, 1/3/92.
- Possible near midair collision: USAir 2251 (B-737) and VARIG 830 (B-747), Runway 24R, Los Angeles, California, 2/23/92.
- USAir 405 (Fokker F28) — accident (27 fatal), LaGuardia Airport, Flushing, New York, 3/22/92.
- Trans World 843 (Lockheed L-1011) — accident (no fatalities), JFK Airport, Jamaica, New York, 7/30/92.
- Alpine Air 305 (Piper Cheyenne) — accident (3 fatal), approach to Walker Field, Grand Junction, Colorado, 10/31/92.
- Continental 1080 (B-727) TCAS resolution advisory against NASA 920 (T-38) — incident (1 serious), Gulf of Mexico, 3/9/93.
- FedEx 943 (B-727) landing over FedEx 314 (B-727), Runway 4L, Newark, New Jersey, 3/22/93.
- Piper Comanche N6884P — accident (2 fatal), near Lake Arrowhead, California, 4/23/93.
- GP Express training flight N115GP (Beechcraft 99) — accident (2 fatal), near Grand Island, Nebraska, 4/28/93.
- Beech Sierra N824V — accident (2 fatal), near Manassas Airport, Manassas, Virginia, 6/7/93.
- United 964 (B-747-123) hard landing — incident (no injuries), Washington Dulles International Airport, Herndon, Virginia, 6/22/93.
- Piper Lance N2207B — accident (2 fatal), north of Marshall, Virginia, 9/10/93.
- Beechcraft 300F N82 — accident (3 fatal), near Front Royal, Virginia, 10/26/93.
- Simmons 3641 (SAAB 340) dual-engine-failure forced landing — accident (no fatalities), New Roads, Louisiana, 2/1/94.

- Cessna 401 N4071Q — accident (4 fatal), Minot, North Dakota, 2/24/94.
- Bell 412 N70AM — accident (4 fatal), Bluefield, West Virginia, 4/22/94.
- Beechcraft 36 N1525G — accident (2 fatal), Brainerd, Minnesota, 6/17/94.
- Cessna 150L N1405Q — accident (1 fatal), crashed into the White House, Washington, D.C., 9/12/94.
- Simmons 4184 (ATR-72) — accident (68 fatal), Roselawn, Indiana, 10/31/94.
- Beechcraft 36 N3086T — accident (1 fatal), Atlanta, Georgia, 1/29/95.
- Taxiway collision: Southwest 5 (B-737) and Raven Air 31 (Cessna 401), Dallas Love Field, Texas, 7/28/95.
- Cessna 172 N2456U — accident (2 fatal), Gainesville, Florida, 3/1/96.
- ValuJet 592 (McDonnell Douglas DC-9) — accident (110 fatal), Everglades near Miami, Florida, 5/11/96.
- TWA 800 (B-747-100) — accident (230 fatal), offshore of Long Island, New York, 7/17/96.
- Piper PA-32 N2881W — accident (3 fatal), Brandywine, Maryland, 10/2/96.
- Airborne Express 343 (DC-8) loss of directional control on takeoff — incident, Orlando, Florida, 12/31/96.
- Nations Air 70 (B-727) and SMASH11 (two F-16s) TCAS evasive maneuver — incident, Warning Area 107 off Atlantic City, New Jersey, 2/5/97.
- Cessna Citation C650 N553AC in-flight fire — accident (no injuries), Buffalo, New York, 4/3/97.

**EDUCATION**

- B.B.A., Dowling College, Oakdale, New York.
- Master's-level program (Cost Accounting), Kellogg Graduate School of Management, Northwestern University.
- Microsoft Certified Professional (MCP), University of Phoenix.

**PROFESSIONAL TRAINING AND CERTIFICATIONS**

- Basic Aircraft Accident Investigation (Course 00035) — U.S. DOT Transportation Safety Institute, Oklahoma City, Oklahoma, August 2004.
- Practical System Safety Course — Southern California Safety Institute, Arlington, Virginia, October 2004.
- International Civil Aviation Organization Safety Oversight Auditor — ICAO Universal Safety Oversight Audit Programme (USOAP), Washington, D.C., July 2005.
- EUROCONTROL Safety Regulatory Auditor (Stages 1–3) — EUROCONTROL Institute of Air Navigation Services (IANS), Luxembourg, 2005–2006; European Union / EUROCONTROL Safety Auditor.
- Part 107 Small UAS for Part 61 Pilots (FAASTeam Course ALC-451) — FAA Safety Team, January 2024.
- Flight Instructor Refresher Course (eFIRC) — AOPA Air Safety Institute; recurrent CFI currency (2022, 2024, 2026).

**PROFESSIONAL AFFILIATIONS**

- Fellow, Royal Aeronautical Society (FRAeS), London.
- Member, American Institute of Aeronautics and Astronautics (AIAA).
- Member, Flight Safety Foundation.
- Member, International Society of Air Safety Investigators (ISASI).
- Member, Aviation Lawyers Association.
- Member, Aircraft Owners and Pilots Association (AOPA).
- Member, Experimental Aircraft Association (EAA).

**PUBLICATIONS (PREVIOUS TEN YEARS)**

- "Aviation's Inconvenient Truth" (2024).

- "Implementing a Just Culture: Simple But Complex" (2023).

**SELECTED EARLIER PUBLICATIONS**

- "Just Culture — An Evolutionary Journey in Aviation Safety," Lintner, T.M. (2014).
- "The Measurement of System-Wide Safety Performance in Aviation: Three Case Studies in the Development of the Aerospace Performance Factor," Flight Safety Foundation International Conference, Beijing (2009).
- "Demystifying ATM Safety Key Performance Indicators," Licu and Lintner, AIRPORT, Vol. 2, Sovereign Publications, London (2009).
- "The Aerospace Performance Factor … Analytic Hierarchy Process," Lintner and Smurthwaite, 10th International Symposium on the Analytic Hierarchy Process, University of Pittsburgh (2009).
- "Anatomy of a Runway Incursion," AOPA ePilot (2009).
- "Runway Safety as a Function of Time," AOPA ePilot (2009).

## James K. Allerdice Jr.

*Chief of Consulting Operations and Board of Directors, Vianair, Inc. • Senoia, Georgia USA*

**SUMMARY**

- United States Air Force air traffic controller; more than three decades with the Federal Aviation Administration in air traffic control, operations support, performance-based navigation, safety risk management, and air traffic facility management and supervision.
- Internationally recognized expert in the development and implementation of Next Generation (NextGen) air traffic control initiatives involving performance-based navigation (PBN).
- Winner of the Secretary of Transportation's Excellence Award (2012) for outstanding service to the American people.
- Retired member and leader in the National Air Traffic Controllers Association (NATCA), including Chairman of the National Safety Committee and President of the Atlanta TRACON Local.
- Chief Consultant for Terminal Operations and Managing Partner, ABCx2, LLC (2015–2020); Chief of Consulting Operations and Board of Directors, Vianair, Inc. (2021–present).

**CERTIFICATES AND RATINGS**

- Certified FAA Safety Management System (SMS) Practitioner and Facilitator.
- Private Pilot (since 1977); instrument training in progress.

**EXPERIENCE**

- United States Air Force — Staff Sergeant; Air Traffic Controller, Training Instructor, and Supervisor (1980–1983; honorable discharge).
- FAA Air Traffic Control Specialist — Mike Monroney Aeronautical Center (1983–1984); New Orleans International Airport (1984–1988, including Front Line Manager detail); Front Line Manager, Lansing Capital Region International Airport (1988–1990); Air Traffic Manager, Jackson County–Reynolds Field (1990–1991).
- FAA Air Traffic Control Specialist — Hartsfield-Jackson Atlanta International Airport (1991–2002); Atlanta TRACON (2002–2005).
- Operations/NextGen Support Specialist, Atlanta TRACON (2005–2014) — project lead for equivalent lateral spacing operations (ELSO), RNAV reduced-divergence standard instrument departures, established-on-departure operations, optimized profile descent arrivals, and RNP procedures.
- Chief Consultant for Terminal Operations and Managing Partner, ABCx2, LLC (2015–2020).
- Chief of Consulting Operations and Board of Directors, Vianair, Inc. (2021–present).

**SKILLS AND WORKING KNOWLEDGE**

- Terminal Area Route Generation Evaluation & Traffic Simulation (TARGETS) software; Vianair Airspace Information Management (AIM) software; Performance Data Analysis and Reporting System (PDARS).
- FAA Order JO 7110.65 (Air Traffic Control) and FAA Order JO 7210.3 (Facility Operation and Administration); Safety Risk Management Documents, orders, notices, and technical papers.

**SELECTED AWARDS**

- Secretary of Transportation's Excellence Award (2012) — performance-based navigation, environmental stewardship, and fiscal responsibility.
- Performance Based Navigation Award (2014) — Established on RNP (EoR) program.
- Special National Air Traffic Award for Outstanding Service — Olympic Games (1996).
- Best Performance Based Navigation Paper in Session, Integrated Communications Navigation and Surveillance (ICNS) Conference (2015).

**PUBLICATIONS**

- (Co-author) "Development and Operational Transition of the First PBN-Enabled Departure Separation Standard," ICNS Conference, April 2015 (Best PBN Paper in Session).
- (Co-author) "Concept and Benefits of PBN-Enabled Parallel Approach Operations," AIAA Aviation Forum and Exposition, June 2015.